**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

RENEE GALLOWAY, DIANNE TURNER,
DOMINIQUE DE LA BAY, LORI
FITZGERALD, ANDREA SCARBOROUGH,
EARL BROWNE, ROSE MARIE BUCHERT,
REGINA NOLTE, KEVIN MINOR, TERESA
TITUS, BURRY POUGH, LISA MARTINEZ,
SONJI GRANDY, ANASTASIA SHERMAN,
JERRY AVENT, LUCINDA GRAY,
ANTHONY GREEN, LINDA MADISON,
DEREK GETER, KEISHA HAMM, FAITH
THOMAS, SHARON PAAVO, and
LATANYA TARLETON, as individuals and
as representatives of the classes,

        Plaintiffs,

    v.

JUSTIN MARTORELLO, BRIAN
MCFADDEN, JAMES DOWD, SIMON
LIANG, EVENTIDE CREDIT
ACQUISITIONS, LLC, REBECCA
MARTORELLO, BRIAN JEDWAB,
AMLAUR RESOURCES, COLUMBIA PIPE
& SUPPLY CO., TIMOTHY ARENBERG,
TERRANCE ARENBERG, DTA TRINITY
WEALTH TRANSFER TRUST, DMA
TRINITY WEALTH TRANSFER TRUST,
JEREMY DAVIS, KAIROS HOLDINGS,
LLC, BREAKWATER HOLDINGS, LLC,
GALLANT CAPITAL, LLC, LIONT, LLC,
and BLUETECH IRREVOCABLE TRUST.

        Defendants.

Case No. 3:19-cv-314

**JURY TRIAL
DEMANDED**

## CLASS ACTION COMPLAINT

COME NOW Plaintiffs, Renee Galloway, Dianne Turner, Dominique de la Bay, Lori

Fitzgerald, Andrea Scarborough, Earl Browne, Rose Marie Buchert, Regina Nolte, Teresa Titus,

Kevin Minor, Burry Pough, Lisa Martinez, Sonji Grandy, Anastasia Sherman, Jerry Avent, Lucinda Gray, Anthony Green, Linda Madison, Derek Geter, Keisha Hamm, Faith Thomas, Sharon Paavo, and Latanya Tarleton, *on behalf of themselves and all individuals similarly situated* ("Plaintiffs"), by counsel, and for their Class Action Complaint against Defendants, allege as follows:

## GENERAL ALLEGATIONS

1.      This is a case about a scheme to make online usurious short-term loans (commonly called "payday loans"). These loans carry triple-digit interest rates, often exceeding 400%, and are illegal.

2.      Payday loans target vulnerable borrowers and, left unregulated, can economically devastate borrowers and their communities. Consumers often renew the loans or take out new loans when they are unable to pay their original loans off, creating a cycle of mounting debt.

3.      In recent years, payday lenders have concocted various schemes to make high-interest loans over the internet while avoiding state usury laws.

4.      In one scheme—the so-called "rent-a-bank" strategy—payday lenders convinced banks headquartered in states with high (or nonexistent) usury limits to form a lending venture in order to capitalize on the fact that the bank was obligated to comply only with the usury law of its home state, even for loans made elsewhere.

5.      Federal banking regulators shut down these "rent-a-bank" schemes. Michael A. Stegman, *Payday Lending*, 21 JOURNAL OF ECONOMIC PERSPECTIVES 169, 178-79 (2007) (describing rent-a-bank scheme and regulatory reaction).

6.      Some payday lenders have since developed a new method to attempt to avoid state usury laws—the "rent-a-tribe" scheme.

7.      In a rent-a-tribe scheme, the payday lender—which does most of its lending over the internet—affiliates with a Native American tribe to attempt to insulate itself from federal and state law by piggy-backing on the tribe's sovereign legal status and its general immunity from suit under federal and state laws. Using this doctrine, lenders argue that because their businesses are located on a Native American reservation or affiliated with a Native American tribe, they are bound by the laws of that reservation or tribe only, not federal or state law. *See* Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 WASH. & LEE L. REV. 751, 759 (2012).

8.      Like its predecessor, this scheme is doomed to fail, because even a cursory examination of the underlying relationship between the payday lender and the tribe demonstrates that the relationship is insufficient to permit the lender to avail itself of the tribe's immunity.

9.      Rent-a-tribe schemes are not designed to promote tribal business but instead are contrivances aimed at avoiding state and federal law, with the vast majority of the revenues going to non-tribal entities.

10.     In recent years, these rent-a-tribe schemes have come under increasing scrutiny from courts and regulators. Two prominent perpetrators were recently convicted and sentenced to prison for their roles.[1]

11.     This case is about one such rent-a-tribe scheme. This case involves a rent-a-tribe enterprise created and operated by Matt Martorello ("Matt Martorello")—a Chicago entrepreneur

---

[1] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; The United States Attorney's Office, Eastern District of Pennsylvania, *Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case*, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

with no lineage to the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("LVD"). Beginning in 2011, the enterprise made high-interest loans to consumers in the name of Duck Creek Financial, LLC ("Duck Creek") and Red Rock Tribal Lending, LLC ("Red Rock")—two entities formed under the laws of the LVD for the dual purpose of avoiding state and federal laws and concealing the role of Matt Martorello's companies. Although Duck Creek and Red Rock were held out as the actual lender of the internet loans, the LVD and Red Rock had minimal involvement in the operations and received a mere 2% of the net profits from the loans. On the other hand, Martorello's companies, namely SourcePoint VI, Bellicose VI, and their parent companies, reaped nearly all the profits; provided the infrastructure to market, fund, and collect the loans; and controlled the day-to-day operations of the lending enterprise.

12.     Two years into its operation, regulators caught on to Red Rock's illegal loan products, starting with the New York Department of Financial Services issuing a cease and desist to Red Rock warning it to stop offering its illegal credit products to New York consumers. *Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013). In response, Red Rock and Martorello did not shut down the enterprise. Rather, Red Rock filed a lawsuit in August 2013, seeking declaratory relief and a preliminary injunction that tribal businesses were inherently sovereign nations and not subject to New York law. *Id.*

13.     The lawsuit completely backfired—the district court not only denied Red Rock's motion for a preliminary injunction, its decision jeopardized the entire business model. Most notably, in an opinion published on September 30, 2013, the district court found that Red Rock was "subject to the State's non-discriminatory anti-usury laws" because the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands." *Id.* at 361.

14.	In an attempt to continue the illegal enterprise, Defendants restructured the entire lending operation, including the formation of two tribal entities: Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, LLC ("Ascension"). As part of the restructure, Red Rock was rebranded as Big Picture, and Bellicose became Ascension, a new entity created by the LVD.[2]

15.	Although Martorello was the architect and primary beneficiary of the scheme, Defendants Justin Martorello, Brian McFadden, James Dowd, and Simon Liang were the other officers and shareholders of Bellicose. And as part of the restructure, each of these individuals became an officer of Ascension and a shareholder of Defendant Eventide Credit Acquisitions, LLC—another company created to facilitate the scheme. Each of these individuals played an integral role in the operation and management of the enterprise; agreed to undertake the conspiracy to collect high-interest loans from consumers in violation of their respective state laws; and received a percentage of the profits earned by the scheme. Similarly, Martorello's wife, Rebecca Martorello, was a former employee of Bellicose and assisted in the conspiracy to collect high-interest loans from consumers.

16.	This case also seeks damages from Defendants Brian Jedwab, Amlaur Resources, Columbia Pipe & Supply Co., Jeremy Davis, Timothy Arenberg, Terrance Arenberg, DTA Trinity Wealth Transfer Trust, and DMA Trinity Wealth Transfer Trust. Although they did not participate in the day-to-day operations of the enterprise, these individuals knowingly provided the capital used to make the high-interest loans to consumers through the rent-a-tribe enterprise and, in return, generated large profits from their investment in the scheme.

---

[2] Ten days after the district court's decision, Martorello formed Bellicose Capital, LLC ("Bellicose Capital"), to add an additional layer of protection to his companies involved in the scheme. Bellicose Capital became the holding company for Bellicose VI and SourcePoint VI to reduce their risk of liability. Each of these companies was wrapped up in the restructure described below.

17.     This case seeks damages from Martorello's shell entities and trust, Defendants Kairos Holdings, LLC, Breakwater Holdings, LLC, Gallant Capital, LLC, Liont, LLC, and Bluetech Irrevocable Trust. Martorello created these entities to disguise his business ownership interests and protect the illegal money received from consumers.

18.     Plaintiffs, on behalf of themselves and the Classes set forth below, seek to recover damages and penalties under state and federal law for Defendants' illegal and usurious loans.

## JURISDICTION AND VENUE

19.     The Court has original jurisdiction over Plaintiffs' Racketeer Influenced and Corrupt Organizations ("RICO") claims under 18 U.S.C. § 1965 and 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

20.     The Court also has jurisdiction under the Class Action Fairness Act because Plaintiffs are citizens of Virginia, California, Florida, Illinois, Indiana, Maryland, New Jersey, North Carolina, Texas, Ohio, and Washington, at least one Defendant is not a citizen of any of those states, the matter in controversy exceeds $5,000,000, and there are at least 100 members of each Class.

21.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District. Venue is also proper in this Court pursuant to 18 U.S.C. § 1965(a) because a civil action may be brought in a district court for "any district" where a person "resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a). Defendants have transacted their affairs in this District through the nationwide scheme, which collected millions of dollars from Virginia consumers. As part of their scheme, Defendants solicited Virginia consumers with direct mail, debited Virginia consumers' bank accounts, and serviced the illegal loans of thousands of Virginia consumers.

## PARTIES

22.    Plaintiff Renee Galloway is a natural person who resides in this District and Division.

23.    Plaintiff Dominque de la Bay is a natural person who previously resided in Alexandria, Virginia.

24.    Plaintiff Lori Fitzgerald is a natural person who resides in Charlottesville, Virginia.

25.    Plaintiff Andrea Scarborough is a natural person who resides in Portsmouth, Virginia.

26.    Plaintiff Dianne Turner is a natural person who resides in Rocky Mountain, Virginia.

27.    Plaintiff Earl Browne is a natural person who resides in Burbank, California.

28.    Plaintiff Rose Marie Buchert is a natural person who resides in Rockford, Illinois.

29.    Plaintiff Regina Nolte is a natural person who resides in Indianapolis, Indiana.

30.    Plaintiff Kevin Minor is a natural person who resides in Toledo, Ohio.

31.    Plaintiff Teresa Titus is a natural person who resides in Ridgefield, Washington.

32.    Plaintiff Burry Pough is a natural person who resides in Texas.

33.    Plaintiff Lisa Martinez is a natural person who resides in Texas.

34.    Plaintiff Sonji Grandy is a natural person who resides in New Jersey.

35.    Plaintiff Anastasia Sherman is a natural person who resides in Florida.

36.    Plaintiff Jerry Avent is a natural person who resides in North Carolina.

37.    Plaintiff Lucinda Gray is a natural person who resides in North Carolina.

38.    Plaintiff Anthony Green is a natural person who resides in Illinois.

39.    Plaintiff Linda Madison is a natural person who resides in Maryland.

40.     Plaintiff Derek Geter is a natural person who resides in Virginia.

41.     Plaintiff George Hengle is a natural person who resides in Virginia.

42.     Plaintiff Keisha Hamm is a natural person who resides in Georgia.

43.     Plaintiff Faith Thomas is a natural person who resides in Georgia.

44.     Plaintiff Sharon Paavo is a natural person who resides in Michigan.

45.     Plaintiff Latanya Tarleton is a natural person who resides in Michigan.

46.     Defendant Justin Martorello is a natural person and resident of Texas. Justin is the brother of Matt Martorello, who was the founder and chief executive officer of SourcePoint VI, Bellicose VI, Bellicose Capital, and the other companies described below, which were created to make and collect the usurious loans described herein. As explained below, Justin Martorello was an officer of Bellicose Capital and owned 9.9% of its shares. As an officer of Bellicose, Justin Martorello participated in the operation and management of the enterprise designed to collect high-interest loans from consumers. And after the sale of Bellicose, Justin Martorello continued to participate in the enterprise as an officer of Ascension Technologies, Inc. ("Ascension"), and as a shareholder of Eventide.

47.     Defendant Brian McFadden is a natural person and resident of Michigan. McFadden, a childhood friend of Matt Martorello, was a former officer and shareholder of Bellicose Capital. As an officer of Bellicose, McFadden participated in the operation and management of the enterprise designed to collect high-interest loans from consumers. And after the sale of Bellicose to the LVD, McFadden continued to participate in the enterprise as the president of Ascension and as a shareholder of Eventide.

48.     Defendant James Dowd is a natural person and resident of Illinois. Dowd was an officer of Bellicose Capital and owned 1.5% of its shares. As an officer of Bellicose, Dowd

participated in the operation and management of the enterprise designed to collect high-interest loans from consumers. And after the sale of Bellicose to the LVD, Dowd continued to participate in the enterprise as the vice president of Ascension and as a shareholder of Eventide.

49.     Defendant Simon Liang is a natural person and resident of South Carolina. Liang was an officer of Bellicose Capital and owned 1.5% of its shares. As an officer of Bellicose, Liang participated in the operation and management of the enterprise designed to collect high-interest loans from consumers. And after the sale of Bellicose to the LVD, Liang continued to participate in the enterprise as the vice president of Ascension and as a shareholder of Eventide.

50.     Defendant Eventide Credit Acquisitions, LLC ("Eventide") is a limited liability company formed under the laws of Delaware. On February 9, 2015, Matt Martorello, Justin Martorello, McFadden, Liang, and Dowd created Eventide as part of the restructure. In exchange for a $300,000,000.00 promissory note to Eventide, Bellicose was "sold" to a tribal company, Tribal Acquisition Corporation ("TAC"), which dissolved shortly after the sale in an attempt to further insulate the scheme from liability.

51.     Rebecca Martorello is a natural person and resident of Texas. Rebecca Martorello is Matt Martorello's wife. As explained below, Rebecca Martorello was an employee of Bellicose and assisted her husband with the conspiracy to collect high-interest loans from consumers.

52.     Defendant Brian Jedwab is a hedge fund manager and resident of New York. At all times relevant hereto, Jedwab was the president of Amlaur Resources, one of the companies who provided the capital used to make the high-interest loans to consumers through the rent-a-tribe enterprise and, in return, generated large profits from its investment in the scheme. As the President of Amlaur Resources, Jedwab personally participated in its decision to provide the capital to the

enterprise, had knowledge that the capital would be used to make high-interest loans to consumers, and signed the key documents related to Amlaur Resources's investment in the enterprise.

53.     Defendant Amlaur Resources is a limited liability company organized under the laws of Delaware. Through a series of agreements with Bellicose Capital, Red Rock, Eventide, and Big Picture, Amlaur Resources knowingly provided millions of dollars to be used to make the high-interest loans to consumers through the rent-a-tribe enterprise and, in return, generated large profits from its investment in the scheme.

54.     Defendant Columbia Pipe & Supply Co. ("Columbia Pipe") is a limited liability company organized under the laws Illinois. Through a series of agreements with Bellicose Capital, Red Rock, Eventide, and Big Picture, Columbia Pipe knowingly provided millions of dollars to be used to make the high-interest loans to consumers through the rent-a-tribe enterprise and, in return, generated large profits from its investment in the scheme.

55.     Defendant Timothy Arenberg is a natural person and resident of Illinois. Timothy Arenberg is the President of Columbia Pipe. As the President of Columbia Pipe, Timothy Arenberg personally participated in its decision to provide the capital to the enterprise, had knowledge that the capital would be used to make high-interest loans to consumers, and signed the key documents related to Columbia Pipe's investment in the enterprise. In addition, Timothy Arenberg personally contributed his own money to the enterprise.

56.     Defendant Terrance Arenberg is a natural person and resident of Illinois. Terrance Arenberg is the vice president of Columbia Pipe. As the vice president of Columbia Pipe, Terrance Arenberg personally participated in its decision to provide the capital to the enterprise, and had knowledge that the capital would be used to make high-interest loans to consumers. In addition, Terrance Arenberg personally contributed his own money to the enterprise.

57.     Defendant DMA Trinity Wealth Transfer Trust is a trust created under the laws of the state of Illinois. Through a series of agreements between Bellicose Capital, Red Rock, Eventide, and Big Picture, the DMA Trinity Wealth Transfer Trust provided a significant amount of the capital used to make the high-interest loans to consumers through the rent-a-tribe enterprise and, in return, generated large profits from its investment in the scheme.

58.     Defendant DTA Trinity Wealth Transfer Trust is a trust created under the laws of the state of Illinois. Through a series of agreements between Bellicose Capital, Red Rock, Eventide, and Big Picture, the DTA Trinity Wealth Transfer Trust provided a significant amount of the capital used to make the high-interest loans to consumers through the rent-a-tribe enterprise and, in return, generated large profits from its investment in the scheme.

59.     Defendant Jeremy Davis is a resident of Puerto Rico. Davis provided a significant amount of the capital used to make the high-interest loans to consumers through the rent-a-tribe enterprise, and, in return, generated large profits from his investment in the scheme.

60.     Defendant Kairos Holdings, LLC ("Kairos Holdings"), is a limited liability company organized under the laws of Delaware. As explained in more detail below, Kairos Holdings was created by Matt Martorello to conceal his ownership interest in the companies involved in the scheme and create an additional layer of protection for the illegal money received from consumers.

61.     Defendant Breakwater Holding, LLC, ("Breakwater Holding") is a limited liability company under the laws of the Cook Islands. As explained in more detail below, Breakwater Holding was created by Matt Martorello to conceal his ownership interest in the companies involved in the scheme and create an additional layer of protection for the illegal money received from consumers.

62. Defendant Gallant Capital, LLC ("Gallant Capital"), is a limited liability company organized under the laws of Delaware. As explained in more detail below, Gallant Capital was created by Matt Martorello to conceal his ownership interest in the companies involved in the scheme and create an additional layer of protection for the illegal money received from consumers.

63. Defendant Liont, LLC ("Liont"), is a limited liability company organized under the laws of Delaware. As explained in more detail below, Liont was created by Matt Martorello to conceal his ownership interest in the companies involved in the scheme and create an additional layer of protection for the illegal money received from consumers.

64. Defendant Bluetech Irrevocable Trust is a trust organized under the laws of the Cook Islands. As explained in more detail below, Bluetech Irrevocable Trust was created and utilized by Matt Martorello to conceal his ownership interest in the companies involved in the scheme and create an additional layer of protection for the illegal money received from consumers.

## SERVICE ON THE ATTORNEY GENERAL

65. Counsel for Plaintiffs are causing a copy of this pleading to be served contemporaneously with this filing on the Attorney General of Washington in accordance with RCW 19.86.095, and on the Attorney General of Illinois in accordance with 815 ILCS 505/10a(d).

## STATE USURY AND CONSUMER PROTECTION LAWS

### A. Virginia

66. Virginia's "usury laws serve a beneficial public purpose and are to be liberally construed with a view to advance the remedy and suppress the mischief." *Radford v. Cmty. Mortg. & Inv. Corp.*, 226 Va. 596, 601 (1984).[3] The Supreme Court of Virginia has repeatedly

---

[3] Usury laws are not unique to the United States of America. Indeed, about "a dozen Biblical passages suggest that usurious lending, especially to the poor, is a grave sin." Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for Candid Predatory Small Loan*

acknowledged that Virginia's "usury statutes represent a clarification of the public policy of the state that usury is not to be tolerated, and the court should therefore be chary in permitting this policy to be thwarted." *Id.* (quoting *Heubusch & Reynolds v. Boone*, 213 Va. 414 (1972)).

67.     In accordance with this longstanding public policy, Virginia's Consumer Finance Act prohibits a person from charging an annual percentage rate ("APR") exceeding 12% without first obtaining a consumer finance license from the Commonwealth. Va. Code §§ 6.2-1501(A), 6.2-303(A). The consumer finance licensing requirements are designed to protect Virginia consumers from predatory lenders like Defendants.

68.     Neither Big Picture nor Red Rock were licensed to make loans in Virginia.

69.     The Virginia General Assembly has expressly declared that any attempt to circumvent usury laws is "against public policy and void." Va. Code. § 6.2-306(A) ("Any agreement or contract in which the borrower waives the benefits of this chapter or releases any rights he may have acquired under this chapter shall be deemed to be against public policy and void."). This includes attempts to evade the application "by any device, subterfuge, or pretense whatsoever," including "procurement of a loan through any use or activity of a third person, whether real or fictitious." Va. Code. § 6.2-1541(C).

70.     Any loan made in violation of Virginia's usury laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made." Va. Code § 6.2-1541(A)-(B).

---

*Ordinances*, 69 Wash & Lee L. Rev. 893, 896 n.9 (2012). Echoing these sentiments, Pope Francis recently explained that "Usury is a serious sin: it kills life, tramples on the dignity of people, is a vehicle for corruption and hampers the common good. It also weakens the social and economic foundations of a country." Pope Francis, Address to National Anti-Usury Council (Feb. 3, 2018), available at https://zenit.org/articles/pope-francis-usury-humiliates-and-kills.

**B. California**

71.     Recognizing that "[u]sury—the charging of excessive interest rates—is an ancient concept dating back to the earliest commercial civilizations," California, which was founded in 1850, has regulated maximum interest rates since 1872. Robert R. Rickett, *California's Model Approach to Usury*, 18 Stan. L. Rev. 1381 (1966).

72.     Currently, the law of usury in California is based upon California Constitution article XV, section 1, which limits the interest payable "[f]or any loan or forbearance of any money." *Sw. Concrete Products v. Gosh Constr. Corp.*, 798 P.2d 1247, 1249 (Cal. 1990) (quoting Cal. Const. Art. XV § 1).

73.     Under the California Constitution, "unless a lender falls into one of the exemptions approved by the state legislature, it may not charge more than 10% interest per annum on a loan." *Dev. Acquisition Group, LLC v. EA Consulting, Inc.*, 776 F. Supp. 2d 1161, 1164 (E.D. Cal. 2011) (citing Cal. Const. Art. XV § 1).

74.     "An interest rate in excess of 10% is usurious, and if a lender negotiates a loan at a usurious rate absent a qualified exemption, the agreement shall be void and the lender will have no action at law to recover any interest." *Id.*

75.     California's usury laws "are primarily designed to penalize those who take advantage of 'unwary and necessitous borrowers.'" *See id.* at 1166 (quoting *Fox v. Peck Iron and Metal Co., Inc.*, 25 B.R. 674, 692-93 (Bankr. S.D. Cal. 1982)).

76.     Thus, California law allows borrowers to recover all interest paid on the loans in excess of 10% within the past two years, plus treble damages for any interest paid within the year preceding the filing of this action and their attorney's fees and costs. Cal. Civ. Code § 1916-3; *Dev. Acquisition Group*, 776 F. Supp. 2d at 1165; Rickett, *supra*, at 1391.

77.     Lending at usurious interest rates also constitutes a violation of California's unfair competition laws, Cal. Bus. & Prof. Code § 17200, *et seq*., which prohibits unlawful, unfair, or deceptive business practices. Cal. Bus. & Prof. Code § 17200.

### C. Illinois

78.     Under the Illinois Consumer Installment Loan Act, a "'[s]mall consumer loan'" means a loan upon which interest is charged at an annual percentage rate exceeding 36% and with an amount financed of $4,000 or less. 205 ILCS 670/15.

79.     Small consumer loan lenders are required to be licensed to make loans. 205 ILCS 670/1. A licensed lender may charge interest rates up to 99%. *See* 205 ILCS 670/17.2(a)(1), (b)(3).

80.     If a lender is unlicensed, annual interest is capped at 9%: "[I]n all written contracts it shall be lawful for the parties to stipulate or agree [to] 9% per annum, or any less sum of interest." *See* 815 ILCS 205/4(1).

81.     If an unlicensed lender makes a small consumer loan to an Illinois consumer, "the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan." 205 ILCS 670/20(d).

82.     Through a civil action, a borrower can sue a lender for violating the Illinois Consumer Installment Loan Act "prior to the expiration of 2 years after the date of his last scheduled payment" to reduce the balance by the amount that the lender is entitled to recover, and to recover attorneys' fees and costs. 205 ILCS 670/20(b); 205 ILCS 670/20.7.

83.     The Illinois Consumer Fraud Act also provides a remedy for consumers who are the victims of unfair or deceptive acts or practices in trade or commerce. 815 ILCS 505/2; 815 ILCS 550/10a.

84.     Defendants were never licensed to lend in Illinois.

**D. Indiana**

85.     In Indiana, with limited exceptions, any entity that makes consumer loans is required to have a license to make such loans in Indiana. Ind. Code § 24-4.5-3-502. A separate license is required for making small loans of less than $550. *Id.* If a loan is made without a license, the loan is void and the debtor is not obligated to pay either the principal or loan finance charge. Ind. Code §§ 24-4.5-5-202, 24-4.5-7-409.

86.     Defendants were never licensed to lend in Indiana.

87.     Even if a lender is properly licensed, the interest on a small loan in Indiana may not exceed 15% for the first $250, 13% for the next $150, and 10% for the last $150. Ind. Code § 24-4.5-7-201. For all other loans, even licensed lenders may not charge interest that exceeds the equivalent of the greater of:

(a) the total of:

(i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal which is two thousand dollars ($2,000) or less;
(ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and
(iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal which is more than four thousand dollars ($4,000); or

(b) twenty-five percent (25%) per year on the unpaid balances of the principal.

Ind. Code § 24-4.5-3-508.

88.     "If the debtor has paid any part of the principal or of the loan finance charge, the debtor has a right to recover the payment from the person violating this Article or from an assignee of that person's rights who undertakes direct collection of payments or enforcement of rights arising from the debt."  Ind. Code § 24-4.5-5-202.

89.     In addition to these penalties, debtors on small loans are also entitled to "actual damages, statutory damages of $2,000 per violation, costs, and attorney's fees." Ind. Code § 24-4.5-7-409.

### E. Ohio

90.     "The [legislature's] right to regulate the rate of interest by law is as old as government itself." *Wessell v. Timberlake*, 116 N.E. 43, 46 (Ohio 1916).

91.     Ohio law generally caps interest rates at 8% per annum. Ohio Rev. Code § 1343.01(A).

92.     Lenders licensed under the Small Loans Law may charge interest rates exceeding 8% APR for loans of $5,000 or less. Ohio Rev. Code § 1321.02. For loans between $1,000 and $5,000, licensees may charge interest rates no greater than 28% APR on the first $1,000 and 22% on amounts of the principal exceeding $1,000. Ohio Rev. Code § 1321.13(A). Defendants were never licensed to lend in Ohio.

93.     Any lender who charges interest rates in excess of those provided by law "shall forfeit to the borrower twice the amount of interest contracted for." Ohio Rev. Code § 1321.14(D).

94.     Lenders licensed under Ohio's Short-Term Loans Law may charge interest rates no greater than 28% APR on loans of $500 or less. Ohio Rev. Code § 1321.35–40. Licensees must be located in Ohio. Ohio Rev. Code § 1321.36.

95.     Any interest charged in excess of 28% APR on loans of $500 or less is deemed an unfair or deceptive business practice in violation of Ohio's Consumer Sales Practices Act. Ohio Rev. Code §1321.44(A). A short-term borrower injured by excessive interest rates "shall have a cause of action and be entitled to the same relief available to a consumer under [the CSPA]." Ohio Rev. Code §1321.44(A).

96.     Ohio's Consumer Sales Practices Act allows injured borrowers to "recover [their] actual economic damages plus an amount not exceeding five thousand dollars in noneconomic damages." Ohio Rev. Code § 1345.09(A).

97.     Defendants were never licensed to lend in Ohio.

**F. Washington**

98.     Washington's usury laws were "enacted in order to protect the residents of this state from debts bearing burdensome interest rates" and "in recognition of the duty to protect our citizens from oppression." RCW 19.52.005.

99.     In Washington, the maximum allowable interest rate is twelve percent per annum. RCW 19.52.020(1); *see also* RCW 19.52.025; State Maximum Interest Rate, *available at* http://leg.wa.gov/CodeReviser/Documents/rates.htm. "No person shall directly or indirectly take or receive in money, goods, or things in action, or in any other way, any greater interest for the loan or forbearance of any money, goods, or things in action." RCW 19.52.020(1).

100.    If interest greater than the statutory maximum of twelve percent is directly or indirectly contracted for, received, or reserved, the contract is usurious. RCW 19.52.030.

101.    If a usurious interest rate is charged, the creditor shall be entitled to collect only the principal amount of the loan, less the amount of interest accruing thereon, and if any interest was actually paid, the creditor shall be entitled to collect only the principal amount less twice the amount of the interest paid and less the amount of all accrued by unpaid interest. RCW 19.52.030. A plaintiff may seek application of these statutory penalties by bringing an action under RCW 19.52.032.

102.    RCW Chapter 19.52 applies to loans made to any person residing in Washington at the time the loan was made, regardless of the location where the loan was made. RCW 19.52.034.

103.     In addition to a statutory usury claim entitling a plaintiff to recover the penalties provided in RCW 19.52.030, entering into or transacting a usurious contract constitutes a per se unfair act or practice in the conduct of commerce for purposes of establishing a claim under the Washington Consumer Protection Act. RCW 19.52.036.

### G.  Texas

104.     Subject to limited exceptions, the maximum rate of interest allowed in Texas is 10%. Tex. Fin. Code § 302.001.

105.     Texas law requires persons issuing consumer loans to obtain a license. Tex. Fin. Code § 342.051. Licensees may exceed the 10% maximum interest rate for consumer loans not secured by real property, depending on the type of loan and subject to calculations made by the Consumer Credit Commissioner. *Id.* § 342.201.

106.     Creditors who charge more than 10% in interest in violation of Texas's Finance Code are liable for the greater of (1) three times the amount of interest charged in excess of 10%, or (2) the lesser of $2,000 or 20 percent of the principal. Tex. Fin. Code § 305.001.

107.     Additionally, if the interest charged and received is more than twice the permissible amount, the creditor will be held liable for the principal amount, the interest, and any other charges or fees. Tex. Fin. Code § 305.002.

108.     Defendants were never licensed to make loans to Texas consumers.

### H.  Florida

109.     In Florida, the maximum allowable rate of interest on loans of $500,000 or less is eighteen percent (18%). Fla. Stat. § 687.03.

110.     Florida makes it either a misdemeanor or felony—depending on the interest rate—to charge usurious interest in excess of twenty-five percent (25%). Fla. Stat. § 687.071. Loan

contracts in excess of the 25% threshold triggering criminal liability for usury are "therefore void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

111.    Lenders must be licensed by the Office of Financial Regulation, and loans of $25,000 or less with interest exceeding 18% per annum are void and unenforceable. Fla. Stat. § 516.02(1-2).

112.    Defendants were never licensed to make consumer loans in Florida.

113.    Under Florida law, consumers can recover twice the amount of usurious interest paid on illegal loans. Fla. Stat. § 687.04.

## I.    New Jersey

114.    The maximum interest rate chargeable to consumers under New Jersey law is 16%. N.J. Stat. § 31:1-1(a). Charging consumers a rate of interest greater than 30% is a criminal act under New Jersey law. N.J. Stat. § 2C:21-19.

115.    The New Jersey Consumer Finance Licensing Act ("CFLA") governs the provision of installment loans to consumers in New Jersey and allows *licensed* lenders to charge interest higher than 16% for installment loans under $50,000. N.J. Stat. §§ 17:11C-1 to 17:11C-49.

116.    The CFLA provides that anyone engaged in business as a consumer lender who is not licensed is "guilty of a crime of the fourth degree." N.J. Stat. § 17:11C-33(b). The act further provides that loans made by unlicensed lenders "shall be void and the lender shall have no right to collect or receive any principal, interest or charges unless the act was the result of a good faith error…." *Id.*

117.    Defendants were never licensed to make consumer loans in New Jersey.

118.     The New Jersey Consumer Fraud Act also provides a remedy for consumers who are the victims of unfair or deceptive acts or practices in trade or commerce. N.J. Stat. § 56:8-2.

**J.   North Carolina**

119.     In North Carolina, the legal interest rate chargeable to consumers is 8%. N.C. Gen. Stat. § 24-1.

120.     Where a written contract exists, for loans with a principal amount of less than $25,000, North Carolina's maximum interest rate permitted is the greater of (1) "the latest published noncompetitive rate for U.S. Treasury bills with a six-month maturity as of the fifteenth day of the month plus 6%" rounded to nearest half percent, or (2) 16%. N.C. Gen. Stat. § 24-1.1(c).

121.     Charging consumers more than the maximum interest rate—regardless of whether the interest has been paid or not—results in a forfeiture of the entire interest. N.C. Gen. Stat. § 24-2. If the interest has been paid, the borrower may recover twice the amount of interest paid. *Id.*

122.     North Carolina's Consumer Finance Act ("CFA") provides that for loans of $15,000 or less, a consumer lender may not charge interest greater than that permitted by Chapter 24 of the General Statutes without first obtaining a license from the North Carolina Commissioner. N.C. Gen. Stat. §§ 53-166(a), 53-168.

123.     Unlicensed lenders who issue loans exceeding the maximum interest rate are guilty of a Class 1 misdemeanor. N.C. Gen. Stat. § 53-166(c). Additionally, the entire loan becomes void, and the party in violation "shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan." *Id.* § 53-166(d).

124.     Defendants were never licensed to make consumer loans in North Carolina.

### K. Maryland

125.    Maryland law, Md. Code, Com. Law § 12-306, prohibits lenders from making consumer loans to Maryland residents in excess of 24% or 33% depending on the size of the loan.

126.    Moreover, no person may make a loan under Maryland's Consumer Loan Law without being licensed by the Maryland Commissioner of Financial Regulation. Md. Code, Com. Law § 12-302; Md. Code, Fin. Inst. § 11-204. Md. Code, Com. Law § 12-314 provides that a person "who is neither a licensee nor exempt from licensing may not receive or retain any principal, interest, or other compensation with respect to any loan that is unenforceable under this subsection." Defendants have never been licensed to make loans in Maryland.

127.    Because Defendants violated Maryland's licensing and interest rate requirements, it was unlawful for any person, including Defendants, to collect or receive any interest, fees, or charges on the loans. Md. Code, Com. Law § 12-314.

128.    For willful violations, like those committed here, Maryland law allows consumers to recover principal, interest, or other compensation paid to Defendants with respect to all loans. Md. Code, Com. Law § 12-313.

### L. Georgia

129.    Short term loans of $3,000 or less fall within the scope of the Georgia Industrial Loan Act. Ga. Code § 7-3-1, *et seq.*

130.    The purpose of the Industrial Loan Act is to "to define and prevent usury." *Georgia Cash Am., Inc. v. Greene*, 734 S.E. 2d 67, 71 (2012) (citation omitted).

131.    Unless expressly exempted by the terms of the Industrial Loan Act, a lender must obtain a license by the Industrial Loan Commissioner to make loans of $3,000 or less at an interest rate exceeding eight percent (8%). Ga. Code §§ 7-3-5, 7-3-6, 7-3-8.

132.    Pursuant to Ga. Code § 7-3-29(a), "[a]ny person who shall make loans under [the Industrial Loan Act] without first obtaining a license . . . shall be guilty of a misdemeanor; and any contract made under [the Industrial Loan Act] by such person shall be null and void."

133.    Georgia's Payday Lending Act also prohibits lenders from making loans of $3,000 or less at an interest rate that exceeds eight percent (8%). Ga. Code § 16-17-1, *et seq*.

134.    A lender who violates of the Payday Lending Act "shall be guilty of a misdemeanor of a high and aggravated nature and upon conviction thereof shall be punished by imprisonment for not more than one year or by a fine not to exceed $5,000.00 or both." Ga. Code § 16-17-2(d).

135.    Ga. Code § 16-17-3 bars a lender from collecting any indebtedness created by the illegal loan and declares the loan "void ab initio."

**M. Michigan**

136.    Under Michigan law, the legal rate of interest is 5%. MCL 438.31. In cases where the parties stipulate in writing for the payment of interest, the legal rate of interest shall not exceed 7%. *Id.*

137.    Pursuant to MCL 438.32, lenders that charge interest at a rate that exceeds 7% are barred from recovering any "interest, any official fees, delinquency or collection charge, attorney fees or court costs" and the borrower is entitled to recover attorney fees and court costs from the lender.

138.    In Michigan, criminal usury results when a person, not being authorized or permitted by law to do so, knowingly charges interest at a rate that exceeds 25%. MCL 438.41.

139.    The penalty for any person guilty of criminal usury is imprisonment for a term not to exceed 5 years or a fine of not more than $10,000, or both. MCL 438.41.

140.     The possession of usurious loan records is also prohibited by Michigan law. MCL 438.42. A person commits the offense of possession of usurious loan records "when, with knowledge of the contents thereof, he possesses any writing, paper, instrument or article used to record criminally usurious transactions" that are prohibited by law. *Id.* The penalty is imprisonment up to one year or a fine of not more than $1,000, or both. *Id.*

141.     In Michigan, the Deferred Presentment Service Transactions Act (DPSTA) regulates lenders that provide short-term loans to consumers up to $600. MCL 487.2121 *et seq*.

142.     Entities that are engaged in such lending must apply and receive a license to issue short-term loans. MCL 487.2131.

143.     Any person who violates the DPSTA is subject to "a civil fine of not less than $1,000.00 or more than $10,000.00 for each violation." MCL 487.2168. A person who knew or reasonably should have known of the violation is subject to "a civil fine of not less than $5,000.00 or more than $50,000.00 for each violation." *Id.*

## THE INITIAL STRUCTURE OF THE SCHEME

144.     Defendants established and operated a rent-a-tribe scheme that charges more than 400% annual interest on short term loans.

145.     Beginning in 2011, the enterprise made high-interest loans to consumers in the name of Red Rock—an entity formed under the laws of the LVD for the dual purpose of avoiding state and federal laws and concealing the role of Martorello's companies.

146.     Consistent with the rent-a-tribe model, Red Rock received 2% of the net revenue from the loans in return for the use of its name. Ex. 1 at § 2.25.[4]

---

[4] In reality, Red Rock actually received 1% of the net revenue of the loans because it paid 50% "broker fee" to Tribal Loan Management, LLC—a company owned by Robert Rosette, *i.e.*, the managing partner of the Rosette law firm.

147.    By contrast, SourcePoint received the "revenue remaining" and reimbursement for all advances and expenses. Ex. 1 at § 3.5.1; § 2.2.2.

148.    Further, under the servicing agreement, SourcePoint was contractually entitled to exercise almost exclusive control over Red Rock's operations.

149.    For example, the servicing agreement provided SourcePoint with the exclusive "authority and responsibility over all communications and interaction whatsoever between" Red Rock and "each servicer provider, lender and other agents" involved in the business. Ex. 1 at § 3.1.

150.    The servicing agreement further outlined the extensive duties SourcePoint performed and Red Rock's nominal role, including: (1) selecting and negotiating with service providers and lenders; (2) "[d]evelopment and promotion of sound and positive business relationships," including "the enforcement and termination of agreements with such service providers and lenders;" (3) preparation of regulatory, compliance, training, education, and accounting standards, as well as standards for "screening and review of" "website contents, marketing and consumer relations practices;" (4) providing "pre-qualified leads" and the "credit-modeling data and risk assessment strategies;" (5) oversight of Red Rock's call center in the Philippines; and (6) sales to third-party debt collectors. Ex. 1 at § 4.2.1.

151.    SourcePoint also had the authority to "collect all gross revenues and other proceeds connected with or arising from the operation of [Red Rock.]" Ex. 1 at § 4.9.

152.    SourcePoint also had the contractual right to "sweep [Red Rock's] bank account into [SourcePoint's] bank account" to receive its share of the proceeds. Ex. 1 at § 3.5.

153.    SourcePoint had "*sole signatory and transfer authority* over such bank accounts." Ex. 1 at § 3.5; § 4.4.

154.     Consistent with the terms of the Servicing Agreement, tribal members provided minimal assistance in the day-to-day operations of Red Rock, and nearly all the activities associated with it occurred off the Lac Vieux Reservation, such as the call centers, payment processing, and servicing of the loans.

155.     Nearly all activities performed on behalf of Red Rock were performed by officers and employees of Mattorello's companies located in the Virgin Islands, Puerto Rico, and the Philippines.

156.     For example, Bellicose Capital procured consumer reports from Trans Union in an attempt to identify consumers who may be susceptible to, or in need of, a loan.

157.     If a consumer's report showed that he or she may be susceptible to a high-interest loan, then Bellicose Capital sent direct mailings to the home of the consumer stating that he or she was pre-approved, that the loan was "a smarter way to borrow," and that funds can be deposited "as early as tomorrow."

158.     If a consumer called the number on the letter, he or she would reach a call center in the Philippines, who took direction and instructions from Bellicose Capital and not the Tribe.

## EVENTS LEADING TO THE RESTRUCTURE

159.     In August 2013, the New York Department of Financial Services issued a cease and desist notice to Red Rock warning it to stop offering its illegal credit products to New York consumers. *Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2d Cir. 2014).

160.     The New York Department of Financial Services also issued warnings to third parties, such as banks and payment processors, to cease providing electronic banking services to

Red Rock, and these third parties "cut back or cut off entirely their financial dealings with the Tribes." *Id*.

161.    In response, Red Rock filed a lawsuit in August 2013, seeking declaratory relief and a preliminary injunction that tribal businesses were inherently sovereign nations and not subject to New York law. *Id*.

162.    The district court denied Red Rock's request for a preliminary injunction on September 30, 2013, finding that the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands," and thus, Red Rock was "subject to the State's non-discriminatory anti-usury laws." *Id*. at 361.

163.    The court reasoned, "There is simply no basis . . . that the Tribes are treated differently from any other individuals or entities that enter New York to lend to New York residents." *Id*.

164.    Ten days after the district court's decision, Martorello formed Bellicose Capital, LLC ("Bellicose Capital"), to add an additional layer of protection to his companies involved in the scheme. Ex. 2.

165.    Bellicose Capital became the holding company for Bellicose VI and SourcePoint VI to reduce their risk of liability.

166.    Although Martorello was the architect and primary beneficiary of the scheme, Defendants Justin Martorello, McFadden, Dowd, and Liang were the other officers and shareholders of Bellicose Capital.

167.    Through multiple shell entities, Matt Martorello owned 85.1% of Bellicose Capital, which wholly owned SourcePoint and Bellicose VI. *See, e.g.*, Ex. 3.

168.    Justin Martorello owned 9.9% of Bellicose; and the remaining 5% was owned by McFadden, Liang, and Dowd. *Id*.

169.    Despite the additional layer of liability, Martorello and the other executives remained worried. In addition to the loss in *Otoe-Missouria*, a growing number of lawsuits and government enforcement actions against the scheme's competitors brought increased scrutiny to the tribal lending business model, including an affirmative action filed by the New York Attorney General against CashCall in August 2013. *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, No. CV1507522JFWRAOX, 2018 WL 485963, at *10 (C.D. Cal. Jan. 19, 2018) (findings of fact and conclusions of law detailing CashCall's tribal lending involvement).

170.    Martorello was paying close attention to the litigation involving CashCall, including the case filed by the CFPB in December 2013. *Consumer Fin. Protection Bureau v. CashCall, Inc.,* No. 1:13-cv-13167 (Mass) (complaint filed on Dec. 16, 2013).

171.    In that case, the CFPB took the same position as the district court in *Otoe-Missouria*, *i.e.*, that state usury laws applied to tribal lenders. Ex. 4, Jan. 2014 e-mail chain at LVD-DEF00018128.

172.    On January 3, 2014, Martorello characterized the CFPB's position as "without question a major attack on legit tribal lending operations." *Id*. If an "attack" on the Red Rock operation happened, he warned, "the stakes are very literally everything." Ex. 4 at LVD18129.

173.    The threat of an attack grew on October 1, 2014, when the Second Circuit affirmed the district court's decision in *Otoe-Missouria*. *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs*., 769 F.3d 105, 117 (2d Cir. 2014).

174.    In doing so, the Second Circuit made several damaging findings, including that "New York's usury laws apply to all lenders, not just tribal lenders[.]" *Id*.

175.    A month after the Second Circuit's decision, Red Rock's attorney, Karrie Wichtman, wrote an e-mail to Martorello, explaining that the best option was to "go quietly into the night and restructure based on what we know from the opinion in order to build an even stronger case for future litigation." Ex. 5 at Rosette1130 (emphasis added).

## OVERVIEW OF THE RESTRUCTURE

176.    Long before the restructure, Martorello had created the concept for Big Picture to be used as another rent-a-tribe enterprise associated with a tribe on the Fort Belknap Indian Reservation.

177.    Martorello worked with a marketing company to develop a logo, website and other marketing materials, which are identical to those used by Big Picture today.

178.    In September 2013, Bellicose VI was getting ready to launch Big Picture Loans for the tribe on the Fort Belknap Indian Reservation, but the "launch date" was delayed because of the lack of an ACH provider to process the payments. *Id*.

179.    Because of the loss in *Otoe-Missouria*, Matt and Justin Martorello never officially launched Big Picture Loans with the tribe located on the Fort Belknap Indian Reservation.

180.    Instead, as evidenced by an e-mail from Justin Martorello dated October 22, 2013, undertakings associated with this venture were placed on "FULL STOP" and because of "the massive attacks on the industry we do not plan use these sites."

181.    Because of these massive attacks, the ongoing enterprise with Red Rock was also at risk. As Matt Martorello further explained: "efforts would be attempted by [s]tate governments to shut down tribal lenders (and are being attempted in fact)." Ex. 6 at Martorello_009775.

182. One of those was an action filed by the Pennsylvania Attorney General, which Martorello characterized as "the most significant issue/risk to SPVI" as "PA could bring the same claims against SPVI for sure." *Id*.

183. Martorello further added that Red Rock had already "received threats from several state AGs demanding they stop lending or they will come after them." *Id*.

184. In addition to state attorney general threats, Martorello further explained that the NYDFS has "issues too" with tribal lending "and they could go after SPVI as well." *Id*.

185. In "order to build an even stronger case for future litigation," Ex. 5, and protect the illegal amounts obtained from consumers, Defendants wrapped up the lending operation in newly-created tribal entities through a "sale" of Bellicose Capital and its wholly owned subsidiaries.

186. Through a series of interrelated agreements, Red Rock was rebranded as Big Picture (using the materials and website previously created for the other tribe), and Bellicose became Ascension, a newly created tribal entity.

187. On paper, the tribe now appeared to have created and to own the lending business, ostensibly: (1) shielding Bellicose (and the substantial revenue paid to it) from any pre-merger claims; and (2) enhancing the appearance of tribal ownership and control over operations.

188. To facilitate the restructure, the LVD's entities agreed to a $300,000,000.00 promissory note to Eventide—a new company with the same ownership structure as Bellicose, *i.e.*, 85.1% being held by Matt Martorello; 9.9% being held by Justin Martorello; and the remaining 5% was owned by McFadden, Liang, and Dowd.

189. But other than changing the form of the transaction, the substance remained the same—the Promissory Note requires the tribal entities to pay 1.8% interest *and* the "Net Cash Available" at the end of each month. Ex. 7, Promissory Note.

190.    The "Net Cash Available" is defined as the tribal entities' gross revenues minus: (1) a "monthly distribution to the Tribe equal to two percent (2%) of the Gross Revenues;" (2) a "one-time reinvestment amount equal to $1.3 million dollars ($1,300,000), and a monthly reinvestment amount thereafter of two percent (2%);" and (3) interest, expenses, and reserves. *Id*. at § 1.2(a)-(b)(1)-(6).

191.    In other words, the Martorellos, McFadden, Liang, and Dowd continue to be the primary beneficiaries of the scheme.

192.    And other than changing the name and the jurisdiction of formation, Ascension continues to be operated in the same manner and by primarily the same individuals who ran Bellicose—none of whom are members of the LVD or work on the reservation.

193.    The LVD not only lacks involvement in Ascension's day-to-day operations, it contractually relinquished any right to control Ascension through a Delegation of Authority Policy. Ex. 8, Delegation of Authority Policy.

194.    Under this policy, Ascension delegated McFadden with the authority to: (1) handle Ascension's "strategic direction, goals and targets," (2) perform "all matters necessary for the day to day management of Ascension," (3) execute documents on behalf of Ascension, (3) open and maintain bank accounts, and (5) adopt employee benefit plans and programs. *Id*. at § 1.4(a)-(e).

195.    McFadden also possesses the exclusive authority to handle "verbal communications with media, regulatory bodies, or other entities" and must approve any written communications with the media, regulatory bodies, and other entities. *Id*. at § 3.1-3.2.

196.    By contrast, the only matters designated to the tribal co-managers, Hazen and Williams, are: (1) approval of contracts in excess of $100,000 in a calendar year, (2) appointment of the president, and (3) approval of any "new major employee benefit plans." *Id*. at § 1.2(a)-(c).

197. And, while the authority to appoint the president seems to provide some control, a Loan and Security Agreement takes this control away.

198. To appoint a new president of Ascension, the tribal entities must receive the approval of Eventide, *i.e.*, a company owned by Martorello and McFadden.

199. Because of Martorello/McFadden/Eventide's *de facto* control of Ascension, Defendants delegated to Ascension the vast majority of responsibilities associated with Big Picture's operations—no different than the relationship between SourcePoint and Red Rock.

200. In particular, Ascension and Big Picture entered into an "Intratribal Servicing Agreement," which is virtually identical to the prior servicing agreement between SourcePoint and Red Rock. *Compare* Ex. 9; *with* Ex. 1.

201. This agreement grants Ascension "all the necessary power and authority to act in order to fulfill its responsibilities," which includes the enumerated responsibilities previously designated to SourcePoint.

202. And, just like the Delegation of Authority Policy, the tribal entities cannot amend, modify, or terminate the Intratribal Servicing Agreement until satisfaction of the $300 million-dollar promissory note.

203. In short, other than the change in titles, things have largely stayed the same because the restructuring agreements "confer on Eventide, and hence Martorello, significant control mechanisms over significant aspects of Ascension's operations." *Williams v. Big Picture Loans, LLC*, 329 F. Supp. 3d 248, 279 (E.D. Va. 2018).

## JUSTIN MARTORELLO, MCFADDEN, LIANG, AND DOWD'S ROLE IN THE ENTERPRISE

204.     Although Martorello was the architect and primary beneficiary of the scheme, Defendants Justin Martorello, McFadden, Dowd, and Liang were the other officers and shareholders of Bellicose Capital.

205.     In their capacity as officers and shareholders of Bellicose, Justin Martorello, McFadden, Dowd, and Liang participated in the operation and management of the rent-a-tribe enterprise; and agreed to undertake the conspiracy to collect high-interest loans from consumers in violation of their respective state laws.

206.     For example, Justin Martorello was the Vice President of SourcePoint who was "responsible for the oversight of the Tribal lending entities overall operations including: risk, analytics, compliance, marketing, P&L, operations, and technology." Ex. 10 at Martorello_005441.

207.     McFadden was the Director of Operations who was "[r]esponsible for managing and coordinating operations, including the Tribe's offshore call center." *Id*. at Martorello_005441. As part of these responsibilities, McFadden managed "payment processing" for Red Rock's portfolio, as well as "all aspects" of Red Rock's "customer service." *Id*. McFadden also coordinated the "marketing plans" for Red Rock to "maximize" its return on investment and monitored key performance indicators.

208.     Liang was the Controller of Bellicose who "[d]esigned the accounting system for [Red Rock's] online lending portfolio." *Id*. at Martorello_005441-2. He oversaw and assisted in the preparation of the "monthly financial statements and servicing fee schedules" and prepared "weekly and monthly operating reports for decision-making." *Id*.

209.     Dowd was another executive of Bellicose who managed "vendor relationships for lead purchasing and underwriting data" for Red Rock's products. Dowd helped "develop the

management reporting, underwriting strategies and proprietary Direct Mail marketing and risk models for" Red Rock. *Id*. at Martorello_005442.

210. Justin Martorello, McFadden, Liang, and Dowd devoted 100% of their professional time to Bellicose. Ex. 3.

211. Indeed, Matt Martorello himself claims "he delegated increasing responsibility to Justin Martorello, McFadden, data analyst James Dowd, accountant Simon Liang" to run the operations of Bellicose and SourcePoint. *See Williams v. Big Picture Loans*, Case No. 4:17-cv-461-REP/RCY, Dkt. 216 at pg. 11.

212. Upon information and belief, each of these individuals had knowledge of the litigation involving the *Otoe-Missouria*, oversaw the restructure, and participated in the creation of Eventide to further the scheme.

213. And following the restructure, each of these individuals remain involved in the day-to-day operations of the business (now under the guise of Ascension) and continue to receive substantial profits from the illegal activities through their ownership interest in Eventide.

## THE INVESTOR DEFENDANTS' ROLE IN THE ENTERPRISE

214. Defendants Amlaur Resources, Columbia Pipe, Timothy Arenberg, Terrance Arenberg, Jeremy Davis, DTA Trinity Wealth Transfer Trust, and DMA Trinity Wealth Transfer Trust (collectively, the "Investor Defendants") provided substantial capital to fund the loans to consumers and worked together with the other entities described herein to systemically perpetrate fraud and to scam consumers.

215. On December 10, 2012, Columbia Pipe provided a $2,000,000.00 loan to fund the illegal loans. Ex. 11 at Martorello_000115. In exchange, Columbia Pipe received a fixed return of 30% APR on the invested funds in the enterprise, which was paid *via* the illegal amounts collected

from consumers. These amounts were reinvested in the enterprise, including as part of a $4,000,000.00 loan on November 21, 2013, and a $2,000,000.00 loan on August 16, 2014. *Id*.

216. On December 10, 2012, Timothy Arenberg provided a $700,000.00 loan to fund the illegal loans. *Id*. In exchange, Timothy Arenberg received a fixed return of 30% APR on the invested funds in the enterprise, which was paid *via* the illegal amounts collected from consumers. These amounts were reinvested in the enterprise, including as part of a $700,000.00 loan on November 21, 2013, and a $400,000.00 loan on December 10, 2014. *Id*.

217. On December 10, 2012, Terrance Arenberg provided a $900,000.00 loan to fund the illegal loans. *Id*. In exchange, Terrance Arenberg received a fixed return of 30% APR on the invested funds in the enterprise, which was paid *via* the illegal amounts collected from consumers. These amounts were reinvested in the enterprise, including as part of a $750,000.00 loan on November 21, 2013, and a $400,000.00 loan on December 10, 2014. *Id*.

218. On September 25, 2013, DTA Trinity Wealth Transfer Trust provided a $300,000.00 loan to fund the illegal loans. *Id*. In exchange, DTA Trinity Wealth Transfer Trust received a fixed return of 30% APR on the invested funds in the enterprise, which was paid *via* the illegal amounts collected from consumers. Upon information and belief, these amounts were reinvested in the enterprise, including as part of a $150,000.00 loan on November 21, 2013. *Id*.

219. On November 11, 2013, DMA Trinity Wealth Transfer Trust provided a $150,000.00 loan to fund the illegal loans. *Id*. In exchange, DMA Trinity Wealth Transfer Trust received a fixed return of 30% APR on the invested funds in the enterprise, which was paid *via* the illegal amounts collected from consumers.

220.     On December 16, 2014, Jeremy Davis provided a $2,500,000.00 loan to fund the illegal loans. *Id*. In exchange, Jeremy Davis received a fixed return of 30% APR on the invested funds in the enterprise, which was paid *via* the illegal amounts collected from consumers.

221.     Prior to December 2015, Amlaur Resources provided a $10,500,000.00 loan to fund the illegal loans. In exchange, Amlaur Resources received a fixed return of 30% APR on the invested funds in the enterprise, which was paid *via* the illegal amounts collected from consumers.

222.     Jedwab is a hedge fund manager and resident of New York. At all times relevant hereto, Jedwab was the president of Amlaur Resources and Jedwab personally participated in its decision to provide the capital to the enterprise. Jedwab had knowledge that the capital would be used to make high-interest loans to consumers, and signed the key documents related to Amlaur Resources's investment in the enterprise.

223.     These loans "were a large part of [Red Rock's] success and the continuous growth of its lending portfolio." Ex. 12, Letter from McFadden to Investors.

224.     Upon information and belief, each of the investors received periodic updates from representatives of SourcePoint and Bellicose, including regarding the litigation with the New York Department of Financial Services.

225.     Each of the Investor Defendants had knowledge of the failed litigation and, as part of the restructure, each of the Investor Defendants had an opportunity to withdraw their money from the enterprise.

226.     Despite their knowledge of the illegality of the lending operations, the Investor Defendants nonetheless agreed to convert their loan with SourcePoint to "a direct Loan and Security Agreement and Promissory Note with Big Picture." *Id*.

227. "With this new direct relationship," McFadden promised that the investors "can feel confident that your investment is protected." *Id*.

228. In addition to the enhanced protections of the new structure, the Loan and Security Agreement further protected the Investor Defendants as it provided them with "a security interest" in Big Picture's collateral, including its consumer loans and accounts receivable. *Id*.

229. Upon information and belief, each of the Investor Defendants continue to maintain their investment in the enterprise, including the millions of dollars identified on Exhibit A to the Agreement and Plan of Merger. *See* Ex. 12 at Martorello_000115. In return, each of the Investor Defendants continue to receive a fixed return of 30% APR on the invested funds in the enterprise.

## REBECCA MARTORELLO'S ROLE IN THE ENTERPRISE

230. Rebecca Martorello is a former employee of Bellicose VI, who personally participated in the establishment and operation of the illegal lending enterprise.

231. Other than several key executives—Matt Martorello, Justin Martorello, McFadden, Liang, Dowd, and a few others—Rebecca Martorello was one of the highest paid executives of Bellicose VI.

232. Upon information and belief, Rebecca Martorello did not work for any other organizations when she was employed by Bellicose and she regularly attended meetings with other executives whereby they directed, reviewed, and approved key business decisions of Bellicose and SourcePoint, including decisions related to the origination, marketing, underwriting, servicing, and collection of the loans.

233. In addition, along with her husband, Rebecca Martorello personally guaranteed and signed key documents related to the enterprise, including indemnification agreements between SourcePoint VI and the Investor Defendants.

234. Rebecca Martorello was fully aware of the illegal practices of the enterprise and knew that these practices violated the law.

235. For example, upon information and belief, Rebecca Martorello had knowledge of and participated in Red Rock's decision to challenge a cease and desist notice warning it to stop offering its illegal credit products to New York consumers. *Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs.*, 974 F.Supp.2d 353, 356 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2d Cir. 2014).

236. After this litigation, Rebecca Martorello resigned from her employment on or around December 2013.

237. In addition, as explained below, Rebecca Martorello is the beneficiary of Bluetech Irrevocable Trust and accepts and retains benefits from the trust, knowing that it was funded *via* the illegal funds obtained from consumers through the rent-a-tribe scheme.

## THE ROLE OF MATT MARTORELLO'S SHELL COMPANIES AND TRUST IN THE ENTERPRISE

238. Between March 1, 2015, and January 26, 2016, Kairos Holdings was a parent company of Bellicose Capital and, thus, the parent company of its wholly owned subsidiaries, SourcePoint VI and Bellicose VI. Ex. 13 at Martorello_003115. During this time, Kairos Holdings held 100% of the voting interest in Bellicose Capital, which provided it with sole authority "to vote on any and all matters" pertaining to Bellicose Capital. Ex. 14. During this same time, Kairos Holdings held 59.5% of the economic shares of Bellicose Capital, entitling it to 59.5% of Bellicose/SourcePoint's profits from the scheme. *Id.*

239. Further, between February 9, 2015 and December 31, 2015, Kairos Holdings held 100% of the voting interest in Eventide, which provided it with sole authority "to vote on any and all matters" pertaining to Bellicose Capital. Ex. 15. During this same time, Kairos Holdings held at least 59.5% of the economic shares of Eventide, entitling it to 59.5% of Eventide's profits from

the scheme. Upon information and belief, Kairos Holdings continues to hold these same interests. *Id*.

240.     Between March 1, 2015, and January 26, 2016, Liont was a parent company and/or the managing member of Bellicose Capital. Ex. 13 at Martorello_003115. During this same time, Liont held 30% of the economic shares of Bellicose Capital, entitling it to 30% of Bellicose/SourcePoint's profits from the scheme. *See* Ex. 13 at Martorello_003115; Ex. 14.

241.     Further, between February 9, 2015 and December 31, 2015, Liont was the delegated manager of Eventide, which is manager-managed. Pursuant to Eventide's Operating Agreement, Liont has the following powers: "to conduct, manage and control the business and affairs of" Eventide, (ii) "to appoint and remove at his pleasure the Officers (if any), agents and employees" of Eventide, (iii) "to appoint boards or committees" and (iv) to "make all other arrangements and do all things which are necessary" for the purpose of Eventide. Upon information and belief, Liont continues to be the manager of Eventide.

242.     Prior to the creation of Bellicose Capital, Breakwater Holding was the parent company of SourcePoint VI and Bellicose VI between June 1, 2013, and December 31, 2013. Ex. 13 at Martorello_003115. On December 31, 2013, Breakwater Holding transferred its interest in these companies to Alpha Tau Capital, another Martorello owned company wrapped up in the restructure. *Id*. Upon information and belief, Breakwater Holding transferred its interest in SourcePoint VI and Bellicose VI for nothing of value. On January 27, 2016—the day after the closing of the restructure—Martorello amended Eventide's Operating Agreement to transfer: (1) 100% of Eventide's voting interest to Breakwater Holding, and (2) 59.5% of the economic shares of Eventide to Breakwater Holding, entitling it to 59.5% of Eventide's profits from the scheme,

which have been substantial. Ex. 15. Upon information and belief, Breakwater Holdings has continued to hold these interests and received similar distributions in 2017.[5]

243.    Martorello's other shares in Eventide are held through Gallant Capital, which received 25.5% of the shares in Eventide on July 15, 2015, in return for nothing of value. Ex. 15. Upon information and belief, Gallant Capital continues to hold 25.5% of the interest in Eventide, entitling it to 25.5% of Eventide's profits from the scheme, which have been substantial. Upon information and belief, Gallant Capital has continued to hold these interests and received substantial distributions in 2016 and 2017.

244.    As early as June 1, 2013, Matt Martorello created Bluetech Irrevocable Trust to serve as the parent company for each of his entities in an attempt to protect the illegal proceeds obtained by Martorello through this and other high-interest lending schemes. Ex. 13 at Martorello_003106. Between June 1, 2013, and January 26, 2016, Martorello diverted 70% of his profits to Bluetech Irrevocable Trust, who directly or indirectly owned 70% of the economic interests in Breakwater Holding, Kairos Holdings, and Bellicose Capital and each of their subsidiaries.[6] *See* Ex. 13 at Martorello_003106-16. After the restructure in January 2016, Martorello continues to divert 70% of his profits from the scheme to Bluetech Irrevocable Trust through its ownership of Breakwater Holding and Gallant Capital.

245.    Bluetech Irrevocable Trust's beneficiaries are Rebecca Martorello and the couple's infant children.

---

[5] Based on text messages between Matt and Justin Martorello, it appears that Matt has been using Eventide's proceeds to fund his defense of this litigation.

[6] The 30% remaining of Martorello's profits were distributed to Martorello through his ownership of other companies directly owned by him, such as MBM Services, which held 30% of the economic interest in Bellicose VI and Bellicose Capital.

246. At all times relevant hereto, Matt Martorello was the President of Breakwater Holding, Kairos Holdings, and Gallant Capital, as well as their sole owners (albeit as the trustor of Bluetech Irrevocable Trust). *See* Ex. 15 (signed three times by Martorello as president of Liont, Gallant Capital, and Kairos Holdings).

### PLAINTIFFS' EXPERIENCES

#### A. Plaintiff Renee Galloway (Virginia)

247. On or around April 21, 2017, Plaintiff Galloway obtained a loan for $600 with Big Picture that had an interest rate of 636.75%.

248. Plaintiff Galloway paid $930 on her loan with Big Picture, almost all of which was credited to interest and fees.

249. As part of her application, Plaintiff Galloway entered in her Virginia residential address.

#### B. Plaintiff Dominque de la Bay (Virginia)

250. On or around July 4, 2017, Plaintiff de la Bay obtained a loan for $1,025.00 with Big Picture that had an interest rate of 482.12%.

251. Plaintiff de la Bay paid more than $500 on her loan with Big Picture, almost all of which was credited to interest and fees.

252. As part of her application, Plaintiff de la Bay entered in her Virginia residential address, located in Alexandria, Virginia.

#### C. Plaintiff Aaron Fitzgerald (Virginia)

253. On or around July 24, 2017, Plaintiff Fitzgerald obtained a loan for $500.00 with Big Picture that had an interest rate of 643.87%.

254.     Plaintiff Fitzgerald paid approximately $836 on his loan with Big Picture, almost all of which was credited to interest and fees.

255.     As part of his application, Plaintiff Fitzgerald entered in his Virginia residential address.

### D.  Plaintiff Andrea Scarborough (Virginia)

256.     On or around May 10, 2018, Plaintiff Scarborough obtained a loan for $750.00 with Big Picture that had an interest rate of 492.18%.

257.     Plaintiff Scarborough also obtained a loan with Big Picture in early 2017 that had a similar interest rate.

258.     Plaintiff Scarborough paid approximately $200 on her 2017 loan with Big Picture.

259.     Plaintiff Scarborough paid more than $200 on her 2018 loan with Big Picture, almost all of which was credited to interest and fees.

260.     As part of her application, Plaintiff Scarborough entered in her Virginia residential address.

### E.  Plaintiff Dianne Turner (Virginia)

261.     On October 12, 2015, Plaintiff Turner obtained a $400 loan with Red Rock that had an interest rate of 615%.

262.     Plaintiff Turner paid no less than $560 on her loan with Red Rock, almost all of which was credited to interest and fees.

263.     As part of her application, Plaintiff Turner entered in her Virginia residential address.

### F.  Plaintiff Derek Geter (Virginia)

264.     Since January 2016, Plaintiff Geter has obtained multiple high-interest loans with Big Picture, including a loan dated October 18, 2018, that had an interest rate of 348.4%.

265.     Plaintiff Geter has paid no less than $7,838 on the loans with Big Picture, much of which was credited to interest and fees.

266.     As part of his application, Plaintiff Geter entered in his Virginia residential address.

### G. Plaintiff Earl Browne (California)

267.     On February 2, 2017, Plaintiff Browne obtained a loan with Big Picture that had an interest rate of 697%.

268.     Plaintiff Browne paid no less than $1,124.09 on his loan with Big Picture within the past year, most of which was credited to interest and fees.

269.     As part of his application, Plaintiff Browne entered in his California residential address.

### H. Plaintiff Rose Marie Buchert (Illinois)

270.     On October 9, 2015, Plaintiff Buchert applied for a $250 loan from Red Rock. The loan had an interest rate of 755%, requiring monthly payments with a final payment due on August 3, 2016. The finance charge was $1,000.

271.     In October 2016, Plaintiff Buchert took out a second loan that was identical in amount, interest rate, and payment plan to her first loan.

272.     As part of her applications, Plaintiff Buchert entered in her Illinois residential address.

273.     Plaintiff Buchert paid off both loans, including $2,000 in finance charges.

### I. Plaintiff Anthony Green (Illinois)

274.     On or around January 9th, 2018, while living in Illinois, Plaintiff Green took out a loan from Big Picture.

275.     The principal amount on the loan was $400.00 and the interest rate was 683.36%. This loan required 13 bi-weekly payments of $116.67.

276.     Plaintiff Green made approximately seven payments and paid at least $800.00 to Big Picture for repayment on the loan.

277.     As part of his application, Plaintiff Green entered in his Illinois residential address.

**J.  Plaintiff Regina Nolte (Indiana)**

278.     Plaintiff Nolte took out a $450 loan from Big Picture that was deposited into her account on December 20, 2016. The interest rate on the loan was at least 200%.

279.     As part of her application, Plaintiff Nolte entered her Indiana residential address.

280.     Plaintiff Nolte paid Big Picture in excess of the principal amount on her loan.

**K.  Plaintiff Kevin Minor (Ohio)**

281.     On or about May 5, 2016, Plaintiff Minor received a $900 loan from Big Picture. The loan had an annual interest rate that exceeded 44%.

282.     On or about August 4, 2016, Plaintiff Minor received a $1,000 loan from Big Picture. The loan had an annual interest rate that exceeded 56%.

283.     Plaintiff Minor made multiple payments on his loans, and paid off at least one of his loans with Big Picture in full.

284.     As part of his loan applications, Plaintiff Minor entered his Ohio address.

**L.  Plaintiff Teresa Titus (Washington)**

285.     On or about July 14, 2015, Plaintiff Titus applied for a loan at www.castlepayday.com. Plaintiff Titus was approved for a loan for $400.00. The loan had an annual interest rate over 400%.

286.     On July 14, 2015, $400 was deposited into her bank account by "Castle Payday.com."

287.     By June 2016, Plaintiff Titus had paid a total of $2,281.25 on her July 2015 loan. But when she could no longer afford her payments on the loan, she had to take out another loan to cover her payments on the first loan. Over the course of the next year, Plaintiff Titus suffered from this debt treadmill whereby she had to take out new loans in order to pay back old loans.

288.     In addition to her original loan, Plaintiff Titus took out loans from Defendants in June 2016 ($500) and July 2017 ($400). These loans both had annual interest rates in excess of 400%. These loans were deposited into Plaintiff Titus's bank account by "VBS Big Picture Loans" and "Big Picture Loans," respectively.

289.     Since August 2015, Plaintiff Titus has paid $4,994.11 to Defendants toward her $1,300 principal in Castle Payday/Big Picture loans. Plaintiff Titus has also paid $175 in overdraft fees and returned item charges associated with automatic bank account debits for her Castle Payday/Big Picture payments.

290.     As part of her application for these loans, Plaintiff Titus entered in her Washington residential address.

291.     As of the filing of the initial complaint in the matter, Defendants are still attempting to collect additional payments from Plaintiff Titus.

**M. Plaintiff Burry Pough (Texas)**

292. On or around November 28, 2017, while living in Texas, Plaintiff Pough took out a loan from Big Picture.

293. The principal amount on the loan was $800.00 and the interest rate was 598.3569%. The loan required 20 bi-weekly payments of about $179.58. Plaintiff paid at least $2,873.28 to Big Picture for repayment on the loan.

294. As part of the loan application, Plaintiff Pough provided his Texas address.

295. Defendants are still attempting to collect on the loan.

**N. Plaintiff Lisa Martinez (Texas)**

296. On or around October 19, 2017, while living in Texas, Plaintiff Lisa Martinez took out a loan from Big Picture.

297. The principal amount on the loan was $800.00 and the interest rate was at least 320%. The loan required 13 bi-weekly payments of about $211.16.

298. Plaintiff Martinez paid off the loan in full prior to the loan maturity date, and paid at least $2,598.28 to Big Picture for repayment on the loan.

299. As part of the loan application, Plaintiff Martinez provided her Texas address.

**O. Plaintiff Anastasia Sherman (Florida)**

300. On or around April 21, 2016, while living in Florida, Plaintiff Sherman took out her first loan from Big Picture.

301. The principal amount on the loan was $400.00 and the interest rate was 569.2071%. Plaintiff Sherman paid off well above the principal balance of the loan.

302. On or around October 20, 2017, still while living in Florida, Plaintiff Sherman took out her second loan from Big Picture.

303.     The principal amount on the loan was $425.00 and the interest rate was 497.6327%. The loan required 13 bi-weekly payments of about $85.45. Plaintiff Sherman paid at least $1,110.66 to Big Picture for repayment on the second loan.

304.     As part of the loan applications, Plaintiff Sherman provided her Florida address.

**P.  Plaintiff Sonji Grandy (New Jersey)**

305.     On or around January 19, 2017, while living in New Jersey, Plaintiff Grandy took out a loan from Big Picture.

306.     The principal amount on the loan was $600.00 and the interest rate was 720.03%. This loan required 28 bi-weekly payments varying from $62.50-$150.00.

307.     Plaintiff Grandy paid at least $3,000 to Big Picture for repayment on the loan.

308.     As part of the loan application, Plaintiff Grandy provided her New Jersey address.

**Q.  Plaintiff Jerry Avent (North Carolina)**

309.     In or around December 2017, while living in North Carolina, Plaintiff Avent took out a loan from Big Picture.

310.     The principal amount on the loan was $200.00 and the interest rate was between 564.392%.

311.     Plaintiff Avent has paid around $700 on the loan, including $653.69 that has been credited to interest.

312.     As part of the loan application, Plaintiff Avent provided his North Carolina address.

**R.  Plaintiff Lucinda Gray (North Carolina)**

313.     On or around December 10, 2017, while living in North Carolina, Plaintiff Gray took out a loan from Big Picture.

314. The principal amount on the loan was $600.00 and the interest rate was 598.7874%. The loan required 12 monthly payments of about $264.27.

315. Plaintiff Gray paid at least $2,114.16 to Big Picture for repayment on the loan.

316. As part of the loan application process, Plaintiff Gray entered in her North Carolina address.

**S. Linda Madison (Maryland)**

317. On or around March 6, 2018, Plaintiff Madison obtained an $800 loan with Big Picture that had an interest rate of 665%.

318. Plaintiff Madison obtained the loan over the internet when she was in Maryland, and her loan application originated in Maryland.

319. Plaintiff Madison paid no less than $880.92 on her loan with Big Picture—most of which was credited to interest and fees.

**T. Plaintiff Keisha Hamm (Georgia)**

320. In or around July 2015, while living in Georgia, Plaintiff Hamm took out a Castle Payday loan for $1,000 with an interest rate of over 500%. She paid back at least $6,931.50 on that loan.

321. In or around April 2017, while living in Georgia, Plaintiff Hamm took out a Big Picture loan for $1,500 with an interest rate of over 4500%. She paid back at least $6,779.96 on that loan.

322. As part of her loan applications, Plaintiff Hamm entered in her Georgia address.

**U. Plaintiff Faith Thomas (Georgia)**

323.     In 2017, Plaintiff Thomas took out loans for $1,300 and $825 from Big Picture with interest more than twice what is allowed under Georgia law. She paid off both the loans, paying back thousands of dollars to Big Picture.

324.     In July 2018, Plaintiff took out another usurious loan with Big Picture for $1,200. She paid back no less $1,358 on that loan.

325.     As part of her loan applications, Plaintiff Hamm entered in her Georgia address.

**V.  Plaintiff Sharon Paavo (Michigan)**

326.     On or around January 29, 2018, Plaintiff Paavo applied for a loan with Big Picture for $350. Plaintiff Paavo made six monthly payments to Big Picture in 2018. Paavo paid back at least $1,056.86 on this loan, with most of the payments going towards an excessive interest rate of over 300%.

327.     As part of her loan application, Plaintiff Paavo entered in her Michigan residential address.

**W. Plaintiff Latanya Tarleton (Michigan)**

328.     Between February 2016 and March 2018, Plaintiff Tarleton applied for at least 6 loans with Big Picture. The amounts of the loans range between $300 to $1,000. Plaintiff Tarleton has paid far in excess of the principal balance of these loans to Big Picture for repayment on the loans.

329.     On or around March 10, 2018, Plaintiff Tarleton applied for a loan with Big Picture for $600. The loan required 13 monthly payments of about $102.90, with a total repayment of $1,337.59. Plaintiff Tarleton has paid far in excess of $600 to Big Picture for repayment on the loan. Most of the payments were going towards an excessive interest rate of over 398.906%.

330. As part of her application, Plaintiff Tarleton entered in her Michigan residential address.

## CLASS ACTION ALLEGATIONS

331. Plaintiffs Galloway, Turner, de la Bay, Lori Fitzgerald, Scarborough, Geter, and Hengle assert their Virginia claims on behalf of the proposed Virginia Class defined as follows:

> *All individuals located in Virginia who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan.*

332. Plaintiff Browne asserts his California claims on behalf of the proposed California Class defined as follows:

> *All individuals located in California who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan.*

333. Plaintiffs Buchert and Green assert their Illinois claims on behalf of the proposed Illinois Class defined as follows:

> *All individuals located in Illinois who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan.*

334. Plaintiff Nolte asserts her Indiana claims on behalf of the proposed Indiana Class defined as follows:

> *All individuals located in Indiana who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan.*

335. Plaintiff Minor asserts his Ohio claims on behalf of the proposed Ohio lass defined as follows:

> *All individuals located in Ohio who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan.*

336. Plaintiff Titus asserts her Washington claims on behalf of the proposed Washington Class defined as follows:

> *All individuals located in Washington who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan.*

337. Plaintiffs Pough and Martinez assert their Texas claims on behalf of the proposed Texas Class defined as follows:

> *All individuals located in Texas who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan.*

338. Plaintiff Sherman asserts her Florida claims on behalf of the proposed Florida Class defined as follows:

> *All individuals located in Florida who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan.*

339. Plaintiff Grandy asserts her New Jersey claims on behalf of the proposed New Jersey Class defined as follows:

> *All individuals located in New Jersey who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan.*

340. Plaintiffs Gray and Avent assert their North Carolina claims on behalf of the proposed North Carolina Class defined as follows:

> *All individuals located in North Carolina who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan.*

341. Plaintiff Madison asserts her Maryland claims on behalf of the proposed Maryland Class defined as follows:

> *All individuals located in Maryland who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan.*

342.   Plaintiffs Thomas and Hamm assert their Georgia claims on behalf of the proposed Georgia Class defined as follows:

> *All individuals located in Georgia who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan.*

343.   Plaintiffs Tarleton and Paavo assert their Michigan claims on behalf of the proposed Michigan Class defined as follows:

> *All individuals located in Michigan who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan.*

344.   Plaintiffs also assert claims on behalf of the proposed RICO Class defined as follows:

> *All individuals located in Virginia, California, Illinois, Indiana, Ohio, Washington, Texas, Florida, North Carolina, New Jersey, Maryland, Georgia, Michigan or states with similar laws who entered into a loan agreement with Big Picture or Red Rock.*

**Numerosity**

345.   At this time, Plaintiffs do not know the exact number of members of the Classes; however, given the volume of Defendants' business, there are likely thousands of members of each Class. Thus, the Classes are so numerous that joinder of all members is impracticable.

**Commonality**

346.   There are numerous common questions of law and fact common to Plaintiffs and members of the Classes. These questions include but are not limited to the following:

   a.   Whether Defendants violated state usury laws;

   b.   Whether Defendants are protected by tribal sovereign immunity;

c.      Whether Defendants engaged in unfair or deceptive acts or practices;

d.      Whether Defendants, Bellicose Capital, SourcePoint, the Tribal officials, and others unknown to Plaintiffs, constitute an "enterprise" under RICO;

e.      Whether Defendants conducted the affairs or participated in the enterprise's affairs;

f.      Whether Defendants violated RICO by charging interest rates more than twice the legal limit under state law; and

g.      The proper measure and amount of damages for the Classes.

**Typicality**

347.     Plaintiffs' claims are typical of the claims of the Classes they seek to represent. Each Plaintiff, like members of the Classes, took out a usurious loan from Defendants. Thus, Plaintiffs' claims, like the claims of the Classes, arise out of the same common practices of conduct by Defendants and are based on the same legal and remedial theories.

**Adequacy**

348.     Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have competent and capable attorneys who are experienced trial lawyers with significant experience litigating complex class actions, including experience in litigating rent-a-tribe cases. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests that conflict with the Classes.

**Injunctive Relief**

349.     The Classes meet the requirements for certification to obtain injunctive or equitable relief under Fed. R. Civ. P. 23(b)(2), as Defendants have acted or refused to act on grounds

generally applicable to the Classes, thereby making appropriate final injunctive or equitable relief with respect to the Classes as a whole. Prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for Defendants.

**Predominance and Superiority**

350.    The Classes meet the requirements for certification to seek monetary relief under Fed. R. Civ. P. 23(b)(3), as the questions of law or fact common to class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Additionally, individual actions may be dispositive of the interests of members of the Classes even though certain members of the Classes are not parties to such actions. Further, a class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

a.    Absent a class action, class members as a practical matter will be unable to obtain redress; Defendants' violations will continue without remedy; and additional consumers will be harmed.

b.    It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions.

c.    A class action will permit an orderly and expeditious administration of class claims and foster economies of time, effort, and expense.

d.    The lawsuit presents no difficulties that would impede its management by the Court as a class action.

e.    Defendants have acted on grounds generally applicable to class members, making class-wide relief appropriate.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of RICO, 18 U.S.C. §§ 1962(c)
### (On behalf of all Plaintiffs and the RICO Class)
### (Class Claims against Justin Martorello, McFadden, Dowd, Liang, Eventide, Kairos Holdings, Breakwater Holdings, Liont, and Bluetech Irrevocable Trust)

351.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

352.    Each Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

353.    The Enterprise, consisting of each named Defendant and the unnamed officers, executives, and other employees of Big Picture and Ascension, together with Bellicose Capital and Source Point, are an "enterprise," as that term is defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through the online lender Castle Payday, later known as Big Picture.

354.    The Enterprise has an ongoing organization with an ascertainable structure, and functions as a continuing unit with separate roles and responsibilities.

355.    Defendants violated § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

356.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

357.    All of the loans made to RICO Class members and collected by Defendants included interest rates far in excess of twice the enforceable rate in their states.

358.     Plaintiffs and RICO Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

359.     This conduct began sometime in 2011, continues to date, and will be repeated again and again in the future to the detriment of consumers in Virginia, California, Illinois, Indiana, Ohio, Washington, Texas, Florida, North Carolina, New Jersey, Maryland, Georgia, Michigan and other states with similar usury laws.

360.     Accordingly, Defendants are jointly and severally liable to Plaintiffs and the RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## SECOND CAUSE OF ACTION
### Violation of RICO, 18 U.S.C. §§ 1962(d)
### (On behalf of all Plaintiffs and the RICO Class)
### (Class Claims against All Defendants)

361.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

362.     Each Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

363.     The Enterprise, consisting of each named Defendant and the unnamed officers, executives, and other employees of Big Picture and Ascension, together with Bellicose Capital and SourcePoint, are an "enterprise," as that term is defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through the online lender Castle Payday, later known as Big Picture.

364.     The Enterprise has an ongoing organization with an ascertainable structure, and functions as a continuing unit with separate roles and responsibilities.

365. Defendants also violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt. Each Defendant knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

366. Plaintiffs and RICO Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

367. This conduct began sometime in 2011, continues to date, and will be repeated again and again in the future to the detriment of consumers in Virginia, California, Illinois, Indiana, Ohio, Washington, Texas, Florida, North Carolina, New Jersey, Maryland, Georgia, Michigan and other states with similar usury laws. Accordingly, Defendants are jointly and severally liable to Plaintiffs and the RICO Class for their actual damages treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**THIRD CAUSE OF ACTION**
**Violation of RICO, 18 U.S.C. §§ 1962(a)**
**(On behalf of all Plaintiffs and the RICO Class)**
**(Class Claims against Amlaur Resources, Columbia Pipe, Timothy Arenberg, Terrance Arenberg, DTA Trinity Wealth Transfer Trust, and DMA Trinity Wealth Transfer Trust)**

368. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

369. As alleged above, Amlaur Resources, Columbia Pipe, Timothy Arenberg, Terrance Arenberg, DTA Trinity Wealth Transfer Trust, and DMA Trinity Wealth Transfer Trust violated § 1962(a) of RICO through the receipt of income derived, directly and indirectly, through collection of unlawful debt; and through the use and reinvestment of parts of such income to acquire interests in and to further establish and assist the operations of the enterprise.

370.     These defendants participated in the collection of the unlawful debt as principals by aiding, abetting, procuring proceeds from the enterprise, and willfully investing money for the purpose of the unlawful scheme.

371.     Plaintiffs and the class members were injured as a result of the violations of 18 U.S.C. § 1962(a) because the loans would not have been made but for their investment and participation in the enterprise.

372.     Plaintiffs and RICO Class members were injured as a direct result of the violations of 18 U.S.C. § 1962(a) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

**FOURTH CAUSE OF ACTION**
**Violation of RICO, 18 U.S.C. §§ 1962(b)**
**(On behalf of all Plaintiffs and the RICO Class)**
**(Class Claims against Amlaur Resources, Columbia Pipe, Jeremy Davis, Timothy**
**Arenberg, Terrance Arenberg, DTA Trinity Wealth Transfer Trust, and DMA Trinity**
**Wealth Transfer Trust)**

373.     As alleged above, Amlaur Resources, Columbia Pipe, Jeremy Davis, Timothy Arenberg, Terrance Arenberg, DTA Trinity Wealth Transfer Trust, and DMA Trinity Wealth Transfer Trust violated § 1962(b) of RICO by acquiring and maintaining interests in and control of the Enterprise involved in the unlawful collection of debt.

374.     These defendants participated in the collection of the unlawful debt as principals by aiding, abetting, procuring proceeds from the enterprise, and by willfully acquiring and maintaining interests in and control of the enterprise.

375.     Plaintiffs and the class members were injured as a result of the violations of 18 U.S.C. § 1962(b) because the loans would not have been made but for Defendants' investment and participation in the enterprise.

376. Plaintiffs and RICO Class members were injured as a direct result of the violations of 18 U.S.C. § 1962(b) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

### FIFTH CAUSE OF ACTION
**Violation of Virginia Usury Laws**
**(On behalf of Plaintiffs Galloway, de la Bay, Fitzgerald, Fitzgerald, Scarborough, Turner ("Virginia Plaintiffs") and the Virginia Class)**
**(Class Claims against All Defendants)**

377. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

378. Under Virginia law, the maximum allowable interest rate on a consumer loan is 12% per annum. Va. Code § 6.2-303.

379. All of the loans made to Virginia consumers in the name of Big Picture and Red Rock used an annual interest rate well in excess of 12%.

380. As a result, the Virginia Plaintiffs and the Virginia Class are entitled to recover all amounts received on these void loans, as well as twice the amount of usurious interest repaid. Va. Code §§ 6.2-1541(B), 6.2-305.

### SIXTH CAUSE OF ACTION
**Violation of California Usury Laws**
**(On behalf of Plaintiff Browne and the California Class)**
**(Class Claims against All Defendants)**

381. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

382. Under the California Constitution, the maximum allowable interest rate on a consumer loan is 10% per annum. Cal. Const. Art. XV § 1.

383. All of the loans made to California consumers in the name of Big Picture and Red Rock used an annual interest rate well in excess of 10%.

384.     Accordingly, Plaintiff Browne and members of the California Class are entitled to recover all interest paid on the loans in excess of 10%, plus treble damages for any interest paid within the year preceding the filing of this action and their attorneys' fees and costs. Cal. Civ. Code § 1916-3.

## SEVENTH CAUSE OF ACTION
**Violations of Cal. Bus. & Prof. Code § 17200**
**(On behalf of Plaintiff Browne and the California Class)**
**(Class Claims against All Defendants)**

385.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

386.     As alleged above, Defendants engaged in unlawful, unfair, and deceptive business practices through the sham relationship with the Tribe in order to make high-interest loans to consumers throughout the country, including California.

387.     Defendants' conduct violated California's unfair competition laws, Cal. Bus. & Prof. Code § 17200, *et seq*., which prohibit unlawful, unfair, or deceptive business practices. Cal. Bus. & Prof. Code § 17200.

388.     Accordingly, Plaintiff Browne and California Class members are entitled to recover all interest paid on the loans in excess of 10%, as well as an injunction prohibiting any future collection of the loans. Cal. Bus. & Prof. Code § 17203.

## EIGHTH CAUSE OF ACTION
**Violation of Illinois Consumer Installment Loan Act - 205 Ill. Comp. Stat. 670/1, et. seq.**
**(On behalf of Plaintiffs Buchert, Green ("Illinois Plaintiffs') and the Illinois Class)**
**(Class Claims against All Defendants)**

389.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

390. Under the Illinois Consumer Installment Loan Act, a "'[s]mall consumer loan'" means a loan upon which interest is charged at an annual percentage rate exceeding 36% and with an amount financed of $4,000 or less. 205 ILCS 670/15.

391. Small consumer loan lenders are required to be licensed to make loans. 205 ILCS 670/1.

392. If an unlicensed lender makes a small consumer loan to an Illinois consumer, "the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan." 205 ILCS 670/20(d).

393. Defendants violated Illinois law by charging interest rates making small consumer loans without a license and charging interest rates far in excess of those permitted.

394. As a result of these unlawful loans, the Illinois Plaintiffs and the Illinois Class are entitled to recover damages, attorneys' fees, and costs pursuant to 205 ILCS 670/20(b); 205 ILCS 670/20.7.

**NINTH CAUSE OF ACTION**
**Violation of Illinois Consumer Fraud Act – 815 ILCS 505/2**
**(On behalf of Illinois Plaintiffs and the Illinois Class)**
**(Class Claims against All Defendants)**

395. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

396. Defendants, in the course of trade or commerce, engaged in unfair acts and practices, in violation of 815 ILCS 505/2, by contracting for and collecting finance charges, interest, and fees, from Illinois residents, in excess of the amounts permitted by Illinois law.

397. These unlawful charges caused actual damages to the Illinois Plaintiffs and the Illinois Class.

398. Pursuant to 815 ILCS 505/10a, the Illinois Plaintiffs and the Illinois Class seek damages for all amounts paid to the Defendants, injunctive relief, and attorneys' fees and costs.

**TENTH CAUSE OF ACTION**
**Violation of Indiana Usury Law - Ind. Code § 24-4.5-5-202**
**(On behalf of Plaintiff Nolte and the Indiana Class)**
**(Class Claims against All Defendants)**

399. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

400. In Indiana, with limited exceptions, any entity that makes consumer loans is required to have a license to make such loans in Indiana. Ind. Code § 24-4.5-3-502. A separate license is required for making small loans of less than $550. *Id.* If a loan is made without a license, the loan is void and the debtor is not obligated to pay either the principal or loan finance charge. Ind. Code §§ 24-4.5-5-202, 24-4.5-7-409.

401. Even if a lender is properly licensed, the interest on a small loan in Indiana may not exceed 15% for the first $250, 13% for the next $150, and 10% for the last $150. Ind. Code § 24-4.5-7-201. For all other loans, even licensed lenders may not charge interest that exceeds the equivalent of the greater of:

(a) the total of:

> (i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal which is two thousand dollars ($2,000) or less;
> (ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and
> (iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal which is more than four thousand dollars ($4,000); or

(b) twenty-five percent (25%) per year on the unpaid balances of the principal.

Ind. Code § 24-4.5-3-508.

402. "If the debtor has paid any part of the principal or of the loan finance charge, the debtor has a right to recover the payment from the person violating this Article or from an assignee of that person's rights who undertakes direct collection of payments or enforcement of rights arising from the debt."  Ind. Code § 24-4.5-5-202.

403. Defendants made loans in Indiana without a license.

404. Defendants further made loans to Indiana residents at interest rates well in excess of the rates permitted by Indiana law.

405. As a result, Plaintiff Nolte and the Indiana Class are entitled to recover all amounts paid on these void loans, as well as interest on amounts paid.

406. Further, debtors on unlawful small loans of $550 or less are entitled to "actual damages, statutory damages of $2,000 per violation, costs, and attorney's fees," where the conduct did not result from a bona fide computation error. Ind. Code § 24-4.5-7-409.

### ELEVENTH CAUSE OF ACTION
**Violation of Ohio Usury Laws**
**(On behalf of Plaintiff Minor and the Ohio Class)**
**(Class Claims against All Defendants)**

407. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

408. Under Ohio law, the maximum allowable interest rate on a general loan is 8% per annum. Ohio Rev. Code § 1343.01(A).

409. Any usurious interest paid "shall be taken to be payments made on account of principal."  Ohio Rev. Code § 1343.04.

410. All of the loans made to Ohio consumers in the name of Big Picture and Red Rock contained interest rates in excess of 8% per annum.

411.    As a result, Plaintiff Minor and the Ohio Class are entitled to have any usurious interest charged by Defendants applied to the principal of their loans. Ohio Rev. Code § 1343.04.

<strong>TWELTH CAUSE OF ACTION</strong><br>
<strong>Violation of Ohio Small Loans Law</strong><br>
<strong>(On behalf of Plaintiff Minor and the Ohio Class)</strong><br>
<strong>(Class Claims against All Defendants)</strong>

412.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

413.    Lenders licensed under the Small Loans Law may charge interest rates exceeding 8% APR for loans of $5,000 or less. Ohio Rev. Code § 1321.02. For loans between $1,000 and $5,000, licensees may charge interest rates no greater than 28% APR on the first $1,000 and 22% on amounts of the principal exceeding $1,000. Ohio Rev. Code § 1321.13(A).

414.    Any loan made in violation of the Small Loans Law—including any loan under $5,000 made by anyone other than a licensed lender—"is void and the lender has no right to collect, receive, or retain any principal, interest, or charges."  Ohio Rev. Code § 1321.02.

415.    Further, "[a]ny licensee or other person who willfully violates [the Small Loans Law] shall forfeit to the borrower twice the amount of interest contracted for."  Ohio Rev. Code § 1321.14(D).

416.    All of the loans made to Ohio consumers in the name of Big Picture and Red Rock were for amounts under $5,000 and contained interest rates in excess of 28% per annum.

417.    As a result, these loans are void; Defendants have no right to retain any principal, interest, or charges; and Plaintiff Minor and the Ohio Class are entitled to recover twice the amount of usurious interest repaid. Ohio Rev. Code §§ 1321.02, 1321.14(D).

## THIRTEETH CAUSE OF ACTION
### Violation of Washington Usury Law - RCW 19.52.030
### (On behalf of Plaintiff Titus and the Washington Class)
### (Class Claims against All Defendants)

418.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

419.    Under RCW 19.52.020, the maximum allowable interest rate in Washington has been twelve percent per annum since at least 2004. *See also* RCW 19.52.025; State Maximum Interest Rate, available at http://leg.wa.gov/CodeReviser/Documents/rates.htm.

420.    A contract is usurious if it provides for a rate of interest higher than the statutory maximum of twelve percent. RCW 19.52.030(1).

421.    If a contract is usurious, "the creditor shall only be entitled to the principal, less the amount of interest accruing thereon at the rate contracted for; and if interest shall have been paid, the creditor shall only be entitled to the principal less twice the amount of the interest paid, and less the amount of all accrued and unpaid interest; and the debtor shall be entitled to costs and reasonable attorneys' fees plus the amount by which the amount the debtor has paid under the contract exceeds the amount to which the creditor is entitled."  RCW 19.52.030(1).

422.    Defendants entered into usurious contracts with Plaintiff Titus and Washington Class members by charging interest rates well in excess of twelve percent.

423.    Therefore, Plaintiff Titus and Washington Class members are entitled to a declaration that Defendants' loan contracts are usurious. Plaintiff Titus and Washington Class members are entitled to recover any amounts paid in excess of the amount Defendants are entitled to collect on the loans, pursuant to RCW 19.52.030.

## FOURTEENTH CAUSE OF ACTION
### *Per se* Violation of the Washington Consumer Protection Act –
### RCW 19.86.020 and RCW 19.52.036
### (On behalf of Plaintiff Titus and the Washington Class)
### (Class Claims against All Defendants)

424. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

425. Plaintiff Titus and Washington Class members are "persons" within the meaning of the Washington Consumer Protection Act, RCW 19.86.010(1).

426. Pursuant to RCW 19.52.036, "[e]ntering into or transacting a usurious contract" is per se "an unfair act or practice in the conduct of commerce for purposes of application of the consumer protection act."

427. As alleged above, Defendants entered into usurious contracts with Plaintiff Titus and Washington Class members by contracting for interest rates exceeding the statutory maximum of twelve percent. Thus, Defendants engaged in unfair acts or practices in the conduct of commerce.

428. Defendants' unfair and deceptive acts or practices have impacted the public interest because they have injured Plaintiff Titus and thousands of Washington residents by charging them interest in excess of the amount allowed by law.

429. Defendants' unfair acts and practices therefore affect the public interest.

430. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff Titus and the Washington Class have been injured. Defendants' conduct has injured the property of Plaintiff Titus and the other class members by charging and collecting interest that they were not legally entitled to charge or collect.

431. Defendants' wrongdoing is continuing in nature and represents an ongoing threat to Plaintiff Titus and Washington Class members, particularly since Defendants continue to make loans to Washington residents at usurious interest rates and continue to collect unlawful interest on usurious loans already made to Washington residents. Thus, Plaintiff Titus and Washington Class members will suffer continuing, immediate, and irreparable injury absent the issuance of injunctive and equitable relief.

432. Plaintiff Titus and Washington Class members are entitled to recover actual damages, treble damages, and injunctive and equitable relief. In addition, Plaintiff Titus and Washington Class members are entitled to recover attorneys' fees and costs pursuant to RCW 19.86.090.

## FIFTEENTH CAUSE OF ACTION
**Violation of the Washington Consumer Protection Act – RCW 19.86 –**
**Deceptive Business Practices**
**(On behalf of Plaintiff Titus and the Washington Class)**
**(Class Claims against All Defendants)**

433. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

434. Plaintiff Titus and Washington Class members are "persons" within the meaning of the Washington Consumer Protection Act, RCW 19.86.010(1).

435. Defendants engaged in deceptive acts that occurred in trade or commerce by conduct set forth above. These deceptive acts include the following:

      a.      Attempting to avoid application of Washington usury law by improperly using tribal sovereign immunity as a shield for their activities;

      b.      Representing or implying that state law does not apply to Plaintiff Titus's and Washington Class members' loans; and

      c.    Charging interest rates that are well in excess of the rates allowed by law and demanding or collecting payment of this excessive interest.

436.    Defendants' deceptive acts and practices have occurred in trade or commerce.

437.    Defendants' deceptive acts or practices have impacted the public interest because they have injured Plaintiff Titus and thousands of Washington residents by charging them interest in excess of the amount allowed by law. Defendants deceived Plaintiff Titus and members of the Washington Class by representing or implying that they could legally charge interest rates of 400% or more because Defendants claim Big Picture and Red Rock are tribal entities not subject to state law.

438.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff Titus and the Washington Class have been injured. Defendants' conduct has injured the property of Plaintiff Titus and the other Washington Class members by charging and collecting interest that they were not legally entitled to charge or collect.

439.    Defendants' wrongdoing is continuing in nature and represents an ongoing threat to Plaintiff Titus and Washington Class members, particularly since Defendants continue to represent that they are lawfully entitled to make loans exceeding Washington's usury cap, continue to make loans to Washington residents at usurious interest rates, and continue to collect unlawful interest on usurious loans already made to Washington residents. Thus, Plaintiff Titus and Washington Class members will suffer continuing, immediate, and irreparable injury absent the issuance of injunctive and equitable relief.

440.    Plaintiff Titus and Washington Class members are entitled to recover actual damages, treble damages, and injunctive and equitable relief. In addition, Plaintiff Titus and

Washington Class members are entitled to recover attorneys' fees and costs pursuant to RCW 19.86.090.

**SIXTEENTH CAUSE OF ACTION**
**Violation of the Washington Consumer Protection Act – RCW 19.86 –**
**Unfair Business Practices**
**(On behalf of Plaintiff Titus and the Washington Class)**
**(Class Claims against All Defendants)**

441.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

442.     Plaintiff Titus and Washington Class members are "persons" within the meaning of the Washington Consumer Protection Act, RCW 19.86.010(1).

443.     Defendants engaged in unfair acts that occurred in trade or commerce by conduct set forth above. These deceptive acts include the following:

      a.     Attempting to avoid application of Washington usury law by improperly using tribal sovereign immunity as a shield for their activities;

      b.     Representing or implying that state law does not apply to Plaintiff Titus's and Washington Class members' loans; and

      c.     Charging interest rates that are well in excess of the rates allowed by law and demanding or collecting payment of this excessive interest.

444.     Defendants' acts and practices are unfair because they: (1) cause substantial financial injury to Plaintiff Titus and members of the Washington Class; (2) are not outweighed by any countervailing benefits to consumers or competitors; and (3) are not reasonably avoidable by consumers. Defendants' acts and practices are also unfair because they are immoral, unethical, oppressive and unscrupulous.

445.     Defendants' unfair acts and practices have occurred in trade or commerce.

446.     Defendants' unfair acts or practices have impacted the public interest because they have injured Plaintiff Titus and thousands of Washington residents by charging them interest in excess of the amount allowed by law. Defendants acted unfairly by representing or implying that they could legally charge interest rates of 400% or more because Defendants claim Big Picture and Red Rock are tribal entities not subject to state law.

447.     As a direct and proximate result of Defendants' unfair acts and practices, Plaintiff Titus and the Washington Class have been injured. Defendants' conduct has injured the property of Plaintiff Titus and the other Washington Class members by charging and collecting interest that they were not legally entitled to charge or collect.

448.     Defendants' wrongdoing is continuing in nature and represents an ongoing threat to Plaintiff Titus and Washington Class members, particularly since Defendants continue to represent that they are lawfully entitled to make loans exceeding Washington's usury cap, continue to make loans to Washington residents at usurious interest rates, and continue to collect unlawful interest on usurious loans already made to Washington residents. Thus, Plaintiff Titus and Washington Class members will suffer continuing, immediate, and irreparable injury absent the issuance of injunctive and equitable relief.

449.     Plaintiff Titus and Washington Class members are entitled to recover actual damages, treble damages, and injunctive and equitable relief. In addition, Plaintiff Titus and Washington Class members are entitled to recover attorneys' fees and costs pursuant to RCW 19.86.090.

## SEVENTEENTH CAUSE OF ACTION
### Violation of New Jersey Usury Laws
### (On behalf of Plaintiff Grandy and the New Jersey Class)
### (Class Claims against All Defendants)

450. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

451. The maximum interest rate chargeable to consumers under New Jersey law is 16%. N.J. Stat. § 31:1-1(a).

452. All of the loans made to Plaintiff Grandy and the New Jersey Class members were in excess of the maximum rates allowed under New Jersey law.

453. Defendants' conduct in doing so was knowing, deliberate, intentional, and willful. Defendants' purpose was to take more than the legal rate of interest for the money loaned to Plaintiff Grandy and members of the New Jersey Class.

454. Under N.J. Stat. § 31:1-4, Plaintiff Grandy and members of the New Jersey Class are entitled to a declaration that their loans are unlawful and usurious, and restitution of all amounts paid to Defendants in excess of the principal amount, plus the costs of bringing this action.

## EIGHTEENTH CAUSE OF ACTION
### Violation of New Jersey Consumer Finance Leasing Act
### (On behalf of Plaintiff Grandy and the New Jersey Class)
### (Class Claims against All Defendants)

455. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

456. Defendants are or were "consumer lenders" as that term is defined by the Consumer Finance Leasing Act ("CFLA"). N.J. Stat. § 17:11C-2.

457. Defendants are or were engaged in the "consumer loan business" as that term is defined by the CFLA. N.J. Stat. § 17:11C-2.

458.    All of the loans made to Plaintiff Grandy and the New Jersey Class were in excess of the maximum rates allowed under New Jersey law.

459.    Defendants' loans to Plaintiff Grandy and members of the New Jersey Class were "consumer loans" as that term is defined by the CFLA. N.J. Stat. § 17:11C-2.

460.    The CFLA requires that consumer lenders must be licensed in the State of New Jersey. N.J. Stat. § 17:11C-3. The CFLA also provides that anyone engaged in business as a consumer lender who is not licensed is "guilty of a crime of the fourth degree." N.J. Stat. § 17:11C-33(b). The act further provides that loans made by unlicensed lenders "shall be void and the lender shall have no right to collect or receive any principal, interest or charges unless the act was the result of a good faith error…." *Id.* In addition, the CFLA provides that "a consumer lender who knowingly and willfully violates any provision of this act shall also forfeit to the borrower three times any amount of the interest, costs or other charges collected in excess of that authorized by law." *Id.*

461.    At no time were Defendants licensed to make consumer loans or to collect or receive payments on consumer loans in the State of New Jersey. As a result, the conduct at issue herein is not merely unlawful; it is criminal.

462.    Defendants' conduct was not the result of a good faith error but instead was a deliberate, willful, and intentional scheme to circumvent New Jersey law and to collect interest at rates well in excess of that allowed under the law. Plaintiff Grandy and members of the New Jersey Class are entitled to a declaration that such loans are void.

In addition, Defendants have no right to any principal, interest, or charges on the loans, and Plaintiff Grandy and members of the New Jersey Class are entitled to restitution of all

amounts paid to Defendants, plus forfeiture of three times of the amounts of interest, costs, or other charges collected by Defendants in excess of that authorized by law.

**NINETEENTH CAUSE OF ACTION**
**Violations of New Jersey Consumer Fraud Act**
**(On behalf of Plaintiff Grandy and the New Jersey Class)**
**(Class Claims against All Defendants)**

463.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

464.    The New Jersey Consumer Fraud Act ("CFA") prohibits, among other things, the "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression or omission of any material fact … in connection with the sale or advertisement of any merchandise."  N.J. Stat. § 56:8-2. The requirements of the CFA extend to the offering, sale, or provision of consumer credit.

465.    Defendants' unlawful, criminal consumer lending practices constitute "unconscionable commercial practices" within the meaning of the CFA.

466.    Defendants' conduct caused an ascertainable loss to Plaintiff Grandy and members of the New Jersey Class by, among other things, forcing Plaintiff Grandy and members of the New Jersey Class to pay excessive, unlawful, unconscionable, and usurious rates of interest on consumer loans.

**TWENTIETH CAUSE OF ACTION**
**Violations of Florida Usury Law**
**(On Behalf of Plaintiff Sherman and the Florida Class)**
**(Class Claims against All Defendants)**

467.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

468.    All of the loans made by Defendants to Florida consumers used an interest rate greater than eighteen percent (18%).

469.    Fla. Stat. § 516.02(c) provides that "[a] loan for which a greater rate of interest or charge than is allowed by this chapter has been contracted for or received, wherever made, is not enforceable in this state."  Defendants' loan agreements violated Fla. Stat. § 516.02 because they contained interest rates greater than eighteen percent (18%).

470.    Defendants' loan agreements violated the criminal usury provisions of Fla. Stat. § 687.071 because they contained interest rates greater than twenty five percent (25%). Such loans are "therefore void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

471.    Plaintiff Sherman and Florida Class members are entitled to disgorgement of twice the amount of such usurious interest that was paid. Fla. Stat. § 687.04

### TWENTY-FIRST CAUSE OF ACTION
**Violations of Maryland Consumer Loan Law**
**(On Behalf of Plaintiff Madison and the Maryland Class)**
**(Class Claims against All Defendants)**

472.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

473.    Maryland's Consumer Loan Law limits the annual interest rate on Defendants' loans as follows:

(i) For any loan with an original principal balance of $2,000 or less, 2.75 percent interest per month on that part of the unpaid principal balance not more than $1,000 and 2 percent interest per month on that part of the unpaid principal balance that is more than $1,000;
(ii) For any loan with an original principal balance of more than $2,000, the maximum rate of interest is 2 percent per month on the unpaid principal balance of the loan

Md. Code, Com. Law § 12-306(a)(6).[7]

474.    Moreover, if an unlicensed lender makes a loan for less than $6,000 and charges interest in excess of Maryland's interest rate limitations, such loans are void and unenforceable, and the lender or any third-party may not collect, obtain, or receive any principal, interest, or charges whatsoever on said loans. Md. Code, Com. Law § 12-314.

475.    As set forth more fully above, in the course of making and collecting on loans to Plaintiff Madison and other consumers in Maryland, Defendants repeatedly and knowingly charged, demanded, and accepted interest far in excess of Maryland's interest-rate caps.

476.    Accordingly, it was unlawful for Defendants to collect or receive any principal, interest, or charges on the loans, including all amounts paid by Plaintiff Madison and the Maryland Class members.

477.    Because Defendants' violations were willful, Plaintiff Madison and the Maryland Class are entitled to recover from Defendants any principal, interest, or other charges with respect to the loans. Md. Code, Com. Law § 12-313(b)(1). Alternatively, Plaintiff Madison and the Maryland Class may recover three times any excess amount paid. Md. Code, Com. Law § 12-313(b)(2).

---

[7] Additionally, "[i]f any principal balance remains unpaid 6 months after the loan matures as originally scheduled or deferred, the lender may not contract for, charge, or receive interest at a rate exceeding 6 percent simple interest per annum on the actual unpaid principal balances from time to time." Md. Code, Com. Law § 12-306.

## TWENTY-SECOND CAUSE OF ACTION
### Violations of North Carolina Usury Law
### (On Behalf of Plaintiffs Avent, Gray ("North Carolina Plaintiffs"),
### and the North Carolina Class)
### (Class Claims against All Defendants)

478.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

479.    The maximum legal interest rate chargeable to consumers under North Carolina law is 8%. N.C. Gen. Stat. § 24-1.

480.    Where a written contract exists, for loans with a principal amount of less than $25,000, North Carolina's maximum interest rate permitted is the greater of (1) "the latest published noncompetitive rate for U.S. Treasury bills with a six-month maturity as of the fifteenth day of the month plus 6%" rounded to nearest half percent, or (2) 16%. N.C. Gen. Stat. § 24-1.1(c).

481.    All of the loans made to the North Carolina Plaintiffs and the North Carolina Class were well in excess of the maximum rates allowed under North Carolina law.

482.    Defendants' conduct in doing so was knowing, deliberate, intentional, and willful. Defendants' purpose was to take more than the legal rate of interest for the money loaned to the North Carolina Plaintiffs and members of the North Carolina Class.

483.    Because Defendants' violations were willful, the North Carolina Plaintiffs and the North Carolina Class are entitled to forfeiture of the entire amount of interest owed and may recover twice the amount of the interest rate paid. N.C. Gen. Stat. § 24-2.

## TWENTY-THIRD CAUSE OF ACTION
### Violation of North Carolina Consumer Finance Act
### (On behalf of the North Carolina Plaintiffs and the North Carolina Class)
### (Class Claims against All Defendants)

484.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

485.     North Carolina's Consumer Finance Act ("CFA") provides that for loans of $15,000 or less, a consumer lender may not charge interest greater than permitted by North Carolina's general usury laws without first obtaining a license from the North Carolina Commissioner. N.C. Gen. Stat. § 53-166(a).

486.     A person who fails to comply with the CFA's requirements "shall be guilty of a Class 1 misdemeanor." N.C. Gen. Stat. § 53-166(c). Moreover, "[a]ny contract of loan, the making or collecting of which violates any provision of [the CFA] . . . except as a result of accidental or bona fide error of computation is void, and the licensee or any other party in violation shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan." *Id.* § 53-166(d).

487.     All of the loans made to the North Carolina Plaintiffs and the North Carolina Class were $15,000 or less and in excess of the maximum rates allowed under North Carolina law.

488.     At no time were Defendants licensed to make consumer loans or to collect or receive payments on consumer loans in the State of North Carolina. As a result, the conduct at issue herein is both unlawful and criminal.

489.     Defendants' conduct was not the result of an accidental or bona fide error but instead was a deliberate, willful, and intentional scheme to circumvent North Carolina law and to collect interest at rates well in excess of that allowed under the law. The North Carolina Plaintiffs and members of the North Carolina Class are entitled to a declaration that such loans are void.

490.     Defendants have no right to any principal, interest, or charges on the loans, and the North Carolina Plaintiffs and members of the North Carolina Class are entitled to restitution of all amounts paid to Defendants.

## TWENTY-FOURTH CAUSE OF ACTION
### Violations of Texas Usury Law
**(On Behalf of Plaintiffs Pough, Martinez ("Texas Plaintiffs"), and the Texas Class)**
**(Class Claims against All Defendants)**

491.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

492.    Under Texas law, "[a] greater rate of interest than 10 percent a year is usurious unless otherwise provided by law." Tex. Fin. Code § 302.001(b).

493.    A person who makes consumer loans and charges interest at a rate higher than 10% is required to hold a license. Tex. Fin. Code §§ 342.005, 342.051.

494.    All of the loans made to the Texas Plaintiffs and the Texas Class were well in excess of the 10% maximum rate allowed under Texas law.

495.    At no time were Defendants licensed to make consumer loans or to collect or receive payments on consumer loans in the State of Texas.

496.    Defendants' conduct was not the result of an accidental and bona fide error but instead was a deliberate, willful, and intentional scheme to circumvent Texas law and to collect interest at rates well in excess of that allowed under the law.

497.    Accordingly, the Texas Plaintiffs and the Texas Class are entitled to the greater of (1) three times the interest charged in excess of 10% or (2) the lesser of $2,000 or 20% of the principal. Tex. Fin. Code § 305.001.

498.    Additionally, because Defendants charged the Texas Plaintiffs and the Texas Class interest at a rate twice the amount authorized by Texas law, the Texas Plaintiffs and the Texas Class are also entitled to recover the principal amount of the loan, interest, and any other charges or fees. Tex. Fin. Code § 305.002.

499.     Alternatively, even if Defendants could take advantage of the higher interest rates permitted under Tex. Fin. Code § 342, *et seq.*, Defendants charged the Texas Plaintiffs and the Texas Class interest in excess of the amount authorized by that law.

500.     Accordingly, the Texas Plaintiffs and the Texas Class are entitled to twice the amount of interest Defendants charged or received, and reasonable attorneys' fees. Tex. Fin. Code § 349.001(a). Additionally, because Defendants charged the Texas Plaintiffs and the Texas Class interest at a rate twice the amount authorized by Texas law, the Texas Plaintiffs and the Texas Class are entitled to the principal balance in addition to interest. Tex. Fin. Code § 349.002.

## TWENTY-FIFTH CAUSE OF ACTION
### Violations of Georgia Usury Law
**(On Behalf of Plaintiffs Thomas, Hamm ("Georgia Plaintiffs"), and the Georgia Class)**
**(Class Claims against All Defendants)**

501.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

502.     In their loans to Georgia consumers, Defendants charged and collected interest at a rate greater than the maximum legal rate of interest under Georgia law. Ga. Code Ann. §§ 16-17-1, et seq; Ga. Code Ann. §§ 7-3-1, et seq.

503.     Defendants made loans to Georgia consumers even though they are not licensed to make loans in the State of Georgia.

504.     Under Georgia law, the loans are void and unenforceable.

505.     Plaintiffs recovery of all principal and interest paid to the Defendants under the terms of the illegal loans and award damages equal to three times the amount of any interest paid by the borrowers arising out Defendants' loan transactions. Plaintiffs further seek the recovery of attorneys' fees and costs.

## TWENTY-SIXTH CAUSE OF ACTION
### Violations of Georgia RICO
### (On Behalf of Georgia Plaintiffs and the Georgia Class)
### (Class Claims against All Defendants)

506.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

507.     Under Georgia's RICO statute, it is "unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." Ga. Code Ann. § 16–14–4(a).

508.     Violations of Georgia's Payday Lending Act, Ga. Code Ann. §§ 16-17- 1, et seq are predicate acts and racketeering activity, reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs. Defendants have engaged in a pattern of racketeering activity by their violation of Georgia's Payday Lending Act.

509.     Conspiracy and/or endeavoring to violate the substantive provisions of Georgia's RICO Act is a separate violation of the statute. Ga. Code Ann. § 16-14–4(c).

510.     For the same reasons set forth in Plaintiffs' federal RICO causes of action, Defendants constitute an "enterprise" under Georgia's RICO law.

511.     Through their conduct, Defendants have violated and/or conspired to violate Georgia's RICO law.

512.     Plaintiffs are entitled to appropriate injunctive relief, treble damages, punitive damages, attorneys' fees and costs. Ga. Code. Ann. § 16-14-6.

## TWENTY-SEVENTH CAUSE OF ACTION
### Violations of Michigan's Lending Laws
**(On Behalf of Plaintiffs Paavo and Tarleton and the Michigan Class)**
**(Class Claims against All Defendants)**

513. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

514. All of the loans made by Defendants to Michigan consumers used an interest rate greater than twenty percent (25%).

515. Defendants were not licensed to make loans in Michigan.

516. Under Michigan law, Defendants were barred from collecting any interest on the loans. MCL 438.32

517. Plaintiffs seek disgorgement of any illegal interest collected.

## TWENTY-EIGHTH CAUSE OF ACTION
### Unjust Enrichment
**(On behalf of All Plaintiffs and All State Classes)**
**(Class Claims against All Defendants)**

518. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

519. Plaintiffs and class members conferred a benefit on Defendants when they made payments on loans that were void or made payments of interest beyond the amounts legally collectible under state law.

520. To the detriment of Plaintiffs and class members, Defendants have been, and continue to be, unjustly enriched as a result of charging and collecting illegal, usurious interest rates from residents of Virginia, California, Illinois, Indiana, Ohio, Washington, Texas, Florida, New Jersey, North Carolina, Maryland, Georgia, and Michigan.

521.     As between the parties, it would be unjust for Defendants to retain the benefits attained by their actions. Accordingly, Plaintiffs seek a full accounting and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful conduct alleged herein.

**TWENTY-NINTH CAUSE OF ACTION**
**CIVIL CONSPIRACY**
**(On behalf of All Plaintiffs and All State Classes)**
**(Class Claims against All Defendants)**

522.     All of the loans to consumers in the name of Red Rock and Big Picture violated Plaintiffs' respective state's interest rates and lending laws.

523.     Defendants conspired amongst themselves with to violate state usury and lending laws and profit from those violations.

524.     Accordingly, on behalf of themselves and all other consumers similarly situated, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans with Red Rock or Big Picture.

**THIRTIETH CAUSE OF ACTION**
**AIDING AND ABETTING**
**(On behalf of All Plaintiffs and All State Classes)**
**(Class Claims against All Defendants)**

525.     All of the loans to consumers in the name of Red Rock and Big Picture violated Plaintiffs' respective state interest rates and lending laws.

526.     Defendants aided and abetted Red Rock and Big Picture and each other in violating state usury and lending laws and profiting from those violations.

527.     Accordingly, on behalf of themselves and all other consumers similarly situated, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans with Red Rock or Big Picture.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

A.      An Order certifying the proposed Classes under Fed. R. Civ. P. 23(b)(2), and (b)(3) and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

B.      An Order declaring that Defendants are financially responsible for notifying class members of the pendency of this suit;

C.      An Order declaring that Defendants committed the violations of law alleged herein;

D.      An Order providing for any and all injunctive relief the Court deems appropriate;

E.      An Order awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

F.      An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

G.      An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

H.      An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees; and

I.      Such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

RESPECTFULLY SUBMITTED AND DATED this 24th day of April, 2019.

CONSUMER LITIGATION ASSOCIATES, P.C.

By: /s/ *Leonard A. Bennett*, VSB #37523
    Leonard A. Bennett, VSB #37523
    Email: lenbennett@clalegal.com
    Elizabeth W. Hanes, VSB #75574
    Email: elizabeth@clalegal.com
    Craig C. Marchiando, VSB #89736
    Email: craig@clalegal.com
    763 J. Clyde Morris Boulevard, Suite 1-A
    Newport News, Virginia 23601
    Telephone: (757) 930-3660
    Facsimile: (757) 930-3662

    Kristi C. Kelly, VSB #72791
    Email: kkelly@kellyguzzo.com
    Andrew J. Guzzo, VSB #82170
    Email: aguzzo@kellyguzzo.com
    Casey S. Nash, VSB #84261
    Email: casey@kellyguzzo.com
    KELLY GUZZO, PLC
    3925 Chain Bridge Road, Suite 202
    Fairfax, Virginia 22030
    Telephone: (703) 424-7572
    Facsimile: (703) 591-0167

    E. Michelle Drake (*pro hac vice* forthcoming)
    Email: emdrake@bm.net
    John G. Albanese (*pro hac vice* forthcoming)
    Email: jalbanese@bm.net
    BERGER & MONTAGUE, P.C.
    43 SE Main Street, Suite 505
    Minneapolis, Minnesota 55414
    Telephone: (612) 594-5999
    Facsimile: (612) 584-4470

Beth E. Terrell (*pro hac vice* forthcoming)
Email: bterrell@terrellmarshall.com
Jennifer Murray (*pro hac vice* forthcoming)
Email:  jmurray@terrellmarshall.com
Elizabeth A. Adams (*pro hac vice* forthcoming)
Email: eadams@terrellmarshall.com
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

Matthew Wessler (*pro hac vice* forthcoming)
Email: matt@guptawessler.com
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
Telephone: (202) 888-1741
Facsimile: (202) 888-7792

*Attorneys for Plaintiffs and Proposed Classes*