IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

RENEE GALLOWAY
et al.,
     Plaintiffs,

v.                          Civil Action No. 3:19-cv-314

JUSTIN MARTORELLO,
et al.,
     Defendants.

### MEMORANDUM OPINION

This matter is before the Court on the MOTION TO DISMISS THE COMPLAINT PURSUANT TO RULE 12(b)(2) AS TO DEFENDANT BLUTECH [sic] IRREVOCABLE TRUST (ECF No. 388). For the reasons set forth below, the MOTION TO DISMISS THE COMPLAINT PURSUANT TO RULE 12(b)(2) AS TO DEFENDANT BLUTECH [sic] IRREVOCABLE TRUST ("the 12(b)(2) Motion") (ECF No. 388) will be denied.

### BACKGROUND

This case comes out of a long series of litigation concerning Matt Martorello ("Martorello") and his short-term loan schemes. CLASS ACTION COMPLAINT ("Compl.") ¶ 1, 11 (ECF No. 1). Martorello allegedly engaged in a "rent-a-tribe" scheme in order to make usurious short-term loans with interest rates in the triple digits. Id. at ¶¶ 1, 6-11.

Bluetech Irrevocable Trust ("Bluetech") is one of Martorello's companies allegedly entangled within his elaborate corporate web. Compl. at ¶ 17. Bluetech is a trust incorporated under the laws of the Cook Islands. Id. at ¶ 64. Plaintiffs allege that Martorello created Bluetech to "conceal his ownership interest in the companies involved in the [allegedly illegal lending] scheme and create an additional layer of protection for the illegal money received from consumers." Id.

Martorello created an elaborate and ever-shifting corporate structure. To understand Bluetech's role in the enterprise, it is necessary here to explain that structure. The record shows that the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("the Tribe"), at Martorello's urging, created Red Rock Tribal Lending ("Red Rock"), later rebranded as Big Picture Loans, LLC ("Big Picture"), to issue high-interest short-term loans via the internet. Williams v. Big Picture Loans, LLC, 929 F.3d 170, 174 (4th Cir. 2019).[1] On October 25, 2011, Red Rock hired Martorello's company, Bellicose VI ("Bellicose"), as its servicer to "completely" operate the lending business. Williams v. Big Picture, No. 3:17cv461, 2020 WL 6784352, at *5 (E.D. Va.

---

[1] Big Picture was originally a defendant in a related suit but, as it is an arm of the tribe, Big Picture was dismissed. Williams v. Big Picture Loans, LLC, 929 F.3d 170 (4th Cir. 2019).

Nov. 18, 2020) ("Misrepresentation Opinion"). Under the Servicing Agreement, Bellicose received 98% of all gross proceeds from the lending operation.[2] On July 31, 2012, with retroactive effect to the start of Bellicose's service agreement, Bellicose assigned the servicing agreement to SourcePoint VI ("SourcePoint"), its wholly owned subsidiary.[3] As was the case with Bellicose, SourcePoint also received 98% of all net profits from the loan operation. Id. From 2011 to 2016, the money ran through a convoluted series of corporations from SourcePoint to Bluetech.

From October 25, 2011 to December 31, 2013, Bluetech received 70% of the total revenue from the lending operation, the other 30% went directly to Matt Martorello and his brother, Justin Martorello.[4] See also Bellicose Capital Corporate

---

[2] SERVICING AGREEMENT BETWEEN RED ROCK TRIBAL LENDING, LLC AND BELLICOSE VI, INC at 2.25; 3.5.1 (ECF No. 494-1).

[3] Misrepresentation Opinion at *7; AMENDED & RESTATED SERVICING AGREEMENT BETWEEN RED ROCK TRIBAL LENDING, LLC AND SOURCEPOINT VI, LLC at 2.25; 3.5.1 (ECF No. 494-2).

[4] The record shows that Bellicose owned 100% of SourcePoint and "all of [SourcePoint's] net profits, net losses, expenses and items of income, gain, loss, and credit" were "allocated" to Bellicose. OPERATING AGREEMENT OF SOURCEPOINT VI, LLC at 1, § IV(A); Amend. A (ECF No. 494-3). Bellicose then distributed 30% of the funds to MBM Services (owned 95% by Martorello and 5% by his brother, Justin Martorello) and 70% to 7X Services. MBM SERVICES, LLC OPERATING AGREEMENT at Article 3.1; 14 (ECF No. 494-7). Breakwater also held 100% voting interest in Bellicose. OPERATING AGREEMENT OF BELLICOSE VI, LLC at § II(E)-(F), Exhibit A (ECF No. 494-4). 7X Services then distributed 100% of that money to Breakwater which, in turn, then distributed 100% of the money to M. Martorello Irrevocable Trust, later re-named Bluetech. 7X SERVICES OPERATING AGREEMENT at Exhibit A (ECF No. 494-6); OPERATING

3

Structure at 3 (ECF No. 494-8). On January 1, 2014 Martorello made several alterations to his corporate structure and Bluetech's share in the enterprise lowered to 60%.[5] See also Bellicose Capital Corporate Structure at 4-6. On March 2, 2015, Bluetech's share dropped by 0.5% to 59.5% of the loan operation's revenue.[6]

In January 2016, the lending enterprise went through a general re-structuring. On January 26, 2016, SourcePoint and Bellicose Capital merged into Ascension Technologies, a tribal entity. Before the sale, Martorello had created a new company called Eventide Credit Acquisitions ("Eventide") to effectuate the sale of Bellicose Capital to the Tribe.[7] However, Martorello

---

AGREEMENT OF BREAKWATER HOLDING LLC at Exhibit "A" (ECF No. 494-5); CERTIFICATE OF REGISTRATION UPON CHANGE OF NAME (ECF No. 494-22).

[5] Bellicose VI transferred its interest in SourcePoint to Bellicose Capital. AMENDED AND RESTATED OPERATING AGREEMENT OF BELLICOSE CAPITAL, LLC at 1. Justin Martorello's share in SourcePoint, through Bellicose Capital, increased to 10%. Id. Alpha Tau Capital replaced 7X Service's and owned 60% of SourcePoint. Id. This new structure lasted until July 1, 2014. On that date, Martorello transferred a 4.5% interest between Brian McFadden, James Dowd, and Simon Liang, three individuals also engaged in the lending scheme and former defendants in this suit. Id.; March 3, 2020 ORDER (ECF No. 324).

[6] At this point, Bellicose Capital's members were as follows: Kairos Holdings, LLC ("Kairos") (59.5%); Liont, LLC ("Liont") (25.5%); Justin Martorello (10%); Brian McFadden (2%); James Dowd (1.5%); and Simon Liang (1.5%). SCHEDULE A OF THE AMENDED AND RESTATED OPERATING AGREEMENT OF BELLICOSE CAPITAL, LLC (ECF No. 494-11). Bluetech owned 100% of Kairos throughout its existence. Bellicose Capital Corporate Structure at 7-13. Martorello is the sole owner and president of Liont. June 4, 2018 Email from Martorello to Huffstutter RE: Additional Information (ECF No. 494-30); OPERATING AGREEMENT OF LIONT, LLC at 18 (ECF No. 513-9). It appears that, from January 1, 2014 to January 1, 2016, Breakwater had no role in the enterprise.

[7] OPERATING AGREEMENT OF EVENTIDE CREDIT ACQUISITIONS, LLC (ECF No. 494-12).

structured the sale to continue to profit from the lending enterprise. To pay for Bellicose, the Tribe signed a Secured Promissory Note in which it was obliged to pay Eventide between 94-96% of the enterprise's gross revenue up to $300,000,000 or seven years.[8] The money then flowed from Eventide through a series of corporations. After the sale, Eventide's members were as follows: Breakwater (59.5%); Gallant Capital (25.5%); Justin Martorello (10%); Brian McFadden (2%); James Dowd (1.5%); and Simon Liang (1.5%). Id. at Schedule A.[9] Throughout this period, Bluetech owned Breakwater.[10] Thus, after the transfer, Bluetech continued to derive a significant percentage of income from the enterprise.

Plaintiffs have asserted twenty-eight claims against Bluetech under state and federal laws. Compl. at 55-82. The Complaint denotes the claims as Causes of Action (such as "FIRST CAUSE OF ACTION"). The Memorandum Opinion refers to them as

---

[8] AGREEMENT AND PLAN OF MERGER BETWEEN LVD TRIBAL ACQUISITIONS COMPANY, LLC AND BELLICOSE CAPITAL, LLC AND EVENTIDE CREDIT ACQUISITIONS, LLC at § 2.7 (ECF No. 494-14); SECURED PROMISSORY NOTE at §§ 1.2, 1.3 (ECF No. 494-15).

[9] As of July 15, 2015, Eventide's members were as follows: Kairos Holdings, LLC (59.5%); Gallant Capital (25.5%); Justin Martorello (10%); Brian McFadden (2%); James Dowd (1.5%); and Simon Liang (1.5%). Id. at Schedule A. On January 1, 2016, Kairos transferred its 59.6% interest in Eventide to Breakwater. INTEREST TRANSFER AGREEMENT (ECF No. 321-4).

[10] Breakwater FINANCIAL INTEREST DISCLOSURE STATEMENT (ECF No. 63) ("The sole member of Breakwater is Guardian Trust Corporation as trustee of the Bluetech Irrevocable Trust").

Counts (such as "COUNT ONE.") The Court dismissed, without prejudice, COUNTS SIX to TWENTY-SEVEN in their entirety and COUNTS TWENTY-EIGHT through THIRTY, except as asserted under Virginia law. September 23, 2021 MEMORANDUM ORDER (ECF No. 371).[11] For purposes of deciding the Rule 12(b)(2) motion, the two RICO counts (COUNTS ONE and TWO) are asserted by Plaintiffs as the providing the jurisdictional predicate.

## DISCUSSION

**Legal Framework**

Fed. R. Civ. P. 12(b)(2) allows for dismissal of an action for "lack of personal jurisdiction." To establish personal jurisdiction, two elements must be satisfied: (1) personal jurisdiction must be statutorily authorized; and (2) the statutory authorization must be constitutional. Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc., 334 F.3d 390, 396 (4th Cir. 2003). Plaintiffs have the burden of proving "grounds for jurisdiction by a preponderance of the evidence." Carefirst of Maryland, Inc., 334 F.3d at 396. There has been an evidentiary hearing and oral argument. See April 4-5, 2023 Hearing Trans. (ECF Nos. 524, 525).

---

[11] As to Bluetech, the remaining claims are the claims under the Racketeer Influenced and Corrupt Organization Act ("RICO") (18 U.S.C. § 1962(c) and (d)) under COUNTS ONE and TWO; the unjust enrichment and civil conspiracy claims under Virginia law under COUNTS TWENTY-SEVEN and TWENTY-NINE; and the related aiding and abetting claim under COUNT THIRTY.

**Analysis**

Plaintiffs argue that there is personal jurisdiction under either: (1) Fed. R. Civ. P. 4(k)(1)(C) (using the RICO's nationwide service of process provision, 18 U.S.C. § 1965(d)), and under (2) Fed. R. Civ. P. 4(k)(2). PLAINTIFFS' OPPOSITION TO DEFENDANT BLUETECH IRREVOCABLE TRUST'S RULE 12(B)(2) MOTION TO DISMISS ("Response") at 1 (ECF No. 564).[12] Furthermore, they argue that the Fifth Amendment's Due Process clause does not prevent this Court from asserting personal jurisdiction. Id. at 2.

### I. Rule 4(k)(1)(C)

Rule 4(k)(1)(C) states: "Serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant. . . (C) when authorized by a federal statute." Plaintiffs rely on RICO, a federal statute which permits nationwide service of process provision. Response at 12; ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 626 (4th Cir. 1997). The provision reads:

> All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.

18 U.S.C. § 1965(d).

---

[12] An unsealed version is filed at ECF No. 561.

As this Court decided when it denied Bluetech's 12(b)(5) motion in a separate Memorandum Opinion, service was proper in this case. Because service was properly accomplished, Rule 4(k)(1)(C) is satisfied.[13]

### II. Rule 4(k)(2)

There also is personal jurisdiction under Rule 4(k)(2), which "is in essence a federal long-arm statute." Saudi v. Northrop Grumman Corp., 427 F.3d 271, 275 (4th Cir. 2005). To satisfy Rule 4(k)(2), Plaintiffs must meet three requirements: (1) "the suit must arise under federal law"; (2) "the defendant must not be subject to personal jurisdiction in any state"; and (3) the exercise of jurisdiction must be "consistent with the Constitution and laws of the United States." Id. (citation and quotation omitted). In this case, the Complaint alleges claims under RICO, a federal law, so the first element is met. Indeed, it is not a contested point.

The second element is also met. "A defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed." Auto. Automobili Lamborghini

---

[13] To avoid the use of a nationwide service provision when service is properly effectuated, defendants can argue that the claim against them is not "colorable, i.e., that it is implausible, insubstantial, or frivolous." D'Addario v. Geller, 264 F.Supp.2d 367, 388 (E.D.Va. 2003); see also Hardwire, LLC v. Ebaugh, No. CV-JKB-20-0304, 2021 WL 3809078, at *5 (D. Md. Aug. 26, 2021). However, Bluetech does not make any such argument.

S.P.A. v. Lamborghini Latino Am. USA, 400 F.Supp.3d 471, 478 (E.D. Va. 2019) (quoting ISI Int'l, Inc. v. Borden Ladner Gervais LLP, 256 F.3d 548, 552 (7th Cir. 2001)); Sotloff v. Qatar Charity, ___ F.Supp.3d ___, 2023 WL 3721683, at *10 (S.D. Fla. 2023) (collecting cases). But here, Bluetech has not done so.[14] So, that point is not in dispute either.

Instead, Bluetech argues that the Plaintiffs' alternative contention that Bluetech would be subject to Virginia personal jurisdiction is "fatal" to their Rule 4(k)(2) theory because it identifies a state in which Bluetech is subject to personal jurisdiction. Id.; see Response at 28. This is not so. "[P]ersonal jurisdiction claims may be properly analyzed in the alternative." Graduate Management Admission Council v. Raju, 241 F.Supp.2d 589, 600 (E.D.Va. 2003).

Put simply, Bluetech cannot have it both ways. It cannot argue that it is not subject to Virginia jurisdiction[15] but then claim that it *may* be subject to another, unidentified state's jurisdiction. Bluetech must, at the very least, direct the Court and Plaintiffs to a state in which it admits that personal jurisdiction would be proper. It has failed to do that. And, it

---

[14] REPLY IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT PURSUANT TO RULE 12(b)(2) BY DEFENDANT BLUETECH IRREVOCABLE TRUST ("Reply") at 11 (ECF No. 573).

[15] See MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT PURSUANT TO RULE 12(B)(2) BY DEFENDANT BLUETECH IRREVOCABLE TRUST ("Memo in Supp.") at 3 (ECF No. 539).

denies that it is amenable to personal jurisdiction in Virginia. Therefore, "it is appropriate to conclude, by a preponderance of the evidence, that [Bluetech] is not subject to personal jurisdiction in any state, which satisfies the [second] Rule 4(k)(2) element." Auto. Automobili Lamborghini S.P.A., 400 F. Supp.3d at 478.

Therefore, as long as the exercise of jurisdiction is constitutional, Rule 4(k)(2) provides the statutory basis for the exercise of personal jurisdiction. That topic will be discussed in Section III below.

Bluetech also argues that "Plaintiffs cannot invoke Rule 4(k)(2) because they did not assert this ground for personal jurisdiction in the complaint." Reply at 10. That argument also lacks merit. The Federal Rules of Civil Procedure only require pleadings to contain "a short and plain statement" of the grounds for subject matter, not personal, jurisdiction over "the claim." Fed. R. Civ. P. 8(a)(1); Stirling Homex Corp. v. Homasote Co., 437 F.2d 87, 88 (2d. Cir. 1971) (per curiam). "[T]he complaint does not need to allege. . . the basis for jurisdiction over the defendant's person or property." Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1206 (4th ed.). Thus, there is no pleading defect.

### III. Due Process

As is the case under Rule 4(k)(1)(C), the Fifth Amendment's Due Process Clause limits federal courts' exercise of personal jurisdiction under Rule 4(k)(2). ESAB Group, Inc., 126 F.3d at 627.[16] Here, Plaintiffs seek to establish specific, not general, jurisdiction over Bluetech. Goodyear Dunlop Tires Ops., S.A. v. Brown, 564 U.S. 915, 919 (2011).[17] To determine whether it is proper to exercise specific personal jurisdiction, courts consider:

> (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the [forum]; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable.

---

[16] The Fifth Amendment minimum contacts analysis mirrors the more familiar Fourteenth Amendment analysis, the sole difference being the substitution of the nation for a state as the relevant forum. Graduate Mgmt. Admission Council, 241 F.Supp.2d at 597; but see Bristol-Myers Squibb Co. v. Superior Ct., 137 S. Ct. 1773, 1784 (2017) ("we leave open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court").

[17] "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State. Specific jurisdiction, on the other hand, depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." Goodyear Dunlop Tires Ops., S.A., 564 U.S. at 919 (cleaned up) (emphasis added).

UMG Recordings, Inc v. Kurbanov, 963 F.3d 344, 352 (4th Cir. 2020) (citation and quotation marks omitted). Each factor will be evaluated in turn.

A. *Minimum Contacts*

First, Plaintiffs must establish that Bluetech had sufficient "minimum contacts" with the United States "such that the maintenance of suit does not offend traditional notions of fair play and substantial justice." UMG Recordings, Inc, 963 F.3d at 351 (quotation marks and citation omitted). When evaluating whether there are sufficient minimum contacts, the Court must be satisfied that the defendant "purposefully avail[ed] itself of the privilege of conducting activities with the forum." Bristol-Myers Squibb, 137 S.Ct. at 1785. "[T]he touchstone. . . remains that an out-of [forum defendant has] . . . engaged in some activity purposefully directed toward the forum." ESAB Group, Inc., 126 F.3d at 625 (quotation marks and citation omitted).

The minimum contacts requirement works to "ensure that a defendant has fair warning before it is subject to the coercive power of a court." Saudi, 427 F.3d at 275. "[F]oreseeability" is "critical" to the due process analysis. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985) (quotation marks and citation omitted). Therefore, "random, fortuitous, or attenuated

12

contacts" or contacts arising from "the unilateral activity of another party or a third person" are not enough to establish sufficient minimum contacts. Id. at 475 (quotation marks and citations omitted). But, "the jurisprudence of minimum contacts casts a wide net, and a nonresident defendant may not always be able to elude that net by such simple expedients" and "courts must look beyond. . . formalistic measures and evaluate the nature of the contacts." Pritzker v. Yari, 42 F.3d 53, 62 (1st Cir. 1994); see also J. McIntyre Machinery, Ltd. v. Nicastro, 564 U.S. 873, 893, 906 (2011) (Ginsburg, J. dissenting) (decrying foreign corporations' attempts to evade American jurisdiction).

The Fourth Circuit has posited a nonexclusive list of factors to consider when determining whether a defendant purposefully availed himself of a forum:

> (1) whether the defendant maintained offices or agents in the [forum]; (2) whether the defendant maintained property in the [forum]; (3) whether the defendant reached into the [forum] to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the [forum]; (5) whether a choice of law clause selects the law of the [forum]; (6) whether the defendant made in-person contact with a resident of the [forum] regarding the business relationship; (7) whether the relevant contracts required performance of duties in the [forum]; and (8) the nature, quality, and extent of the parties' communications about the business being transacted.

13

<u>UMG Recordings, Inc.</u>, 963 F.3d at 352 (citation omitted). And, the Supreme Court has made clear that in

> appropriate cases [courts] may evaluate <u>the burden on the defendant</u>, the <u>forum</u> State's <u>interest</u> in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective <u>relief</u>, the <u>interstate judicial system's interest in obtaining the most efficient resolution</u> of controversies, and the shared interest of the several States in furthering fundamental substantive social policies. . . . <u>These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required.</u>

<u>Burger King Corp.</u>, 471 U.S. at 477 (quotation marks and citations omitted) (emphasis added). In the federal context, courts must also consider "the national interest in furthering the policies of the law(s) under which the plaintiff is suing." <u>Pinker v. Roche Holdings, Ltd.</u>, 292 F.3d 361, 371 (3d Cir. 2002). <u>Burger King</u>, in effect, creates a sliding scale for the quantity and quality of required contacts based on the interest of the forum.

Under a traditional minimum contacts analysis, Bluetech has sufficient minimum contacts with the United States to satisfy the requirements of Due Process under either a stream of revenue theory or conspiracy jurisdiction.[18]

---

[18] Plaintiffs also request that this Court pierce the corporate veil and impute Martorello's contacts to Bluetech. Response at 14. Because the Court can exercise personal jurisdiction without piercing the corporate veil, it is not necessary to decide that question.

### (i) Stream of Revenue Theory

Plaintiffs allege, and have offered sufficient evidence to show, that Bluetech knowingly participated in a United States-based unlawful RICO enterprise targeted at American consumers and that the proceeds of the alleged RICO enterprise came to rest in Bluetech. Compl. ¶¶ 244, 355, 365; Response at 8 ("the record reflects that money from the illegal lending enterprise flowed out of the United States to Bluetech, to be held for the benefit of Martorello's family in the United States").[19] Plaintiffs have demonstrated their theory and provided supporting documentation showing how money flowed through the lending enterprise, starting from loans collected in the United States and ending with Bluetech. PLAINTIFFS' STATEMENT OF POSITION REGARDING HOW MONEY FROM THE ALLEGED SCHEME FLOWED THROUGH EACH OF MARTORELLO'S COMPANIES ("Statement on Flow of Money") (ECF No. 497); Bellicose Capital Corporate Structure

---

[19] Here, it is appropriate to note that Bluetech has refused to engage in any form of discovery and has steadfastly acted to obstruct and prolong this litigation. Indeed, Bluetech point-blank refused "to provide the information" sought by the Court regarding the flow of money throughout the lending enterprise and the make-up of the loan customers. Therefore, the Court will rely on the record before it: that produced by the Plaintiffs. Bluetech's failure and refusal to engage in discovery will be discussed in a separate memorandum opinion. See BLUETECH IRREVOCABLE TRUST'S STATEMENT OF POSITION IN RESPONSE TO THE COURT'S MARCH 23, 2023 ORDER [ECF NO. 492] (ECF No. 501); MOTION FOR PROTECTIVE ORER [sic] AS TO DEFENDANTS BLUETECH IRREVOCABLE TRUST AND BREAKWATER HOLDINGS, LLC (ECF No. 533); MEMORANDUM IN SUPPORT OF MOTION FOR PROTECTIVE ORDER AS TO DEFENDANTS BLUETECH IRREVOCABLE TRUST, AND BREAKWATER HOLDINGS, LLC at 3 (ECF No. 534).

(ECF No. 494-8).[20] Though a class has not yet been certified in this case, Plaintiffs allege, and Martorello does not deny, that the proposed class "involves the same, or a substantially similar, class of consumer[s] to the one settled in *Galloway v. Williams*, 3:19-cv-470 (E.D. Va.) (ECF No. 115)." Statement on Flow of Money at 20. In that class of 490,024 unique consumers, "all but five of the class members had addresses in the United States." Id. The five non-United States addresses included four in U.S. Territories and one on a military base in Kuwait. Id.; DECLARATION OF AMERICAN LEGAL CLAIMS SERVICES, LLC at 2 (ECF No. 494-31). Based on the record in this case, it is both logical and permissible to conclude that the alleged RICO lending enterprise targeted its loans to individuals located within the United States and not to other jurisdictions. As a result, the Court finds, by the preponderance of the evidence, that the RICO lending enterprise was anchored in the United States and that Bluetech received significant sums of money from that RICO enterprise.

And, because Bluetech drew a continual stream of revenue from United States based loans, it can be subject to American personal jurisdiction, upon application of the "the stream of revenue theory." Under that well-recognized concept, the Court

---

[20] The unsealed version is filed at ECF No. 494.

looks to the origination of the loan revenue and traces the flow of the money to its end.[21] If there is a sufficient continuous flow of revenue from the United States to the defendant and that revenue encompasses all, or nearly all, of the entity's income, personal jurisdiction attaches. This sound jurisdictional principle is designed to overcome attempts to divert money into off-shore bank accounts to elude the reach of American jurisdiction.[22] Here, the headwaters of the stream begin in the United States and flow through Martorello's various corporate entities to Bluetech. Thereafter, Bluetech directs the allegedly illegal proceeds to Martorello, his family, and invests in Martorello's companies that provide the funding for the loans in the first place.

---

[21] Provident Nat. Bank v. Cal. Fed. Sav. & Loan Ass'n, 819 F.2d 434 (3d. Cir. 1987); Easter v. Am. W. Fin., 381 F.3d 948, 961 (9th Cir. 2004); Johnson v. Long Beach Mortg. Loan Tr. 2001-4, 451 F. Supp. 2d 16 (D.D.C. 2006); Ruegsegger v. Caliber Home Loans, Inc., No. SA CV 17-0907-DOC, 2018 WL 5993857 (C.D. Cal. April 30, 2018); see also Resonant Sensors Inc. v. SRU Biosystems, Inc., No. 3:08-cv-1978, 2012 WL 5843498, at *2-4 (N.D. Tex. Nov. 16, 2012) (discussing a similar concept in the realm of patent infringement).

[22] Cook Islands trusts, like Bluetech, are favored means of attempting to hide money from American authority. David R. McNair, "Cook Islands Asset Protection Trust Law," 3 J. Bus. Entrepreneurship & L. 321, 327 (2010); Stewart E. Sterk, "Asset Protection Trusts: Trust Law's Race to the Bottom," 85 Cornell L. Rev. 1035, 1037, 1048 (1999). Indeed, according to at least one legal scholar, the Cook Islands intentionally fashioned its "asset protection" legal regime explicitly to attract an American clientele and to serve as an overseas haven for American citizens' funds. McNair, "Cook Islands Asset Protection Trust Law," at 322.

17

This theory finds its constitutional and theoretical footing on its corollary, the stream of commerce theory.[23] Under the stream of commerce theory, as adopted by the Fourth Circuit, a court can exercise personal jurisdiction over a corporation that intentionally placed its products in the stream of commerce and purposefully "establish[ed] a meaningful contact with the forum state."[24]

Here, the record shows that Bluetech derived revenue from roughly half a million different loans made to American residents. Statement on the Flow of Money at 20. This alone is enough to show that Bluetech had "meaningful contact" with the

---

[23] The Court is well aware of jurisprudential confusion surrounding the scope of the stream of commerce theory. Asahi, the most on-point Supreme Court case, is a famously fractured opinion in which no majority of the Court spoke on this question. See Asahi Metal Indus. Co., Ltd. v. Superior Court of Cali., 480 U.S. 102 (1987). Following Asahi, the Fourth Circuit adopted Justice O'Connor's views, as expressed in her Asahi concurrence, articulating a more narrow understanding of the stream of commerce. Lesnick v. Hollingsworth & Vose Co., 35 F.3d 939, 944-45 (4th Cir. 1994). This three-decade old case may have been overturned or limited by subsequent Supreme Court cases discussing the extent of federal courts' personal jurisdiction. See e.g. J. McIntyre v. Nicastro, 564 U.S. 878 (2011); Daimler AG v. Bauman, 134 S.Ct. 746 (2014); Ford Motor Co. v. Montana Eight Judicial District Ct., 141 S.Ct. 1017 (2021). However, lower courts in the Fourth Circuit continue to follow the "foreseeability plus" or "stream-of-commerce plus" test adopted in Lesnick and Justice O'Connor's Asahi concurrence. Collier v. Land & Sea Restaurant Co., No. 7:13-cv-00104, 2014 WL 5254916, at *5 (W.D. Va. Oct. 15, 2014); see also Grizzard v. LG Chem LTD, No. 2:21cv4692022, WL 17076706, at *7 (E.D.Va. Nov. 18, 2022). Here, the Court will assume that Lesnick remains the law in the Fourth Circuit and use the more stringent understanding of the test, as outlined there, as a blueprint for its articulation of the stream of revenue theory.

[24] Lesnick, 35 F.3d at 944-45; see also Asahi, 480 U.S. at 111 (O'Connor, J. concurring) (requiring "[a]dditional conduct of the defendant" to "indicate an intent or purpose to serve the market in the forum").

United States. But, in this case, there is even more. Martorello, the trust settlor and the trust's beneficiaries (Martorello's wife (Rebecca Martorello) and Martorello's infant children) are all residents of the United States (or, at certain points during the conspiracy, Puerto Rico, a United States territory). Compl. ¶¶ 51, 244-45; Statement on Flow of Money at 15.[25] By virtue of Martorello's American citizenship, Bluetech is required to--and has--paid U.S. taxes.[26] The record also shows that Martorello received, apparently on an annual basis, an invoice from Bluetech's trustee, Asiaciti Trust Pacific Limited, for services rendered in the administration of the trust. 2016 Asiaciti Invoice (ECF No. 494-25); 2015 Asiaciti Invoice (ECF No. 494-26). These invoices used the U.S. dollar as currency and listed a JPMorgan Chase New York account as the "Correspondent Bank" for all payments.[27] Id. Because Asiaciti continues to serve as trustee, it is permissible to infer that the invoices were

---

[25] DEED OF EXCLUSION AND ADDITION OF BENEFICIARIES ("Add. Of Beneficiaries") at 3 (ECF No. 494-24); Annual Information Return of Foreign Trust With a U.S. Owner at 6 (ECF No. 497-6).

[26] Statement on Flow of Money at 14; Annual Information Return of Foreign Trust With a U.S. Owner at 6; 26 U.S.C. § 6048.

[27] A correspondent bank is essentially a middleman in cross-border transactions. For example, if Bank A wants to make a transfer to Bank B but neither Bank A nor Bank B hold accounts with one another, they will use Bank C (the correspondent bank), in which they both hold accounts, to effectuate the transfer. Rena S. Miller, "Overview of Correspondent Banking and 'De-Risking' Issues," Congressional Research Service (April 8, 2022), https://crsreports.congress.gov/product/pdf/IF/IF10873.

paid. This means that, on at least two occasions, Martorello's payments on behalf of the trust went through U.S. bank accounts. In addition, Bluetech appointed Liont, an American-based company, as it's manager.[28] Taken as a whole, the record establishes that Bluetech has "meaningful contact" with the United States.

Other courts have adopted the stream of revenue theory of personal jurisdiction. In a District of Columbia case, the court found that an out-of-state trust was subject to D.C. personal jurisdiction even though it had no offices, bank accounts, employees, or contracts in D.C. Johnson v. Long Beach Mortg. Loan Tr. 2001-4, 451 F. Supp. 2d 16, 29 (D.D.C. 2006). The court, in Johnson, concluded that, even though the trust did not originate, solicit, or collect payments on loans, it was subject to D.C. courts because it took assignment of a mortgage and "[drew] a revenue stream" from it "even if it does not directly collect such payments." Id. at 29-30. Like the Johnson defendants, Bluetech "receive[s] income" from United States based loans. Id. And, the income is from the payments made on the illegal loans, making the linkage a direct one.

---

[28] GUARDIAN TRUST CORPORATION ("the Trustee") atf the BLUETECH IRREVOCABLE TRUST ("the Trust") Resolution of Trustee dated the 9 February 2015 (ECF No. 494-28).

Likewise, the Ninth Circuit has held that there was specific personal jurisdiction over trust defendants who were "beneficiaries of deeds of trust" on real property within the forum. Easter v. Am. W. Fin., 381 F.3d 948, 961 (9th Cir. 2004). As part of its minimum contacts analysis, the Ninth Circuit considered the fact that, "albeit routed through the loan servicing companies who actually bill the payors," the defendants "receive[d] money from [forum] residents." Id. The Ninth Circuit emphasized that the defendant's "income stream is derived from loans negotiated and executed in [the forum] and made to [forum] residents." Id. Even more so than in the D.C. case, the Ninth Circuit found it highly significant that *origination* of the defendants' stream of income (from within the United States), rather than the security interest in the in-forum property. The Ninth Circuit also made clear that it does not matter who the borrowers directly pay as much as it matters where the money ends up. Finally, the Ninth Circuit approved of specific jurisdiction because "the suit is for recovery of the allegedly excessive interest payments Borrowers made on their notes." Id.

It is true that both the D.C. and Ninth Circuit cases concern loans attached to real property, which is not the case here. But, like those loans, these loans too are "at home" and

centered in the United States. In another case concerning a similar loan enterprise, the Fourth Circuit affirmed just that finding. Hengle v. Treppa, 19 F.4th 324, 348-49 (4th Cir. 2021) (determining that loans made online do not constitute "on reservation" conduct). And, as in Easter, the loan payments ended up with Bluetech.

Thus, on this record, this is a case where a defendant "'purposefully derive[d] benefit' from [its] [in-forum] . . . activities." Burger King Corp., 471 U.S. at 473-74. And, it does not offend due process to require the defendant to be accountable here for the "consequences that arise proximately from such activities." Id. Indeed, the United States has a "substantial interest" in protecting its citizens from usurious loans and racketeers and no other sovereign has a greater interest in litigating this case. And, after all, one of Congress's major objectives in enacting RICO was to stop the collection of unlawful loans (loansharking). United States v. Turkette, 452 U.S. 576, 588-90 (1981). As the Supreme Court explained, while the personal jurisdiction analysis focuses on the defendant's relationship with the forum, the location of the "[p]laintiff's residence may well play an important role in determining the propriety of entertain a suit against the defendant in the forum." Keeton v. Hustler Magazine, Inc., 465

22

U.S. 770, 780 (1984).   Though the Plaintiffs do not proceed under a traditional "effects test" theory of personal jurisdiction, the Court notes that the record shows that the RICO enterprise's "actions were expressly aimed at [the United States]" and that defendants, including Bluetech, "knew that the brunt of that injury would be felt" in the United States. Calder v. Jones, 465 U.S. 783, 789-90 (1983).

This alleged RICO enterprise targeted American citizens—and not Cook Islanders. Bluetech profited mightily from the loans made to Americans and revenues taken from Americans' pockets. That fact is clearly established by the record. Under Burger King and the decisions cited above, Bluetech is amenable to United States personal jurisdiction.

That conclusion is fully consistent with the purpose behind the personal jurisdiction doctrine: that Bluetech must have adequate notice that it could be hailed before American courts. See Saudi, 427 F.3d at 275.   The Supreme Court recently reiterated the importance of "clear notice" and "fair warning" of litigation in the forum. Ford Motor Co., 141 S.Ct. at 1025. Receiving money generated from the loans made in the United Sates, being subject to the jurisdiction of the Internal Revenue Service, and having an American settlor certainly gave Bluetech warning that it may be subject to jurisdiction in the United

23

States. See also 2015 Asaiciti Invoice (informing Martorello that "[d]uring the previous year, we [Bluetech's trustee] have been required to implement procedures and systems in order to comply with the global Foreign Account Tax Compliance Act measures imposed by the United States Government"). In addition, Bluetech has been the sole owner of multiple United States-based corporate entities including 7X Services, Alpha Tau Capital, and Karios Holdings. Bellicose Capital Corporate Structure. On this record, Bluetech cannot plausibly be heard to say that it was blindsided by the fact that it may be forced to answer for its actions in the courts of the United States. And, as described above, this is further reinforced by the fact that the United States "is the focal point both of the [RICO conspiracy] and of the harm suffered." Calder, 465 U.S. at 789.

Discussing foreseeability, Justice Brennan observed "[t]he stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products." Asahi Metal, 480 U.S. at 117 (Brennan, J. concurring). There is even less, in fact no, unpredictability about the stream of revenue in this case. In a "regular and anticipated flow," the money traveled, as intended, from the United States to Bluetech's coffers.

In sum, Bluetech "directly profited" from making loans in the United States and "cannot now disentangle [itself] from a web woven by [it]." UMG Recordings, Inc., 963 F.3 at 355. Taking into consideration Bluetech's contacts with the United States, the United States' substantial interest in this litigation, and Bluetech's knowledge that it could be hailed before American courts, Plaintiffs have made out, by the preponderance of the evidence, that there is personal jurisdiction under a stream of revenue theory.

### (ii) Conspiracy Theory

Independently and separately, the Court finds that Due Process is satisfied under the conspiracy theory of personal jurisdiction. The Fourth Circuit has recognized the conspiracy theory of personal jurisdiction as constitutionally valid. Unspam Technologies, Inc. v. Chernuk, 716 F.3d 322, 322 (4th Cir. 2013).[29]

Under a conspiracy theory of personal jurisdiction, defendants can be "imputed with constitutionally sufficient contacts with [the forum] through the actions of their alleged coconspirators." Unspam Technologies, Inc., 716 F.3d at 329. "To

---

[29] It is true that the Fourth Circuit has only had occasion to consider this question with respect to the Fourteenth Amendment's Due Process provision. But, as outlined above, the Due Process analyzes under the Fifth and Fourteenth Amendments are the same.

succeed on this theory," plaintiffs must "make a plausible claim":

> (1) that a conspiracy existed; (2) that the . . . defendants participated in the conspiracy; and (3) that a coconspirator's activities in furtherance of the conspiracy had sufficient contacts with Virginia to subject that conspirator to jurisdiction in Virginia.

Id.; Comm'n on Health Care Certification, Inc. v. Fig Servs., Inc., No. 3:22-cv-39, 2022 WL 1696019, at *7 (E.D. Va. May 26, 2022); Gibbs v. Elevate Credit, Inc., No. 3:20-cv-632, 2021 WL 4851066, at *12 n.30 (E.D. Va. Oct. 17, 2021) (applying conspiracy jurisdiction in the RICO context).

Bluetech argues that the Unspam test is incompatible with the Supreme Court's 2014 decision in Walden v. Fiore, 571 U.S. 277 (2014), which emphasizes that personal jurisdiction must arise from contacts that a defendant itself makes. Reply at 12. However, multiple courts, including this one, have continued to recognize Unspam and its conspiracy jurisdiction test in the near decade since Walden. See Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 87 (2d Cir. 2018) (adopting the Unspam test); Comm'n on Health Care Certification, Inc., 2022 WL 1696019, at *7; SouthStar Fin., LLC v. T-Zone Health, Inc., No. 2:21-CV-02511-DCN, 2021 WL 5235223, at *4 (D.S.C. Nov. 10, 2021); BeoCare Group Inc. v. Morrissey, 124 F.Supp.3d 696, 702 (W.D.N.C. 2015). This rather robust support makes it clear that

Unspam and the conspiracy theory of personal jurisdiction are not foreclosed by Walden.

Unspam itself and the in-circuit district court decisions applying it, do so in the context of state long-arm statutes. However, before Unspam, the Southern District of West Virginia endorsed the theory of conspiracy jurisdiction in conjunction with Rule 4(k)(2). Felman Prod. Inc. v. Bannai, 517 F.Supp.2d 824 (S.D.W. Va. 2007). Felman shares a similar fact pattern with this case. In Felman, plaintiffs brought a RICO suit against international steel companies and their owners. Id. at 827. Looking to Rule 4(k)(2) for statutory authority, the Court determined that, if it had personal jurisdiction over one defendant, that jurisdiction could extend to international co-conspirators. Id. at 831–32. Though the Court ultimately determined that it could not make the requisite findings, Felman endorsed a theory of conspiracy jurisdiction in the international context.

The question of Rule 4(k)(2) and conspiracy jurisdiction has been increasingly explored by courts around the country. However, there are no "circuit court decisions that determine whether conspiracy jurisdiction is appropriate under Rule 4(k)(2)." Sotloff, 2023 WL 3721683, at *15. A recent Southern District of New York case, applying the Unspam analysis,

27

determined that Rule 4(k)(2) allowed for the exercise of federal conspiracy jurisdiction. <u>Rudersdal v. Harris</u>, No. 1:18-CV-11072-GHW, 2022 WL 263568, at *10 (S.D.N.Y. Jan. 28, 2022) ("Under Rule 4(k)(2), there is no limitation that would exclude an application of a conspiracy theory of jurisdiction"). Likewise, the Southern District of Florida, the Eastern District of New York, and the Northern District of Alabama also have endorsed this theory of personal jurisdiction. <u>Sotloff</u>, 2023 WL 3721683, at *15; <u>Henkin v. Charity</u>, 21-CV-5716, 2023 WL 2734788, at *10 (E.D.N.Y. March 31, 2023); <u>Przewozman v. Charity</u>, No. 20-CV-6088, 2023 WL 2562537, at *18 (E.D.N.Y. March 17, 2023); <u>Drummond Co., Inc. v. Collingsworth</u>, No. 2:15-CV-506-RDP, 2017 WL 3268907, at *14 n.4 (N.D. Ala. Aug. 1, 2017); <u>see also</u> <u>In Platinum & Palladium Antitrust Litig.</u>, 61 F.4th 242, 274 (2d. Cir. 2023) (<u>holding</u> that conspiracy jurisdiction comports with the Fifth Amendment).

It is true that some federal courts have declined to adopt this theory,[30] while other courts have observed that it is an

---

[30] <u>Schrier v. Qatar Islamic Bank</u>, No. 20-60075-CIV, 2022 WL 4598630, at *24-25 (S.D. Fla. Sept. 30, 2022), <u>appeal filed</u>, 22-13513 (11th Cir. Oct. 19, 2022) ("Rule 4(k)(2) doesn't—at least on its face—appear to allow for the exercise of personal jurisdiction over a defendant based *only* on a conspirator's contacts with the United States").

open question.[31] However, the reasoning of Sotloff, Rudersdal, Henkin, Drummond, and Przewozman provide persuasive authority to follow their lead.

In light of the Fourth Circuit's clear endorsement of the concept in Unspam, it is reasonable to rely on conspiracy jurisdiction in the context of Rule 4(k)(2). If its first two requirements are met, Rule 4(k)(2) extends, by its very language, to the outermost bounds allowed by Due Process. Fed. R. Civ. P. 4(k)(2)(B) (authorizing personal jurisdiction over a defendant if "exercising jurisdiction is consistent with the United States Constitution and its law"). And, the Due Process analysis is the same for the Fifth and Fourteenth Amendments. The Fourth Circuit has squarely held that the Fourteenth Amendment's Due Process clause allows for conspiracy jurisdiction. Martorello has offered neither reason nor authority to conclude that the Fifth Amendment does not permit the same.

---

[31] Aljabri v. Saud, No. CV 20-2146 (TJK), 2022 WL 4598519, at *8 n.4 (D.D.C. Sept. 30, 2022), appeal filed, (D.D.C. Oct. 31, 2022) (quoting Ofisi v. Al Shamal Islamic Bank, No. 15-cv-2010 (JDB), 2019 WL 1255096, at *5 n.8 (D.D.C. Mar. 19, 2019) ("But 'as far as the Court is aware, no court to have considered the question has permitted the assertion of conspiracy jurisdiction under Rule 4(k)(2)'"); In re Lupron Mktg. & Sales Pracs. Litig., 245 F.Supp.2d 280, 294 (D. Mass. 2003) ("Assuming, however, that the conspiracy theory of jurisdiction could, in an appropriate factual context, pass federal constitutional scrutiny, due process requires more than a bare allegation of the existence of a conspiracy").

Applying the Unspam test, all three requirements for conspiracy jurisdiction are met. This Court has held on multiple occasions that, at this stage of the proceedings, there is ample evidence "that a conspiracy existed." Unspam Techs., Inc., 716 F.3d at 329; see ECF No. 375; ECF No. 377; ECF No. 380. There is also evidence that "a coconspirator's activities in furtherance of the conspiracy had sufficient contacts with [the United States] to subject that conspirator to jurisdiction in [the United States]." Unspam Techs., Inc., 716 F.3d at 329; see ECF No. 374 (denying Justin Martorello's motion to dismiss for lack of personal jurisdiction); ECF No. 470 (same as to Rebecca Martorello and Eventide).

Thus, the remaining question is whether Plaintiffs have plausibly shown that "defendants participated in the conspiracy." Unspam Techs., Inc., 716 F.3d at 329. At this point, that requisite is plausibly met. Plaintiffs have demonstrated that Bluetech, whose settlor is Martorello, participated in the conspiracy by serving as the final repository for the scheme's allegedly ill-gotten funds. Statement on the Flow of Money at 3-7; Bellicose Capital Corporate Structure. Bluetech shared in the conspiracy's "common plan" to collect, retain, and redistribute the profits from the RICO enterprise. Comm'n on Health Care Certification, Inc., 2022

30

WL 1696019, at *7. Thus, Bluetech has adequately participated in the conspiracy to meet this component of Unspam. Accordingly, under well-settled conspiracy law, the contacts of the other alleged co-conspirators are imputed to Bluetech.

And, because Bluetech participated in and reaped the benefits of the conspiracy, it cannot claim that it was "altogether blindsided by its co-conspirator's contacts with the forum." Sotloff, 2023 WL 3721683, at *18 (citation and quotation marks omitted). Instead, the impact in the forum was the "principal object of the conspiracy." Id. (quoting RMS Titanic, Inc. v. Kingsmen Creatives, Ltd., 579 Fed. Appx. 779, 789-90 (11th Cir. 2014)); see also Calder, 465 U.S. at 789.

## B. Arise Out of Contacts

As Plaintiffs are seeking to establish specific personal jurisdiction, it is necessary to ascertain whether "the claims arise out of those activities" that were directed to the forum. UMG Recordings, Inc., 963 F.3d at 352 (citation omitted); Bristol-Myers Squibb, 137 S.Ct. at 1781 ("What is needed. . . is a connection between the forum and the specific claims at issue."). The record satisfies this requirement. Plaintiffs, and the vast majority of the class, are "residents of the forum"; took out the loans in the forum; and "suffered injuries" in the forum. Ford Motor, 141 S.Ct. at 1031. "In sum, each of the

31

plaintiffs brought suit in the most natural [forum]—based on an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that t[ook] place' there." Id. (quoting Bristol-Myers Squibb, 137 S.Ct. at 1779-80, 1780-81). Indeed, this factor is not disputed.

    *C. Inconvenience*

It is thus Bluetech's task "to show that the burden of distant litigation is so great as to put [it] at a 'severe disadvantage.'" ESAB Group, 126 F.3d at 627 (quoting Republic of Panama v. BCCI Holdings (Luxembourg) S.A., 119 F.3d 935, 948 (11th Cir. 1997)). Once "minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." Base Metal Trading v. OJSC Novokuznetsky Aluminum, 283 F.3d 208, 214 (4th Cir. 2002) (quoting Asahi Metal Indus. Co., 480 U.S. at 114). "[I]t is only in highly unusual cases that inconvenience will rise to a level of constitutional concern." Republic of Panama, 119 F.3d at 947.

Bluetech attempts to meet its burden by arguing that "forcing Bluetech to litigate in the United States would be burdensome and extremely inconvenient and unfair." Reply at 9. However, the only factor it points to is distance. Id. ("As a Cook Islands entity, [Bluetech] has no offices, agents,

employees or property in the United States"). But, geographic distance alone does not arise to the level of constitutionally cognizable inconvenience. _Tire Engineering & Distribution, LLC v. Shandong Linglong Rubber Co._, 682 F.3d 292, 303 (4th Cir. 2012). As the Supreme Court stated over half a century ago, "progress in communications and transportation has made the defense of a suit in a foreign tribunal less burdensome." _Hanson v. Denckla_, 357 U.S. 235, 251 (1958). This is even more true today.

In addition, Bluetech has retained Virginia counsel who have ably litigated this case and engaged in a robust motions practice for the past four years. Beyond that, Bluetech is also managed by Liont, a Delaware Limited Liability Company, which may be called upon to support it during litigation. On the record, Bluetech has not met its burden of showing that the exercise of jurisdiction over it is negated by an asserted inconvenience.

It is true, as Bluetech argues, that the Supreme Court "cautioned federal courts against reaching out to exercise jurisdiction over foreign entities" but Bluetech "cannot rely on the border between [the Cook Islands] and the United States as a shield for [its] illegal activities." _ePlus Tech., Inc. v. Aboud_, 313 F.3d 166, 177 n.10. (4th Cir. 2002). "[T]he Due

33

Process Clause may not readily be wielded as a territorial shield to avoid. . . obligations that have been voluntarily assumed." Burger King Corp., 471 U.S. at 474. Under either Rule 4(k)(1)(C) or 4(k)(2), this Court may exercise personal jurisdiction over Bluetech in accordance with Due Process.[32]

## CONCLUSION

As this Court has personal jurisdiction over Bluetech, the MOTION TO DISMISS THE COMPLAINT PURSUANT TO RULE 12(b)(2) AS TO DEFENDANT BLUTECH [sic] IRREVOCABLE TRUST (ECF No. 388) will be denied.

/s/ _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: August _11_, 2023

---

[32] The parties dedicate parts of their briefs to the discussion of the Court's pendent jurisdiction over the state law claims. As the question of pendent jurisdiction pertains to the Court's subject matter, not personal, jurisdiction, it is inappropriate to consider it as part of a Rule 12(b)(2) motion. However, the Court finds that it does have pendent jurisdiction over the state law claims that remain in the case as they all "derive from a common nucleus of operative fact" as the federal RICO claims. 28 U.S.C. § 1367(a); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966).