<pre>
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2                    RICHMOND DIVISION

 3   _____ )
                                 )
     RENEE GALLOWAY, et al.       )
 4                               )
     v.                          )    Civil Action No.:
 5                               )    3:18 CV 406
     BIG PICTURE LOANS, LLC, et al.)
 6   _____ )    June 3, 2024

 7                  TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE ROBERT E. PAYNE
 8            UNITED STATES DISTRICT COURT JUDGE
     APPEARANCES:
 9
     Kristi C. Kelly, Esquire
10   James Patrick McNichol, Esquire
     KELLY GUZZO, PLC
11   3925 Chain Bridge Road, Suite 202
     Fairfax, VA 22030
12
                Counsel on behalf of the Plaintiffs
13
     John David Taliaferro, Esquire
14   LOEB & LOEB LLP
     901 New York Ave NW, Suite 300 East
15   Washington, DC 20001

16              Counsel on behalf of the Defendants
                Justin Martorello and Eventide Credit
17              Acquisitions, LLC

18   William B. Jackson, Esquire
     WILLCOX & SAVAGE, P.C.
19   440 Monticello Avenue, Suite 2200
     Norfolk, Virginia 23510
20
                Counsel on behalf of Defendant
21              Rebecca Martorello

22

23

24              TRACY J. STROH, RPR
                OFFICIAL COURT REPORTER
25            UNITED STATES DISTRICT COURT
</pre>

```
 1  APPEARANCES (Continued):

 2  JOSEPH F. BROPHY, ESQUIRE
    Brophy & Bland, PLLC
 3  The Overlook at Barton Creek
    317 Grace Lane, Suite 210
 4  Austin, Texas 78746

 5  CULLEN D. SELTZER, ESQUIRE
    Sands Anderson, PC
 6  919 E Main Street, Suite 2300
    Richmond, VA 23218
 7
                Counsel on behalf of Defendant
 8              Matt Martorello

 9  Jonathan Frank Hollis, Esquire
    WOODS ROGERS VANDEVENTER BLACK PLC
10  901 East Byrd Street, Suite 1550
    Richmond, VA 23219
11
                Counsel on behalf of Defendants
12              Breakwater Holdings, LLC and
                Bluetech Irrevocable Trust
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    (The proceeding commenced at 10:04 a.m.)

2                    THE CLERK:  Case Number 3:19 CV 314, *Renee*

3   *Galloway, et al. v. Justin Martorello, et al.*

4                    The plaintiffs are represented by Kristi Kelly

5   and J. Patrick McNichol.

6                    The defendants Justin Martorello and Eventide

7   Credit Acquisitions, LLC are represented by John

8   Taliaferro.

9                    The defendant Rebecca Martorello is represented

10  by William Jackson.

11                   The defendant Matt Martorello is represented by

12  Cullen Seltzer and Joe Brophy.

13                   The defendants Breakwater Holdings, LLC and

14  Bluetech Irrevocable Trust are represented by Jonathan

15  Hollis.

16                   Are counsel ready to proceed?

17                   MS. KELLY:  Plaintiffs are.

18                   MR. JACKSON:  The defense is, Your Honor.

19                   THE COURT:  All right.

20                   (Excerpt of hearing under seal.)

21  ///

22  ///

23  ///

24  ///

25  ///

1           THE COURT:  All right.  Yes, ma'am.

2           MS. KELLY:  Judge, I know Your Honor had some

3  questions regarding various aspects of the settlement, and

4  I'm happy to address those or I'm happy to just walk

5  through the Rule 23 factors.  Whatever Your Honor prefers.

6           THE COURT:  Well, let's go through the questions

7  that I had.

8           By the way, I've read the papers -- to save you

9  some time, I've read the papers on the joint motion on

10 vacatur, 659, and I agree that you have -- this is

11 extraordinary circumstances, it meets the requirements of

12 Rule 60(b) and -- I think I ought to be specific.  I think

13 it is Rule 60(b)(5), is it not?

14          Just a minute.  Let me look at it.

15          MS. KELLY:  I think it's (b)(6), Judge.

16          THE COURT:  It's (b)(6).  60(b)(6).  It meets

17 the requirements of 60(b)(6).

18          And the concerns that I have have been taken

19 care of and you don't need further to address it.  I

20 believe that the provisions of the agreement meet all of

21 those requirements, and I'll make a further finding on

22 that later.  My questions on that point were adequately

23 addressed.  Thank you.

24          All right.  Now, the next place I had questions

25 have to do with the cases that are being settled because

1    they include bankruptcy cases.  So that would be in the

2    "whereas" clause on page 5 of 652-1 and the provision on

3    page 37 relating to paragraph 11.6.

4              What happens in the bankruptcy court here I

5    guess is basic question?  The bankruptcy court proceedings

6    involve who?

7              MS. KELLY:  Judge, so there are two bankruptcy

8    court proceedings.

9              THE COURT:  Right.

10             MS. KELLY:  The first is the Eventide

11   bankruptcy.  That is in the Northern District of Texas,

12   and that's Case Number 9:23-bk-900007.  And that case,

13   aside from the consumer borrower creditors, it does

14   have -- there is an issue with Big Picture Loans regarding

15   payment of the note.  But all of the consumer borrower

16   claims are stayed pending a joint stipulation between the

17   parties as of the date the settlement agreement was

18   signed.

19             THE COURT:  So does the bankruptcy -- do either

20   one of the bankruptcy courts have to approve the

21   settlement?

22             MS. KELLY:  No, Judge.  The consumer borrower

23   claims are going to be stayed, and they will be dismissed

24   as a result of this settlement.  So that is different from

25   the *Gibbs* settlement that was before Judge Lauck because

1   those claims were litigated there and we had to separately

2   approve them.   There were some other state regulators

3   involved as well.   So that is not necessary based on how

4   this settlement is structured.

5            There is also pending the BWH Texas, LLC

6   bankruptcy, and that is Case Number 4:23-bk-43085.   And

7   that also -- there was a joint stipulation filed that will

8   stay that entire case.   And any --

9            THE COURT:   So under 11.5 and 11.6 of 652-1,

10  page 37, it says, "The parties shall move to stay," and

11  then identify the proceedings.

12           MS. KELLY:   Yes.

13           THE COURT:   Have those motions been filed?

14           MS. KELLY:   Yes.   There was --

15           THE COURT:   Has the Court agreed to stay them?

16           MS. KELLY:   Yes.

17           THE COURT:   Okay.   So they are, in fact, stayed

18  now?

19           MS. KELLY:   That's correct.

20           THE COURT:   As to what's going on here?

21           MS. KELLY:   Yes.

22           THE COURT:   There's no need for me to wait for

23  anything in the bankruptcy court or to consult the

24  bankruptcy court on any matter?

25           MS. KELLY:   Nope.   That's -- it has been stayed.

1          Paragraph 7.1, on page 27, it required us, upon

2    execution of the settlement agreement, to move for a joint

3    stay, and that was done, and that was granted by the

4    courts.

5          THE COURT:  Okay.

6          MS. KELLY:  So that's already been done, Judge.

7          THE COURT:  All right.  Thank you.

8          I'm not quite sure exactly what it means, but on

9    page 11 of the 652-1, "Defendants dispute that a class

10   would be manageable and further deny that a litigation

11   class could be certified on the claims asserted in the

12   actions."

13         This has been certified and affirmed on appeal,

14   and the time for filing a petition for writ of certiorari

15   has expired.  So I just am concerned -- I thought.  So I

16   was a little confused by the presence of the language and

17   why it was appropriate or necessary in the view of

18   anybody.

19         MS. KELLY:  Judge, you're correct.  In *Williams*,

20   we did certify a class for the Virginia consumers, and

21   that was appealed in a Rule 23(f) petition and was

22   affirmed by the Fourth Circuit.

23         But this settlement settles a broader class, the

24   nationwide class, with other defendants who were not a

25   party to that class certification motion.  And so those

1    defendants and Mr. Martorello I believe are just --

2              THE COURT:  And class certifications has not

3    been granted in the *Duggan* or the *Smith* case?

4              MS. KELLY:  That's correct, Judge.  They're

5    fully briefed and the courts have not ruled.  Those cases

6    are also stayed as a result of this settlement.

7              THE COURT:  I see.

8              MS. KELLY:  And so they're just waiving their

9    rights there.

10             THE COURT:  I understand it, then.

11             MS. KELLY:  Yep.  Or not waiving their rights.

12             THE COURT:  One other question I have is what's

13   the reason for the number 5 percent of the opt-outs?

14   Page 33, page 652-1.

15             MS. KELLY:  Judge, that is sometimes the

16   standard term in class settlement agreements where

17   defendants, if there is a mass opt-out of a bunch of

18   consumers, will decide to void the agreement, but -- or to

19   potentially --

20             THE COURT:  In one place it says, in the papers,

21   that the settlement will benefit more than a million

22   people.  In the other place in the papers it says it's

23   800-and-some thousand.  Which is it?

24             MS. KELLY:  Judge, we actually don't know yet.

25   We have the data from TranDotCom.  Big Picture Loans

1   agreed to provide the data as part of the prior settlement

2   from 2019.

3          Upon achieving this settlement, we immediately

4   reached out to TranDotCom to get this larger class data,

5   and we learned a couple weeks ago that Big Picture

6   terminated its relationship with TranDotCom and used a new

7   loan management provider.  And so we've been communicating

8   with counsel for Big Picture.  They have agreed to produce

9   the data, and we're expected to have all of the data --

10          THE COURT:  All right.

11          MS. KELLY:  -- and the full scope of the class

12   size by June 15th.

13          THE COURT:  All right.  And can you give me a

14   general overview of X, Tax Treatment of the Fund?

15          MS. KELLY:  Yes, Judge.  That -- that deals with

16   the creation of what's called a qualified settlement fund.

17          THE COURT:  Yes.

18          MS. KELLY:  It is routinely used in class action

19   settlements.  There are a couple of reasons why.  And for

20   benefits of the consumers, they will not have to deal with

21   any tax treatment of the attorneys' fees provision.

22          THE COURT:  Right, I'm familiar with that.  But

23   this seems to go beyond that.  It's longer, more complex

24   than any other provision of its kind that I've seen.  And

25   to understand the complexities, I think I would probably

1  have to go get a master's in tax or something.  I didn't

2  want to do this at this stage of life.

3          MS. KELLY:  I don't disagree, Judge.  But it is

4  just fleshing out the requirements of the qualified

5  settlement fund.

6          THE COURT:  All right.

7          MS. KELLY:  So I've learned more about taxes in

8  this case, but I'm still not quite up to speed here.

9          THE COURT:  Are you pleased you're not a tax

10 lawyer?

11         MS. KELLY:  No.

12         THE COURT:  All right.  Then I think I've got

13 it.  I understand it, then.

14         MS. KELLY:  Yeah.

15         THE COURT:  All right.  Now you may go into the

16 Rule 23 factors, if you will.

17         MS. KELLY:  Okay.  Judge, as you're more than

18 well aware, this is a settlement that would be resolving

19 seven years worth of litigation.  The *Williams* case was

20 originally filed in June of 2017.  The settlement will

21 resolve two cases in this court and cases across the

22 country and two cases in the bankruptcy court for the

23 consumer borrowers.

24         We believe that all of the requirements of

25 Rule 23 would be met.  Rule 23(a), the class is numerous.

1  We know that there's at least 800,000 consumers that would

2  be able to receive the benefits of this settlement.

3  There's common issues that would impact litigation of

4  these claims.  All the consumers had loans taken out under

5  the name of Red Rock or Big Picture Loans.  They were high

6  interest loans that we have alleged were used to avoid

7  state usury laws in various states.  It was the same

8  enterprise.  The common issues of whether state law

9  applies or trial law would be common to the class.

10         The claims, of course, are also typical.  They

11  are the result of obtaining one of two loan products,

12  either Big Picture Loans or Red Rock loans, and the

13  appropriate interest rate under state law.

14         The plaintiffs here are more than adequate.  The

15  *Williams* plaintiffs have been involved in all aspects of

16  litigation.  They sat for depositions.  They were prepared

17  for trial.  They responded to discovery.  So have the

18  *Galloway* plaintiffs.  They've responded to discovery.

19  *Smith* and *Duggan* have also participated in discovery as

20  well.

21         Under Rule 23(b)(3), we believe that

22  predominance would also be met.  Common issues of law and

23  fact would predominate here.  Of course, it is a superior

24  way to resolve over 800,00 claims of individuals.

25         We believe the Court should also approve the

1  settlement under Rule 23(e).  Here, we believe the class

2  notice plan is appropriate.  Notice would first be sent

3  via e-mail using the same settlement administrator that we

4  used in the prior settlement with Your Honor in *Galloway*.

5  The e-mail is the best means to communicate with these

6  people because they took out Internet loans using their

7  e-mail address.  If an e-mail receives a bounce back, they

8  would get notice by first class mail.

9          THE COURT:  That is the process used in the

10 *Galloway* settlement.

11         MS. KELLY:  It will be identical.

12         THE COURT:  And achieved what percent of

13 penetration, 90-something percent?

14         MS. KELLY:  I can't recall specifically, Judge,

15 but I think it would be above 96 percent.  I'm not quite

16 sure, but that still is a very good percentage.

17         In addition, there will be a website where

18 consumers can get information about the case.  And in the

19 website as well, there will be a portal that will be

20 individualized where consumers can use their unique code

21 to determine what payment amount they would receive so

22 they could decide if they think the settlement is fair for

23 them based on their specific circumstances and the amount

24 they would receive back.

25         THE COURT:  How many class people are in the

```
 1    tier 3 in Nevada and Utah?  They're not getting cash

 2    payments.  What are they getting?

 3              MS. KELLY:  They are getting -- if consumers

 4    don't receive cash payments, they're only releasing the

 5    ability to bring a lawsuit as a class representative.  So

 6    they're still reserving their right to receive actual

 7    damages.  And so they're getting the benefit of injunctive

 8    relief.  And that is identified on page 9, Judge, the --

 9    for settlement class members, they would --

10              THE COURT:  Just a minute.  Page 9 of what?

11              MS. KELLY:  Of 652-1.  They would not be able to

12    bring a class action or collective action or --

13              THE COURT:  What injunctive relief do they get

14    the benefit of?

15              MS. KELLY:  So the injunctive relief prevents

16    Mr. Martorello, Ms. Martorello, the companies from

17    financing or supporting Big Picture Loans, including

18    through investment or other support.

19              THE COURT:  No.  Let's look at that provision

20    because it's one of the things I had a question about.

21              MS. KELLY:  Yes.

22              THE COURT:  What provision is that in the

23    settlement agreement?  What page is it?

24              MS. KELLY:  It's page 20 of 652-1.  It's 3.15,

25    Injunctive Relief.
```

1          THE COURT:  It says, "Defendants agree."  Is

2    that everybody?

3          MR. BROPHY:  Yes, Your Honor.

4          THE COURT:  All right.  Now, what happens if the

5    defendants just change their names or if they don't change

6    it and they just go form a new corporation and the same

7    people move over and do the same thing?

8          MS. KELLY:  Well, I think because Mr. Martorello

9    and Ms. Martorello and Justin Martorello are defendants

10   and they agree that will not participate or assist in the

11   marketing, origination or collection of any loans,

12   including attempted collections by --

13         THE COURT:  All the defendants agree to that?

14         MS. KELLY:  That's correct.

15         THE COURT:  All the defendants in all the cases?

16         MS. KELLY:  All the defendants --

17         THE COURT:  Is that right?

18         MS. KELLY:  All the defendants in the settlement

19   agreement.

20         There are prior defendants that were --

21         THE COURT:  I know, but in -- all of the

22   defendants that you're talking about in that sentence are

23   the defendants named in the settlement agreement, which

24   are the defendants in these cases that are being settled?

25         MS. KELLY:  That's correct, Judge.

1           THE COURT:  Okay.  So that takes care of that

2 situation.

3           MS. KELLY:  Yes.  Yes.

4           THE COURT:  All right.

5           MS. KELLY:  And we believe that's important

6 because the whole nature of this was that the

7 defendants -- we allege the defendants were really running

8 the show.  And so now they will no longer participate or

9 receive the benefits of that and that consumers, if they

10 want to take a loan, they certainly can do that, but they

11 will not be subject to dealing with the defendants in the

12 future.

13           THE COURT:  All right.

14           Go right ahead.  Excuse me.

15           MS. KELLY:  So the -- I was talking about the

16 Rule 23(e) factors.  The CAFA notice was mailed on Friday.

17 I confirmed with the settlement administrator this

18 morning.  So we will file a notice with the Court so the

19 Court is aware of that.

20           THE COURT:  What did you -- I lost you.  The

21 first sentence.

22           MS. KELLY:  Oh.  The CAFA notice was mailed on

23 Friday.

24           THE COURT:  Mailed on Friday.

25           MS. KELLY:  Yep.  And so we will file a notice

1    with the Court so that's on the docket as well.  But I did

2    confirm that with the settlement administrator this

3    morning.

4              THE COURT:  Okay.

5              MS. KELLY:  So we think under Rule 23(e)(2), the

6    settlement is also fair, reasonable and adequate.  We

7    think the Court will find that the class representatives

8    and class counsel have adequately represented the class.

9    We've certainly worked very hard in this case to try to

10   find a resolution for the class and to prosecute these

11   claims.  I think that there were a lot of novel issues,

12   and, you know, obviously, the Court worked hard as well,

13   and we do appreciate that.

14             The proposal was negotiated at arm's length.

15   There were many attempts to settle this case over many

16   years with Judge Novak, Nancy Lesser before she retired.

17   And Judge Colombell oversaw the settlement process here

18   and was able to get this one over the finish line.

19             The relief provided for the class is adequate,

20   taking into account the costs, risks and delay of trial

21   and appeal.  Certainly that is a concern here.  One of the

22   biggest problems was the issue of collecting the judgment

23   for the class, and this settlement provides a broader and

24   a higher judgment amount that resolves all these cases and

25   will prevent potentially years of delay and attempts to

1  collect a judgment.

2            THE COURT:  Well, let's talk about that for a

3  minute.

4            The judgment in *Williams* was for how much?

5            MS. KELLY:  It was for approximately 43 million,

6  with a 5 --

7            THE COURT:  Right.  And if -- if that had been

8  affirmed on appeal, then attorneys' fees could have been

9  secured independently of that sum, right?

10            MS. KELLY:  That's correct, Judge.

11            THE COURT:  And I -- to what extent do the

12  attorneys' fees that are proposed here reflect the

13  attorneys' fees that would have been sought in *Williams* or

14  do you know that?

15            MS. KELLY:  Judge, we had not --

16            THE COURT:  Because in *Williams*, you're not

17  limited to a contingent fee in *Williams*.

18            MS. KELLY:  That's correct, Judge.  We would

19  have requested our lodestar or a multiplier of our

20  lodestar in *Williams*.  We had not yet decided on what we

21  intended to do there.  But --

22            THE COURT:  Well, would the lodestar have been

23  $21 million?

24            MS. KELLY:  No, Judge.  It would not have been

25  that high.  I'm -- I can definitely represent that it

1   would not have been that high.

2          THE COURT:  So the proposed attorneys' fee

3   provision here, which takes roughly one third of the

4   settlement fund, is for all the law firms?

5          MS. KELLY:  It is -- that's correct, Judge.

6   There are multiple law firms.  There is Caddell Chapman;

7   Consumer Litigation Associates, who was involved in

8   *Williams*; Berger Montague; Terrell Marshall; Gupta

9   Wessler, who -- and Tycko & Zavareei, who will all receive

10  their attorneys' fees for litigating these cases on behalf

11  of the class.

12         THE COURT:  But they'll have to submit detailed

13  applications for attorneys' fees so they will be approved

14  so we can see how much was earned, match the lodestar

15  against the percent of recovery.

16         MS. KELLY:  That's correct, Judge.  We would all

17  intend to do that before final approval so Your Honor

18  could evaluate the fairness of any fee and decide what is

19  appropriate.

20         THE COURT:  Now, there has been some information

21  submitted already in connection with the matter, but there

22  hasn't been any evidence submitted by Tycko & Zavareei in

23  support of their application to be appointed as class

24  counsel.  Should that be taken out?  Should they not be

25  class counsel or did I miss something?

1              MS. KELLY:  It's --

2              THE COURT:  T-Y-C-K-O & Z-A-V-A-R-E-E-I.  Who do

3   they represent?

4              MS. KELLY:  They represented some consumers that

5   had filed a case in California against Mr. Martorello

6   after these cases were filed.  And so in order to work

7   collaboratively, we entered into an agreement with all

8   counsel so that we wouldn't be --

9              THE COURT:  Well, we're not settling any

10  California case, so why should they be a class counsel?

11             MS. KELLY:  Judge, we have an agreement to all

12  work collaboratively together on these cases, and so we

13  will -- we can submit a declaration to address that

14  deficiency in the filing so that they can be appointed

15  class counsel.

16             THE COURT:  Well, they couldn't get attorneys'

17  fees because their clients aren't getting anything out of

18  the settlement.  How could I give them attorneys' fees?

19             MS. KELLY:  The class counsel in this case have

20  an agreement with one another to work together and divide

21  the fee amongst themselves so that we would not be

22  litigating opposite one another.  So we have an agreement

23  between all of the plaintiffs' law firms who subsequently

24  filed cases to agree on a fee portion for everyone so that

25  we wouldn't be opposing one another in that regard.

1          THE COURT:  Well, that will present a problem, I

2    think, because I don't see how I can award attorneys' fees

3    to anybody whose clients are not getting money, but what

4    you all do with your part of it I suppose is your

5    business.

6          MS. KELLY:  I understand, Judge.

7          THE COURT:  Their clients aren't doing releases

8    either, are they?

9          MS. KELLY:  Their clients are not one of the

10   named parties -- one of the class representatives.

11         THE COURT:  Why not I guess is -- if everybody

12   is cooperating so nicely, why aren't they included in the

13   case or maybe that's a matter of privilege into which I

14   should not intrude?  But it does come to mind.

15         I'll take the advice of learned counsel on how

16   far to proceed, but it does present something I think is

17   going to come up down the road.

18         MS. KELLY:  Judge, I am not sure.  I can't

19   answer that.  I'm sorry.  I just --

20         THE COURT:  Give that some thought, because I'm

21   not going to appoint them as class counsel right now.

22         MS. KELLY:  I understand.  I understand.

23         THE COURT:  I will entertain a motion to amend

24   and appoint them as class counsel, but I can't do that

25   right now on the record as it exists.

1        MS. KELLY:  I completely understand, Judge.  And

2   I apologize for the confusion and the oversight.

3        THE COURT:  And I don't know how many cases --

4   well, I suppose it's best if I just leave it right there

5   because sometimes loose lips sink ships.  I don't want to

6   do that.

7        All right.  Anything else?

8        MS. KELLY:  Judge, I was just -- on the Rule

9   23(e)(2)(C) factor -- and I was talking about the costs,

10  risks, delay of trial and appeal.  I think that's really

11  evident here.

12       THE COURT:  Selection is your biggest concern,

13  though, isn't it, given that you have secured judgment --

14  you mention mistake of law in the *Williams* case, but --

15       MS. KELLY:  Yes.

16       THE COURT:  And I guess that's asserted in all

17  of the cases, but --

18       MS. KELLY:  Yeah.  Plaintiffs --

19       THE COURT:  If I remember correctly,

20  Mr. Martorello didn't actually assert mistake of law in

21  the classic sense.

22       MS. KELLY:  That's correct, Judge.  You know,

23  from plaintiffs' perspective, we were very confident on

24  the merits, but we did have concerns about collection.

25  There is a very sophisticated estate planning or asset

1  protection set up here, and, you know, we do have a

2  judgment against Mr. Martorello, and it appears that most

3  of his assets are no longer in his name.  So that posed

4  significant hurdles for us.

5       THE COURT:  But as a general proposition, I

6  think the law is such that if they actually -- the assets

7  you're chasing were in his name, it may be cumbersome and

8  expensive, but ultimately every one of them could be

9  chased even if they were banked in the Soviet Union or

10 China.

11      MS. KELLY:  That's correct, Judge.  And that's

12 what we were doing, and that's how we discovered some of

13 these assets that we're now --

14      THE COURT:  But litigating in the Soviet Union

15 and China and the off shore, Caymans and other things,

16 presents its own set of risks and problems and litigation

17 challenges.

18      MS. KELLY:  Yes.  I was actually -- I was

19 receiving pleadings from the Cook Islands court.  So I --

20 it was challenging, and there were a lot of risks and

21 hurdles.  And so that is why, as class counsel, we believe

22 that this is a great outcome and it provides money to

23 consumers now instead of many years in the future, if at

24 all, dealing with the collection issues that we were faced

25 with.  And so we think this is a very fair outcome given

1  those risks.

2          THE COURT:  Are you going to get questions from

3  the various class members, after the notice goes out,

4  along these lines, "Well, I've read all this and I

5  understand what everybody says, but how much am I

6  getting?"  Do you have a way of answering those people,

7  how much you're getting?

8          MS. KELLY:  Yes.  And we --

9          THE COURT:  So they can make a decision whether

10 they want to opt out or object to it.

11         MS. KELLY:  Yes.  Each consumer gets a unique

12 ID, and on the website they can go to the website and it

13 will -- they click a button and then it will show them

14 what their estimated payment amount is so that they can

15 decide if they think that is acceptable and fair to them

16 or not.

17         THE COURT:  Has that calculation actually been

18 made yet?

19         MS. KELLY:  Not yet, because we're waiting on

20 the rest of the data, and we won't have it until

21 June 15th.

22         THE COURT:  Okay.  Yeah.

23         MS. KELLY:  But by the time notice goes out, we

24 should have that there.

25              And we've done that in a lot of our tribal

1   settlement cases because we do think it's important.  Some

2   people also e-mail us, and we will ask the administrator

3   and provide that information.

4           THE COURT:  All right.  Pardon me.

5           MS. KELLY:  We think that the method of

6   distributing relief to the class is fair in relation to

7   one another.  It's the same method of distribution that

8   we've used in almost all of the same tribal lending cases.

9           It was first used when we litigated the *Think*

10  *Finance* case with the Consumer Financial Protection Bureau

11  and the Pennsylvania Attorney General, and we've used the

12  same distribution method in all of the cases, and this

13  court has found that it's fair.

14          THE COURT:  It was in *Gibbs*?

15          MS. KELLY:  It was in *Gibbs*.  It was in *Spotloan*

16  in front of Judge Novak.

17          THE COURT:  Who?

18          MS. KELLY:  *Spotloan*.  It was in front of

19  *Hengle*, also in front of Judge Novak.  It was -- I think

20  in *American Web Loan*, the distribution method, there were

21  some issues there initially.  That was in front of

22  Judge Morgan, and then it was amended, with the help of

23  Judge Novak, to make it more fair.  And I believe that was

24  more in line with this method as well.

25          THE COURT:  All right.

1          MS. KELLY:  And then if a consumer is eligible

2   for repayment, they would get automatic payment.  So they

3   don't have to do anything to receive their payment.

4          And then the last factor is the terms of any

5   proposed award of attorneys' fees, including timing of

6   payment.  We can address that at final approval, and I

7   would be happy to answer any questions you would have

8   about that now.

9          But for those reasons, we would ask Your Honor

10  approve the settlement preliminarily and direct notice to

11  the class.

12         THE COURT:  Do any of the lawyers who are in the

13  case have contingent fee agreements with any of the

14  clients or are you depending upon remuneration from a

15  court order of some kind or a settlement?

16         MS. KELLY:  Judge, I actually don't -- I only

17  know the agreement I have with my clients, which is

18  contingent, and so I don't know the agreement that other

19  law firms have.  I'm sorry.

20         THE COURT:  All right.  Well, you can discuss

21  that in your application, because that's relevant to

22  ascertaining whether the amount that is sought ultimately

23  is consistent or not with the agreement that was reached

24  to begin with.

25         MS. KELLY:  I understand, Judge.

1                    THE COURT:  All right.

2                    MS. KELLY:  And if you don't have any further

3    questions, I would rest my argument here.

4                    THE COURT:  Thank you.

5                    MS. KELLY:  Thank you.

6                    THE COURT:  Defendants have anything you'd like

7    to say?

8                    MR. JACKSON:  Briefly, Your Honor.

9                    THE COURT:  Yes, sir.

10                   MR. JACKSON:  Just on a procedural issue, I just

11   want to be clear.  The portion of this hearing that was

12   under seal, I believe you opened it up and then we went

13   back to talking about redactions briefly.  And then we

14   moved --

15                   THE COURT:  All discussions of redaction are

16   under seal.

17                   MR. JACKSON:  Thank you, Your Honor.

18                   The other -- the only other issue I have -- and

19   maybe this is something I can talk to with class counsel.

20   But this law firm from California who may not be part of

21   the class team, the concern that the defense team would

22   have is that if this California firm were to be left out,

23   there would be an incentive for them to turn around and --

24                   THE COURT:  They did what now?  Say again.

25                   MR. JACKSON:  The concern is that if this

1  California law firm, Tycko & --

2           THE COURT:   -- Zavareei.

3           MR. JACKSON:   Yes, Your Honor.   If they were to

4  be left out of the class counsel team for this settlement,

5  defense's team concern is that they would then turn around

6  and initiate other lawsuits against the defendants in

7  other parts of the country that would somewhat undermine

8  the purposes of this settlement.

9           THE COURT:   How do -- I mean, they have got a

10  case actively pending now that's not resolved by this

11  settlement, as I understand it.   She said that they had a

12  case that was pending in California.   I guess it's the --

13  is it the federal court in California?

14           MS. KELLY:   Yes, it's -- I'm sorry, Judge.   It's

15  my understanding that that case was dismissed.

16           THE COURT:   Huh?

17           MS. KELLY:   It's my understanding that the case

18  they had was dismissed when we agreed --

19           THE COURT:   So there are no plaintiffs?

20           MS. KELLY:   That's my understanding, when we

21  agreed to work all together collaboratively.   So --

22           THE COURT:   That sort of -- one thought that

23  comes to mind is that a law firm that agrees to work

24  collaboratively and get part of a fee but dismisses the

25  case on behalf of its clients, that's a problem.   But if

1   the case in California is dismissed, is there any -- is

2   there an agreement that these class counsel will not sue

3   the defendants for anybody else?  Where is that?

4           MR. JACKSON:  The agreement -- there is an

5   agreement in this -- this agreement has that provision.

6   But if these attorneys were left out, then they wouldn't

7   be bound to that provision.

8           THE COURT:  Uh-huh.  Well, you know, that -- you

9   know, that's a provision in the settlement that's not

10  favored, though, about limiting counsel's ability to

11  practice law, and I wonder if I missed that in my study.

12  What paragraph is it?

13          MS. KELLY:  It's 11.13.

14          THE COURT:  I don't see that that provision says

15  what you say it says.  The first sentence says -- I think

16  I -- maybe I've read it wrong.  My question was is this

17  lawful?  And I didn't ask you that question, I don't

18  think, on the telephone, but my notes say that.

19          Then I looked back at it, and it says that the

20  class counsel will not solicit, suggest, et cetera, the

21  filing of new actions.  So they're not going to suggest

22  anything.

23          MR. JACKSON:  That's right, Your Honor.

24          THE COURT:  But then it doesn't -- it doesn't

25  bar them from representing anybody else.  They agree they

1    won't represent any members of the settlement class who

2    opt out.  And it says, "This provision does not prohibit

3    class counsel from representing plaintiffs or the

4    settlement class in disputes relating to this settlement

5    or to the administration of this settlement."

6           But there's nothing in here that requires any of

7    the plaintiffs' lawyers not to take other cases and not to

8    sue any of these defendants.  It does say they can't

9    suggest and, to use a pejorative term, hustle business.

10   They can't go out and solicit business.  But that's a far

11   cry from agreeing to represent.

12          And I think the reason I ultimately may not have

13   done the briefing is that there's nothing wrong with

14   agreeing not to solicit, whereas there is a problem not

15   to -- not to limit their practice of law, and this

16   provision does not do that.

17          MR. JACKSON:  We agree, Your Honor.

18          THE COURT:  So I'm -- I don't know what you want

19   me to do about it.  I had identified that in my little

20   notes here on the document and come to the conclusion that

21   the limit in the first sentence of the paragraph 11.13 was

22   a permissible limit, but it did not transcend where the

23   law says you should go, and that is restrict the right of

24   the plaintiffs' lawyers to practice law.  Although I'm not

25   sure that issue has ever been completely settled.  I

1  haven't done any research on it in several years, and at

2  one point in time the ethical issues were up in the air,

3  and I really don't know what the bottom line is.  But

4  since this provision didn't raise that prospect, I opted

5  not to ask you all to brief it, as my notes originally

6  said I should do.

7          MR. JACKSON:  Yes, Your Honor.  And your

8  understanding tracks our understanding as well, which is

9  why we settled on the language that we did.

10         THE COURT:  Yeah.  Okay.

11         So it lets the California -- if they're not

12 class counsel, then they're not covered by the first

13 sentence in paragraph 11.13, and they're allowed to go

14 solicit other people.

15         MR. JACKSON:  Yes, Your Honor.

16         THE COURT:  In other forum, other place -- well,

17 what -- what harm is there to anybody if you leave them

18 out and let them go solicit?

19         MR. JACKSON:  I don't think there's any

20 additional harm, but there's just the potential for

21 additional litigation that we're trying to extinguish

22 through this class settlement.

23         THE COURT:  Well, I know.  Let me explain to you

24 my problem.  We have a law firm here who hasn't filed

25 anything to demonstrate why they are qualified to be class

1   counsel.  After these cases were filed, they filed a

2   tag-along, according to what Ms. Kelly said -- and if I'm

3   wrong, tell me -- in California representing some

4   plaintiffs.  I don't know how many plaintiffs there were.

5   I guess it was a class action.  I don't know.  That case

6   has been dismissed, but they want to be class counsel so

7   they can get part of the fees.  And that presents a

8   problem of the Court authorizing payment to somebody who

9   has struck a deal that looks like it was to the

10  disadvantage of their clients, their clients can't

11  participate in this settlement, and they dismissed the

12  case, at least as I understand it.

13          And so I guess the bottom line is that there has

14  to be some balance struck between that and what effect not

15  making them class counsel does to what you secured in the

16  first sentence of -- as defendants, secured in the first

17  sentence of 11.13.

18          MR. JACKSON:  Yes, Your Honor.

19          THE COURT:  I hadn't really thought about that.

20  I didn't understand, I guess, exactly the relationship.

21  But given that they -- that the Tycko firm didn't file

22  anything, it was pretty easy to say, well, I don't need to

23  have them as class counsel.

24          MR. JACKSON:  Yes, Your Honor.  And that's --

25  you know, the more we discuss this, the more I realize

45

1   this is probably something that we'll have to discuss with

2   class counsel and plot out how we're going to handle that

3   in the future.

4          THE COURT:  I think I'd think about it if I were

5   you all.  I don't want it to jeopardize the settlement.

6   On the other hand, there is a limit to what -- what courts

7   ought to sanction, and I don't like the sniff of this

8   agreement, but I may not understand it all either.  So I

9   can't say for sure.

10         MR. JACKSON:  Yes, Your Honor.  I understand.

11         THE COURT:  I'll let Ms. Kelly -- I'll tell her

12   what I want her to do.  I understand your point, and thank

13   you.

14         MR. JACKSON:  Thank you.  And that's all the

15   defense team has, Your Honor.  We agree with what

16   Ms. Kelly has explained about the benefits to the class

17   settlement.

18         THE COURT:  All right.  Thank you.

19         Ms. Kelly.  You're going to have to get me some

20   explanation for how this Tycko firm gets anything out of

21   this case.

22         MS. KELLY:  Judge --

23         THE COURT:  I mean, I can understand -- but I

24   don't know.  They dismissed their clients from the case

25   after they got a deal --

1            MS. KELLY:  So --

2            THE COURT:  -- that gives them money.  That

3  doesn't smell right.

4            MS. KELLY:  The Tycko firm is not identified as

5  class counsel in the settlement agreement before

6  Your Honor.  They were class counsel in the prior

7  agreement in *Galloway* with Big Picture Loans.  And so --

8            THE COURT:  And that did involve California

9  plaintiffs?

10           MS. KELLY:  There were -- in your decision,

11 Judge, it referenced their California cases, along with

12 *Duggan* and *Smith* --

13           THE COURT:  Yeah.

14           MS. KELLY:  -- *McCoy* and *Cumming*.

15           THE COURT:  Yeah.

16           MS. KELLY:  And my understanding is those cases

17 were resolved and dismissed.

18           THE COURT:  Well, they're not listed as class

19 counsel.

20           MS. KELLY:  That's correct.  They're not listed

21 as class counsel in this agreement.

22           THE COURT:  Well, then that --

23           MS. KELLY:  Yep.  I just checked.  They're not

24 listed as class counsel in this agreement.  That's why

25 there was no declaration.  And I apologize for the

1    confusion.

2              THE COURT:  Okay.

3              MS. KELLY:  It's all my fault.  Sorry.

4              THE COURT:  Well, no, it's not.  I mean, we had

5    some of the same concern.  Okay.  Thank you.

6              MS. KELLY:  Thank you, Judge.

7              THE COURT:  All right.  Everybody else --

8    anybody else have anything?

9              All right.  I've reviewed the plaintiffs' motion

10   for preliminary approval of class settlement, both the

11   redacted and the unredacted versions, and the settlement

12   agreement that's attached thereto, to each redacted and

13   unredacted version, as well as the joint memorandum on

14   vacatur, and studied the issues that I asked to be

15   briefed.

16             This settlement settles three cases in this

17   court -- or two cases in this court -- Williams against

18   Big Picture Loans, 3:17 CV 461; and Galloway against Big

19   Picture Loans, LLC, 3:18 CV 406 -- as well as the case of

20   Duggan against Martorello in Massachusetts, and Smith

21   against Martorello in Oregon, as well as the bankruptcy

22   proceedings -- two bankruptcy proceedings in the Northern

23   District of Texas.  If approved, the settlement would

24   approve a substantial settlement common fund to be

25   distributed to the borrowers who repaid allegedly unlawful

1  interest amounts and would provide injunctive relief

2  against the defendants providing any services to

3  Big Picture or its successors in interest, including the

4  collection of loans.

5          As to the question of vacatur, it is the request

6  in the settlement agreement that the vacatur is of the

7  judgment order entered in the *Williams* case.  It does not

8  request vacatur of any substantive decisions therein.  The

9  touchstone for decision on this point is U.S. Bancorp

10  Mortgage Company against Bonner Mall Partnership.  And the

11  driving force for the decision in *Bancorp* was that the

12  public has an interest in judicial decisions once entered.

13  They become part of the law.

14          And in *Valero Terrestrial Corporation*, our Court

15  of Appeals explained how the *Bancorp* decision and test is

16  to be applied to request of a district court to vacate one

17  of its judgments under Federal Rule of Civil Procedure

18  60(b)(6).

19          And, in essence, there's a great similarity to

20  the test that the Supreme Court approved and that our

21  Fourth Circuit approved in granting a vacatur, but the

22  bottom line is that there has to be extraordinary reasons.

23  And in that regard, part of the extraordinary reasons have

24  to be matched up against what it is that is sought to be

25  vacated.  And only the judgment is vacated.  And there's a

1    good, sound reason for doing that, because it would
2    subject one of the parties to conflicting judgments if the
3    settlement is approved.  And basically, that would stand
4    as an impediment to the approval -- or willingness to
5    settle the case.  And so there's a very logical reason for
6    the vacatur which is sought here.

7            It will end years of litigation in this court
8    and others.  It impacts at least 800,000 people who will
9    receive, by virtue of the settlement, substantial
10   benefits.  It impacts no third parties, as I can
11   determine.  And the public interest in this case says that
12   the approval of the vacatur of the limited nature is
13   appropriate and warranted under the test of Rule 60(b) and
14   the Fourth Circuit and the Supreme Court in *Valero* and
15   *Bancorp*, respectively.

16           Under Rule 23(e), the Court is obligated to
17   approve the settlement in accord with the factors in *Jiffy*
18   *Lube Securities Litigation*.

19           The Court must find that the proposed settlement
20   is fair, reasonable and adequate, at least preliminarily,
21   subject, of course, to any objections that are raised in
22   subsequent addressing of that issue in the final hearing.
23   But at this stage, the test is does the agreement seem to
24   be fair, reasonable and adequate.

25           The Court is to consider whether the

1   representatives of the class and the lawyers for the class

2   have adequately represented the class and the interest of

3   the class, and without question, they have.  This has

4   been -- this is now -- we are in 2024.  Seven years ago

5   the *Williams* case was filed, and then the *Galloway* case

6   came close upon its heels.  The others were filed

7   thereafter, but they've all been fully litigated.

8            The proposal here was negotiated at arm's length

9   with the aid of two magistrate judges and a mediator over

10  time.  Two of those efforts failed, but the third one

11  succeeded.

12           The relief provided is adequate if I take into

13  account the costs, risks and delay of trial and appeal.

14  While I believe, as is evidenced in the *Williams* case

15  decision on summary judgment, that the plaintiffs have a

16  very strong case, I share the view of the plaintiffs that

17  collecting on the judgment -- and they had a judgment of

18  $45 million -- is a long and tedious process which could

19  take years and as to which there is no certainty because

20  of the various laws wherever the assets are located.

21  Assets can be traced, and the law says they can be, and

22  proceedings can go forward to trace them, and they can be

23  retrieved and ordered brought back, but the actions of

24  other governments can foreclose some of that as well.  And

25  so that's a significant reason for reaching a compromise

1    in a case.

2         It's not a significant reason for not reaching a

3    significant compromise, and in this case, there is a

4    significant relief to each of the tiered plaintiffs.  And

5    the cost and the effectiveness of the proposed method of

6    distributing the relief has been proven to be satisfactory

7    in this court and others as well.  And it looks to me,

8    from all appearances, that all class members are treated

9    equitably with respect to each other.

10        And the fairness analysis is intended to ensure

11   that the settlement was reached by good faith bargaining

12   at arm's length, without collusion, and to consider that,

13   we look at the posture of the case at the time settlement

14   was proposed.  It's been proposed for some time, but this

15   settlement was proposed well into the case and after there

16   had been significant litigation.  And the extent of

17   discovery also teaches that it is appropriate to consider

18   the settlement fair.

19        The circumstances surrounding the negotiations

20   include the fact that in the *Williams* case, which would

21   have benefited everybody who's in the class in the

22   different cases, ultimately, had it been affirmed on

23   appeal, had been decided on summary judgment.  There was a

24   pending appeal, and the defenses therein raised, and the

25   defenses in the other cases, were significant matters to

1  be decided by an appellate court.  And while the

2  plaintiffs were confident that they could prevail, good,

3  sound lawyering calls for an assessment of the risk of

4  losing on appeal and the risk of not collecting even if

5  you win on appeal, and that was done here.

6         And so all of the factors that call for an

7  assessment of fairness have been met.

8         In particular, of course, there's no presence of

9  a suggestion of any kind of fraud or collusion in the

10  settlement negotiation dealt with after hard-fought

11  litigation and at arm's length in the presence of

12  mediators and magistrate judges, and if you look at the

13  results of the settlement, it bespeaks fairness.

14         The experience of plaintiffs' counsel is a

15  factor that certainly augurs a finding of fairness here

16  because these lawyers are extremely experienced in complex

17  litigation of this kind.

18         The adequacy determination asks the Court to

19  consider the relative strength of the case on the merits,

20  the difficulties of proof, the strong defenses, the

21  anticipated duration and expense of litigation, the

22  solvency of the defendants, likelihood of recovery on a

23  litigated judgment and the degree of opposition to the

24  settlement.  There doesn't seem to be any opposition at

25  this stage, but that will have to be reserved for the

1  final judgment.  The principal considerations are the
2  relative strength of the plaintiffs' claims and the merits
3  and existence of any difficulties of proof or strong
4  defenses, including the ability to collect on a final
5  judgment.

6          Based on the history of the case, all of the
7  defendants would no doubt have continued to litigate to
8  the end of the case, until all legitimate avenues of
9  appeal are exhausted, and the fact of the matter is, and a
10 driving factor in this case, is that collection would be
11 difficult.  Although the Court will never conclude that
12 assets of the kind that are at issue here cannot be
13 reached, the key question is the repatriation of those
14 assets and the process by which it can occur and the
15 difficulty associated with it, and the costs not just in
16 terms of attorneys' fees and costs, but in the delay of
17 the remuneration of the plaintiffs that is achieved by the
18 substance of the settlement.  And taking all that into
19 account, that factor is satisfied and augurs in favor of
20 an adequacy finding.

21         There isn't any real issue of solvency of the
22 defendants here.  Even though there are some bankruptcy
23 proceedings that are implicated in some of the defendants,
24 it's not a factor to be taken into account in the adequacy
25 adjustment at this stage.

54

1        So then whether it's a reasonable settlement.

2   Considering the amount of the settlement, the scale of the

3   litigation, the plaintiffs' success in prevailing not only

4   at trial but on appeal, the Court's in favor of finding,

5   for the same reason of the adequacy and fairness

6   determinations, that the rule is satisfied.

7        Also, the Rule 23(a) factors, three factors, the

8   factor of ascertainability required by our Court of

9   Appeals is met.  The ease with which that can be

10   accomplished is facilitated by virtue of a previous

11   agreement in a previous related settlement.

12        The numerosity requirement is beyond question.

13        The commonality questions, there are several

14   core questions at issue in the cases as to the loan and

15   the enterprise and the legality of the rates, the extent

16   of the activity of some or all of the defendants in the

17   challenged loan process.

18        And the typicality requirement is met because

19   the plaintiff -- representative plaintiffs' claims are

20   typical of the class.  They arise from the same course of

21   conduct, the same lenders, the same activities that are

22   alleged to be unlawful.

23        Fair and adequate representation by the

24   representative parties and their counsel certainly has

25   been achieved.

1          And the questions of law and fact that exist
2     clearly predominant over individual member questions, of
3     which there are virtually none.  And the class action is
4     clearly the superior way to resolve this litigation for
5     these claims likely would not even have proceeded had they
6     been left to individual resolution, but now there has been
7     very full redress obtained by virtue of the class process.

8          The Court's obligated to appoint class counsel,
9     and I've considered all of the factors under 23(g)(1) for
10    the appointment of class counsel, the work that they've
11    done in identifying and investigating the claims, their
12    experience in handling class actions complex and claims of
13    this kind, knowledge of the applicable law, which is
14    paramount here and which is proved, and the resources that
15    they have been committed to, the class, which have been
16    extremely significant, evincing a desire and a willingness
17    to do what's necessary fairly and adequately to represent
18    the clients.

19         And so the lawyers who have applied for class
20    certification have submitted sufficient information to
21    warrant their application:  Kelly Guzzo, Consumer
22    Litigation Associates, Cadell and Chapman, Terrell
23    Marshall, Gupta Wessler, Berger Montague.  And they will
24    be appointed class counsel.

25         I've reviewed the notice, and it seems to me to

1  be fully adequate.  It is similar to the notice that has

2  been used previously in this and other litigation of this

3  kind, and the notice plan provides for reasonable

4  identification of class members and is similar to that

5  which was used in *Galloway III,* which produced a

6  99.67 percent delivery rate.  And the Court previously has

7  found that the class members' due process rights are

8  satisfied, and it was the best notice practicable under

9  the circumstance.  And the Court so finds here.

10        The direct notice, to the extent not successful

11  by e-mail, will be followed up by first class mailings and

12  return mailings will be remailed.  And that is the process

13  which has proven successful.

14        The class settlement administrator here is

15  capable and has been approved previously and has performed

16  well and so will be approved again.

17        There's an automatic payment to class members so

18  there's no requirement to fill out forms, and they don't

19  have to be approved.

20        A final fairness hearing.  The date has been

21  proposed as -- what date is it?  October the what?

22        MS. KELLY:  October 28th, Judge.

23        THE COURT:  28th.  And that's keyed to the

24  notice provisions of the statute.  And that's still the

25  time to do that?

```
 1          MS. KELLY:  Yes, Judge.

 2          THE COURT:  Everybody's in agreement with that

 3  time, that date?

 4          MR. JACKSON:  That's right, Your Honor.

 5          THE COURT:  All right.

 6          Now, do we have an interim schedule for the

 7  filing of subsequent papers, application for final

 8  approval, counsel fee, objections?

 9          Objections and opt-outs are provided in the

10  notice, but how about the filing of the final papers?  We

11  need a little time to look at them.

12          Let's see.  Let me get the notice out and see

13  what it says.  The form of notice is ECF 654-2.

14          MS. KELLY:  Yes.

15          THE COURT:  And --

16          MS. KELLY:  Judge --

17          THE COURT:  -- we need to put a date in for the

18  exclusion.  When would that be?

19          MS. KELLY:  Judge, in the settlement agreement

20  it provides that class members will have at least 45 days

21  after entry of the preliminary approval order.

22          THE COURT:  So let's get a date.  The order will

23  be entered today.  You don't have that many fingers.

24          MS. KELLY:  So I think given -- we have it

25  extended a little bit longer than normal period due to how
```

1   the settlement is structured, but I think if we gave

2   consumers until September, mid-September, I think that

3   would be fine.

4                Is that --

5                THE COURT:  Well, what's today?

6                MS. KELLY:  It's June 3rd today, Judge.

7                THE COURT:  June 3rd.  And it's -- 30 days is

8   July 3rd, and then 15 days would be more than that.  It

9   would be July the 18th.

10               MS. KELLY:  18th, yes.

11               THE COURT:  July the 18th is a Thursday.  So why

12  don't we have the opt-outs in July instead of September?

13               MS. KELLY:  Judge, the only issue is we're not

14  going to have all the data to give notice until June 15th,

15  and so I just want to make sure people have time.

16               THE COURT:  Okay.  June 15 to July 15 is 30

17  days, and 40 days after that would be July 31 or so.  So

18  we can put it in August.

19               MS. KELLY:  Yep, I think August should be fine.

20  I just want to make sure people have time --

21               THE COURT:  How about August 12?  That's a

22  Monday.

23               MS. KELLY:  Could we do the end of the month?

24               I just don't want to -- if there's any issues

25  with the data on June 15th, because the administrator has

1  not received it yet.  I just want to make sure there's

2  enough time, Judge.

3            THE COURT:  Well, if you need more time, we'll

4  have to change it, but let's do -- let's do August the

5  19th.  That will give you plenty of time.

6            MS. KELLY:  Okay.  Thank you, Judge.

7            THE COURT:  All right.  So that needs to be put

8  in the notice.  And you have to write the Court about why

9  you don't like the settlement and the Court should not

10  approve it.  That's the objection to the settlement.

11           When are we going to do the objections?

12           MS. KELLY:  I believe the settlement

13  contemplates the same day as the opt-out deadline.

14           THE COURT:  All right.  August 19th.

15           Then when am I going to get any response from

16  you all?

17           MS. KELLY:  Judge, the settlement, in section

18  3.1-5, says we have to provide our filings at least

19  30 days prior to the hearing, but we are happy to provide

20  them whenever you would like.

21           THE COURT:  Thirty days is September what?

22           MS. KELLY:  September 28th.

23           THE COURT:  Okay.  So all the -- that's the

24  responses to the objections and opt-outs, if there's a

25  problem, and the motion for final approval and attorneys'

1  fees -- motion for attorneys' fees separately.

2          Anything else?

3          MS. KELLY:  No, Judge.

4          THE COURT:  All right.  By September 28th.

5          MS. KELLY:  Yes.

6          THE COURT:  All right.

7          All right.  Is there any other dates that have

8  to be put in?

9          You're going to insert the date where it says

10 "insert" and yellow highlight.  It really relates to the

11 website.

12         My note on page 3 of 654-2, the notice.  Not

13 everybody can get to these websites, it appears.  Why

14 don't you put the complete releases as an attachment to

15 the notice.  Don't put it in the text of the notice, but

16 put it as an attachment.

17         MS. KELLY:  Okay.

18         THE COURT:  But you're going to have to say --

19 because you've got releases for certain people that are

20 one way and certain people the other.  So you say releases

21 for -- Exhibit A is the release that will be for all

22 plaintiffs but those in -- where?  Nevada and some- --

23 whatever it is.

24         MS. KELLY:  Right.

25         THE COURT:  And then Exhibit B is the release

1   for there.

2           MS. KELLY:  We will insert that, Judge.

3           THE COURT:  All right.

4           And then you're going to have to put the dates

5   in on page 4.

6           Now, the other thing that this contains that I

7   don't understand is it says, "A list of any prior cases in

8   which you or your counsel have objected to class

9   settlement."  Why would we want to do that?  What's that

10  all about?

11          I mean, if that were an evidentiary proposition,

12  it would offend Rule 403.

13          MS. KELLY:  Yes, Judge.  I understand what

14  you're saying.  The settlement agreement I believe also

15  provides for that.  And why that is in there is because it

16  is my understanding, although I've not personally dealt

17  with it, is that there are some individuals that routinely

18  object to settlements and --

19          THE COURT:  So what?  I mean --

20          MS. KELLY:  I understand.

21          THE COURT:  -- that and a nickel will get you a

22  Coke.

23          What they said in one place doesn't have

24  anything to do with this settlement, other than generally

25  that they're cranks.  That's what you want to prove.  And

1  I cannot make a decision on the basis of somebody's a

2  crank.  Do you think that would get reversed immediately?

3  The Court would find me to be a crank.

4          MS. KELLY:  And so that just would be striking

5  the first sentence.

6          THE COURT:  Does anybody object to strike that?

7          MR. JACKSON:  No, Your Honor.

8          THE COURT:  Everybody on board?

9          All right.  Good.  Just that one sentence.

10          And I don't have anything else to say other than

11  that about the -- you get the net changed, and you're

12  going to get the notice mailed when?

13          MS. KELLY:  The notice will have to be mailed to

14  provide everyone -- it will have to be mailed by the end

15  of June.

16          THE COURT:  June 30?

17          MS. KELLY:  Yes.  Or e-mailed, yeah.

18          THE COURT:  Or earlier, right?

19          MS. KELLY:  Yes.

20          THE COURT:  Do it earlier, if you can.

21          You've got the settlement -- the administrator

22  is pretty good about getting this stuff done.  So --

23          MS. KELLY:  Yes, but they also like to check the

24  data, make sure everything's there.  So I just want to

25  make sure it's done right.  So -- yep.

```
1              THE COURT:  Well, I agree.

2              MS. KELLY:  Judge, the only other thing I think

3   is we needed a hearing time on October 28, on the last --

4              THE COURT:  I'm sorry.  I put the time on my

5   record.  It would be 10 a.m.

6              MS. KELLY:  Okay.

7              THE COURT:  Thank you very much.

8              MS. KELLY:  All right.  Thank you, Judge.

9              THE COURT:  Is there anything else?

10             MS. KELLY:  Not for plaintiffs.

11             MR. JACKSON:  Nothing from the defense team,

12  Your Honor.

13             THE COURT:  All right.  I'd like to tell you

14  that I certainly hope this goes through and we don't have

15  a problem down the road because of the factor that we

16  talked about, but I will tell you now that I appreciate

17  the ability of the lawyers who have litigated the case

18  thoroughly and completely and have ultimately gotten it to

19  the conclusion it's gotten.

20             I have told the law clerks and friends that in

21  this job there's almost nothing better than working with

22  good lawyers, and I feel that I have had that experience

23  in this case, and I thank you for what you've contributed

24  thus far.  Let's see if we can keep it online and get it

25  accomplished.
```

```
 1              MS. KELLY:  Thank you very much, Judge.  And we
 2   understand the efforts the Court has placed in this case,
 3   and we do appreciate it as well.
 4              THE COURT:  Thank you.
 5              We'll be in adjournment.
 6              Oh, wait a minute.
 7              Mr. Taliaferro, I kept you in the case for a
 8   certain period and reason, and you had said you wanted out
 9   of the case because you hadn't been paid I believe is what
10   it was.  Is that what it was?
11              MR. TALIAFERRO:  That's correct, Your Honor.
12   And there's a colloquy between my firm and Mr. Brophy
13   that's been kicked off.  We expect to renew our motions in
14   this and the other case, but there are some logistical
15   details and I'm --
16              THE COURT:  All right.  I appreciate the
17   sacrifice that you've made.  I hope it gets resolved.  I
18   don't know that it will involve me one way or the other.
19              When you're ready to move to be relieved from
20   representing Mr. Martorello, you're free to file the
21   motion as you wish.
22              MR. TALIAFERRO:  Thank you, Your Honor.
23              THE COURT:  Thank you very much for your
24   service.
25              All right.  Now we will be in adjournment.
```

1           (The proceeding concluded at 11:42 a.m.)

2

3                    REPORTER'S CERTIFICATE

4       I, Tracy J. Stroh, OCR, RPR, Notary Public in and for

5   the Commonwealth of Virginia at large, and whose

6   commission expires September 30, 2027, Notary Registration

7   Number 7108255, do hereby certify that the pages contained

8   herein accurately reflect the stenographic notes taken by

9   me, to the best of my ability, in the above-styled action.

10      Given under my hand this 4th day of June 2024.

11

12                _____
                        /s/
                  Tracy J. Stroh, RPR

13

14

15

16

17

18

19

20

21

22

23

24

25