**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| RENEE GALLOWAY, *et al.*, *on behalf of themselves and all individuals similarly situated*, | Case No. 3:19-cv-00314-REP |
| Plaintiffs, | |
| v. | |
| JUSTIN MARTORELLO., *et al.*, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL**
**OF CLASS SETTLEMENT, SERVICE AWARDS, AND ATTORNEYS' FEES**

Plaintiffs, by and through counsel, submit this Memorandum in Support of their Motion for Final Approval of Class Settlement, Service Awards, and Attorneys' Fees. At the onset, Plaintiffs note that the funding of the settlement is not completed because the shares of the third-party private company have not been sold as of the date of this filing. Under the terms of the settlement, the liquidation must be completed by October 21, 2024. As discussed during the telephonic hearing with the Court on September 24, 2024, it is unknown whether the funding will occur at any time, including by the October 21, 2024 deadline. Plaintiffs are filing this motion in hopes that the settlement is timely funded.

**INTRODUCTION**

Over the past seven years, this Court has presided over a series of related cases against Matthew Martorello, his family members, and companies. *See also Williams v. Big Picture Loans, LLC*, Case No. 3:17-cv-461 (E.D. Va.); *Galloway v. Big Picture Loans, LLC*, Case No. 4:18-cv-406 (E.D. Va.). These cases have resulted in extensive—even perhaps unprecedented—litigation related to online short-term loans that carry triple-digit interest rates. Collectively, these three cases

1

have generated almost **3,000** docket entries, including more than two dozen opinions issued by this Court on a variety of different issues. In addition to the litigation before this Court, the proposed settlement also resolves the extensive litigation that has been ongoing in the United States District Court for the District of Massachusetts, the United States District Court for the District of Oregon, and the United States Bankruptcy Court for the Northern District of Texas. *Duggan v. Martorello*, 596 F. Supp. 3d 158, 165 (D. Mass. 2022); *Smith v. Martorello*, No. 3:18-CV-1651-AC, 2021 WL 981491, at *1 (D. Or. Mar. 16, 2021); *In Re: Eventide Credit Acquisitions, LLC*, Case No. 23-90007-mxm11 (N.D. Tex. Bankr.).

In December 2020, this Court approved a related settlement with the tribal entity, Big Picture Loans, LLC, as well as some of its other business partners. As a result of that settlement, the prior class members received: (1) a substantial reduction in the amounts owed on their loans; and (2) $8.7 million dollars. *See Galloway v. Williams*, No. 3:19-CV-470, 2020 WL 7482191, at *1 (E.D. Va. Dec. 18, 2020) (granting final approval of the class settlement) (hereafter "*Galloway III*"). Since that time, Plaintiffs and their counsel have continued to press litigation against Mr. Martorello, his company, and family members, who were not parties to the prior settlement. As a result of this effort, Plaintiffs have now obtained a second settlement, which is <u>7.5 times</u> the size of the prior settlement fund.[1] If approved by the Court, this settlement will result in the creation of a settlement fund in the amount of $65,000,000.00.

The proposed settlement is the second largest ever obtained against a participant in the tribal lending industry. And it surpasses the cash funds of multiple other settlements—in cases filed after this case—approved by this Court in other tribal lending cases. *See, e.g., Gibbs v. TCV,*

---

[1] Neither Mr. Martorello, nor his entities have the authority to cancel loans originated by Big Picture Loans, LLC. Thus, debt cancellation is not a component of this settlement.

*V, LLP*, No. 3:19-cv-00789, ECF 95 (E.D. Va. Mar. 29, 2021) (granting final approval of a class settlement resulting in the creation of a settlement fund in the amount of $50,050,000.00 by *three* separate contributors); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, ECF 141 (E.D. Va. Dec. 13, 2019) (granting final approval of a class settlement resulting in the creation of a settlement fund in the amount of $53 million by *seven* separate contributors); *Gibbs v. Stinson*, Case No. 3:18-cv-676 (E.D. Va. Aug. 16, 2022) (approving settlement with cash fund of $44.5 million by multiple defendants); *Turner v. Zest Finance, Inc.*, Case No. 3:19-cv-00293 (E.D. Va.), ECF 114 (approving settlement with cash fund of $18.5 million by a single company); *Hengle v. Asner*, No. 3:19-cv-250-DJN (E.D. Va.), ECF 230 (approving settlement with cash fund of $39 million by multiple defendants); *Blackburn v. A.C. Israel Enterprises*, Case No. 3:22-cv-146 (E.D. Va. Mar. 2, 2024), ECF 228 (approving settlement with cash fund of $39 million by multiple defendants).

After years of litigation and unsuccessful mediation efforts, Plaintiffs, Matt Martorello, Rebecca Martorello, Bluetech Irrevocable Trust, and BWH Texas, LLC, entered into a Stipulation and Agreement of Settlement ("Settlement Agreement"). The proposed settlement affords significant relief, namely: (1) the creation of a $65,000,000.00 million common fund to be distributed to consumers who repaid unlawful amounts; and (2) Defendants' agreement "not to provide any services to Big Picture or its successors-in-interest in any form," including the collection of any loans. *See* ECF 649-1 at §§ 3.4, 3.15.[2] This relief builds on the significant relief already approved by this Court, and it mirrors similar relief approved by this Court in other tribal lending cases.

---

[2] Because the Stipulation and Agreement of Settlement (the "Settlement Agreement") has been previously filed, Plaintiffs cite to the ECF entry when citing its provisions.

On June 4, 2024, the Court granted preliminary approval of the class action settlement. Since that time, the feedback has been overwhelmingly positive. And for the reasons explained below, the proposed settlement satisfies Rule 23(e)(2)'s requirements that a class settlement be fair, reasonable, and adequate, and Plaintiffs respectfully request that the Court grant final approval of the Settlement—so long as it is timely funded.

## KEY SETTLEMENT TERMS

**A.   Class Definition.**

Under the Settlement Agreement, the parties agreed to resolve the claims of a nationwide class ("Settlement Class") defined as:

> All persons within the United States who executed loan agreements with Red Rock or Big Picture from June 22, 2013, through May 1, 2024.

ECF 649-1 at § 2.23. This is similar to the settlement class approved by the Court in the prior settlement except this definition accounts for consumers who took out loans after the approval of the last settlement. *Compare* 649-1 at § 2.23; *with Galloway III*, 2020 WL 7482191 at *2. There have been 626,171 class members identified through the loan-level data obtained from Big Picture Loans, LLC. Ex. 1, ALCS Decl. ¶ 4.

**B.   The Settlement Provides Significant and Meaningful Relief to Consumers.**

The proposed class settlement provides significant cash payments to consumers who repaid more than the principal balance of their loans. Specifically, the Settlement Agreement creates a Settlement Fund of sixty-five million dollars ($65,000,000.00). Ex. 649-1 at § 2.25. As outlined in the Settlement Agreement, payments from the Fund will be allocated using a tiered formula after payment of service awards to Plaintiffs,[3] attorneys' fees, and costs, as approved by this Court:

---

[3] On six occasions, this Court has approved the use of this tiered formula. *Gibbs,* No. 3:19-cv-00789, ECF 95; *Gibbs*, No. 3:17-cv-495, ECF 141; *Gibbs*, Case No. 3:18-cv-676, ECF 141;

> Tier 1:  The dollar amount of all payments made by each Settlement Class Member in Arizona, Arkansas, Colorado, Connecticut, Idaho, Illinois, Indiana, Kansas, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, South Dakota, Vermont, Virginia, and Wisconsin so long as the Settlement Class Member paid the principal amount of his or her loan.
>
> Tier 2:  The dollar amount of payments made above the legal interest limits if the original principal amount was repaid and if the Settlement Class Member resided in Alabama, Alaska, California, Delaware, Florida, Georgia, Hawaii, Iowa, Louisiana, Maine, Maryland, Michigan, Mississippi, Missouri, Nebraska, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Washington, Washington D.C., West Virginia, or Wyoming at the time the Settlement Class Member took out the loan; and
>
> Tier 3:  Settlement Class Members in Nevada and Utah will not receive cash payments.

*Id*. at § 3.12(a). Settlement Class Members in Tier 1 or Tier 2 who repaid the principal amount borrowed will receive a cash award based on a *pro rata* calculation rounded down to the nearest cent. *Id*. at § 3.12(b)(1). In the event any Settlement Class Member took out more than one loan during the class period, his or her claim amount will be calculated by determining the claim amount for each loan and adding them together.  *Id*. at § 3.12(b)(1).

The relief provided by the proposed class action settlement is significant.  Most consumers will receive a cash payment (in addition to the cash payments made pursuant to the *Galloway III* settlement), and those with outstanding loan balances with benefit from Defendants' agreement "not to provide any services to Big Picture or its successors-in-interest in any form," including the collection of any loans. *Id*. at 3.15. Importantly, Class Members will receive payments without needing to submit a claim form, prove any harm, or take any affirmative action. By way of example, the estimated payments for each of the named plaintiffs is:

---

*Turner*, Case No. 3:19-cv-00293, ECF 114; *Hengle*, No. 3:19-cv-250-DJN, ECF 230; *Blackburn*, Case No. 3:22-cv-146, ECF 228.

| Name | Estimated Amount |
|---|---|
| WILLIAMS, LULA | $87.95 |
| TURNAGE, GLORIA | $14.57 |
| HENGLE, GEORGE | $732.52 |
| COFFY, DOWIN | $145.83 |
| MARCELLA SINGH AS ADMINISTRATOR OF THE ESTATE OF FELIX GILLISON | $100.83 |
| GALLOWAY, RENEE | $38.30 |
| TURNER, DIANNE | $19.14 |
| DELABAY, DOMINQUE SHERYL | $212.67 |
| FITZGERALD, LORI | $41.49 |
| SCARBOROUGH, ANDREA | $106.66 |
| BROWNE, EARL | $32.23 |
| BUCHERT, ROSE MARIE | $144.63 |
| NOLTE, REGINA | $340.62 |
| MINOR, KEVIN | $304.88 |
| TITUS, TERESA | $168.87 |
| POUGH JR, BURRY | $92.22 |
| MARTINEZ, LISA | $79.97 |
| GRANDY, SONJI | $238.97 |
| SHERMAN, ANASTASIA | $218.18 |
| AVENT, JERRY | $33.86 |
| GRAY, LUCINDA | $96.35 |
| GREEN, ANTHONY | $31.90 |
| MADISON, LINDA | $0.00 |
| GETER, DENNIS | $409.71 |
| HAMM, KEISHA | $547.10 |
| THOMAS, FAITH | $351.37 |
| PAAVO, SHARON | $31.68 |
| TARLETON, LATANYA | $306.70 |
| SMITH, RICHARD | $121.42 |
| DUGGAN, DANA | $49.36 |

Ex. 1, Kelly Decl. at ¶ 27. As reflected by this chart, class members who repaid more than the principal balances of their loans will receive meaningful cash payments.

**C.     Class Action Fairness Notice.**

On May 31, 2024, the settlement administrator, American Legal Claims Services, LLC ("ALCS"), "mailed, via certified mail, a Notice of Proposed Class Action Settlement pursuant to 28 U.S.C. § 1715 (the "CAFA Notice") to Attorneys General of 49 states," the Attorney General of the United States, and Attorneys General for certain territories. ECF 664-1, ALCS Decl. at 1. ALCS also emailed the Attorney General's office for the state of Nevada. *Id*. None of these governmental agencies have sought to intervene or lodged any objections to the settlement.

**D.     The Settlement Administrator Provided Direct Notice to Settlement Class Members.**

In its Preliminary Approval Order, the Court approved the proposed notice plan and ordered that the Class Notice be sent to Settlement Class Members by ALCS. ECF No. 216 ¶¶ 10-15. Consistent with the Settlement Agreement and Court's Preliminary Approval Order, ALCS obtained data from Big Picture Loans, LLC, and "processed the mailing list ("Class List") with two tabs of data containing 626,171 rows of member names and addresses in the first tab and 1,017,868 rows of loan information in the second tab." Ex. 1, ALCS Decl. ¶ 4. Through these records, ALCS identified and compiled a final class list that containing "626,171 class members." *Id*.

On July 3rd and 4th, 2022, ALCS commenced the process of emailing the Class Notice to "536,282 class members," whose emails were initially verified. Of the "536,282 emails sent, 9,429 were deemed undelivered, and were sent Notice by USPS First Class Mail." *Id*. In addition to those mailings, ALCS also mailed a Class Notice on July 3, 2024, to "1,404 class members that did not have an email address." *Id*. ¶ 5. And on July 5, 2024, "ALCS mailed the Notice to 88,485 class members that did not have a valid email address." *Id*. ¶ 5. To locate these class members, ALCS utilized several means of ensuring the most accurate mailing addressing for class members,

including identifying addresses through "a nationally recognized location service to attempt to locate new addresses for these class members." *Id*. ¶ 6.

Altogether, ALCS "mailed a total of 99,318 Notices to class members (89,889 Initial Notices plus the 9,429 undeliverable emails)." *Id*. ¶ 6. "Of the 99,318 mailed Notices, 21,811 were returned by USPS" as of September 11, 2024. *Id*. ¶ 6. Of those, "14,376 were remailed to updated addresses," and "2,088" of those were returned. In sum, 616,648 notices are presumed delivered and only 9,523 notices remain undelivered, which results in a notice rate of 98.48%. *Id*. ¶ 7.

**E.     Objections and Exclusions.**

Of the 626,171 class members, only 1 has objected to the settlement. A copy of that objection was filed with the Court on July 19, 2024. *See* ECF 672. In accordance with the Court's Preliminary Approval Order, a response to this objection is due 14 days before the Final Fairness Hearing. *See* June 4, 2024 Preliminary App. Order, ECF 662 at ¶ 29. As will be explained in Plaintiffs' response, this lone objection lacks merit.

Only 8 consumers excluded themselves from the Settlement. Ex. 1, ALCS Decl. ¶ 8.

**F.     Release of Claims**

In return for this consideration, Settlement Class Members will provide a release to the "Released Parties," which the Settlement Agreement defines as Matt Martorello, Rebecca Martorello, Justin Martorello, Eventide, BWH Texas, Liont, LLC, Gallant Capital, LLC, the RLM 2018 Family Trust, the Martorello 2018 Children's Trust, Martorello Investments, LP, the RLM Management Trust, the Capstone Irrevocable Trust, the Bluetech Irrevocable Trust, Martorello 2023 Children's Trust, BVNT Children's Trust 1, BVNT Children's Trust 2, BVNT Children's, LLC, Vroom Trust, Obsidian LLC, Capstone Holdings, LLC, Capstone Opportunities, LLC, GFLP Entity 1, LP, GFGP Entity 1, LP, Kairos Holdings, LLC, Promovere Inc., Braviant, LLC ("Braviant"), Woodside Special Opportunity PE Fund, LP, Promus Ventures II, LP, GreenKey

Technologies, LLC, PV Rocket Labs I, LLC, Promus III, LP, PV Expansion Fund I, Dorado Analytics, LLC, and Lonnie Jeremy Davis, and any and all other persons, entities or trusts whether presently or previously in existence, that are directly or indirectly in any way now or heretofore owned by, controlled by, related to, or associated with the foregoing, together with any of their respective current, former or successor: parent companies, holding companies, subsidiaries, trusts, sub-trusts, trustees, beneficiaries, parents, guardians, children, estates, principals, protectors, grantors, settlors, officers, directors, agents, employees, attorneys, successors, affiliates, heirs, assignees, general partners, limited partners, managers, members, vendors, consultants, transferees, investors, creditors, accountants, insurers, and shareholders. ECF 649-1 at § 2.20.[4]

The "Released Claims" depend on whether a settlement class member receives a cash payment. *Id.* at § 2.18. For any "Settlement Class Member who is sent a payment from the Settlement Fund," they release "any and all claims, causes of action, suits, obligations, debts, demands, agreements, promises, liabilities, damages, losses, controversies, costs, expenses and attorneys' fees of any nature whatsoever, whether arising under federal law, state law, common

---

[4] All of the foregoing companies and trusts are affiliated with the Martorello's. Thus, other than the release for Lonnie Jeremy Davis (*i.e.*, a business partner who was previously a defendant), the release only applies to the Martorello's and their entities and trusts. And critically, the Settlement Agreement expressly defines "Non-Released Parties" as "Big Picture Loans, the Tribe, Tribal Economic Development, LLC, Tribal Acquisition Company, LLC, Duck Creek Tribal Financial, LLC, Ascension Technologies, LLC, Amlaur Resources, Columbia Pipe & Supply Co., Timothy Arenberg, Terrance Arenberg, and DTA Trinity Wealth Transfer Trust, and, to the extent that any such interpretation does not include any Released Parties, any and all other persons, entities, or trusts, whether presently or previously in existence, that are directly or indirectly in any way now or heretofore owned by, controlled by, related to, or associated with the foregoing, together with any of their respective current, former or successor: parent companies, holding companies, subsidiaries, trusts, sub-trusts, trustees, beneficiaries, parents, guardians, children, estates, principals, protectors, grantors, settlors, officers, directors, agents, employees, attorneys, successors, affiliates, heirs, assignees, general partners, limited partners, managers, members, vendors, consultants, transferees, investors, creditors, accountants, insurers, and shareholders." *Id.* at § 2.20. This means that Class Members retain their rights to challenge the legality of their loans with Big Picture or to seek damages from its non-tribal investor business partners.

law or equity, tribal law, foreign law, territorial law, contract, rule, regulation, any regulatory promulgation (including, but not limited to, any opinion or declaratory ruling), or any other law, including Unknown Claims, whether suspected or unsuspected, asserted or unasserted, foreseen or unforeseen, actual or contingent, liquidated or unliquidated, punitive or compensatory, as of the date of the Preliminary Approval Order, that relate to or arise out of loans made by and/or in the name of Red Rock or Big Picture from June 22, 2013 to May 1, 2024 (with the sole exception of claims to enforce the Settlement or the Judgment). For those who do not receive a payment, they release only their potential right "to bring a class action, collective action, or mass action against Released Parties based on any and all claims, causes of action, suits, obligations, debts, demands, agreements, promises, liabilities, damages, losses, controversies, costs, expenses, and attorneys' fees of any nature whatsoever, whether arising under federal law, state law, common law or equity, tribal law, foreign law, territorial law, contract, rule, regulation, any regulatory promulgation (including, without limitation, any opinion or declaratory ruling), or any other law, including Unknown Claims, whether suspected or unsuspected, asserted or unasserted, foreseen or unforeseen, actual or contingent, liquidated or unliquidated, punitive or compensatory, as of the date of the Preliminary Approval Order[.]" *Id.* at § 2.18.

## **ARGUMENT**

### I.      **The Notice Program Satisfied the Requirements of Rule 23(c)(2)(B).**

When a class is "certified for purposes of settlement under Rule 23(b)(3)," a district court "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). This notice may be provided by "United States mail, electronic means, or other appropriate means." *Id.* The Rule also requires that the notice inform potential class members that: (1) they have an opportunity to opt out; (2) the judgment will bind all class members who do

not opt out; (3) and any member who does not opt out may appear through counsel. *Id.* In assessing the sufficiency of the notice, the Court must consider both the method of delivery and the notice's content. *See* Federal Judicial Center, *Manual for Complex Litigation* § 21.312 (4th ed. 2004).

In the prior related case, *Galloway III,* this Court approved a similar notice plan and a very similar notice to the one here. *Galloway III*, Dec. 20, 2019 Preliminary Approval Order, ECF 65 at pg. 5-6. That plan and notice program resulted in a "successful delivery rate of 99.67%," and the Court found that "the notice provided to class members satisfies due process and that it was both reasonable, and the best notice practicable under the circumstances." *Galloway III*, 2020 WL 7482191 at *6.

In this case, just as in the *Galloway III* matter, Class Members were identified from the loan records, which contained the class members' names, addresses, and email addresses. Using this information, ALCS identified and compiled a final class list that containing 626,171 class members. Ex. 1, ALCS Decl. ¶ 4. After ALCS compiled the list, reasonable measures were taken to provide individual notice to those Members through the Notice Program previously approved by the Court. As detailed above, this Notice Program, which included both emailed and mailed notices, resulted in a 98.48% delivery success rate to the Class, which is on-par with the success rate in *Galloway III*. *Compare* Ex. 1, ALCS Decl. ¶ 7; *with Galloway III*, 2020 WL 7482191 at *6.

As this Court has previously explained, "[w]hat amounts to reasonable efforts under the circumstances is for the Court to determine after examining the available information and possible identification methods . . . 'In every case, reasonableness is a function of [the] anticipated results,

costs, and amount involved.'" *Fisher v. Va. Elec. & Power Co.*, 217 F.R.D. 201, 227 (E.D. Va. 2003) (citations omitted).

Here, 616,648 notices (*i.e.*, 98.48%) are presumed delivered and only 9,523 notices remain undelivered. Ex. 1, ALCS Decl. ¶ 7. Courts—including this one and others within the Fourth Circuit—have approved mailed-notice programs that reached a much smaller percentage of class members than the success rate here. *See In re Serzone*, 231 F.R.D. 221, 236 (S.D. W. Va. 2005) (approving notice program where direct mail portion was estimated to have reached 80% of class members); *Martin v. United Auto Credit Corp.*, No. 3:05cv143 (E.D. Va. Aug. 29, 2006) (granting final approval where class notice had approximately 85% delivery success). And as noted above, this success rate is only 1.29% lower than the rate in *Galloway III*, in which this Court found that the same notice program was "both reasonable, and the best notice practicable under the circumstances." *Galloway III*, 2020 WL 7482191, at *6.

In sum, as in *Galloway III*, the parties here have complied fully with the Court's Preliminary Approval Order and have taken reasonable steps to ensure that the Class Members were notified—in the best and most direct manner possible—of the Settlement's terms and significant benefits, as well as their right to exclude themselves or object.

## II. The Settlement Satisfies the Requirements of Rule 23(e)(2).

"Rule 23(e) of the Federal Rules of Civil Procedure obliges parties to seek approval from the district court before settling a class-action lawsuit." *In re: Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 952 F.3d 471, 483 (4th Cir. 2020) (citing Fed. R. Civ. P. 23(e)). When a court "reviews a proposed class-action settlement, it acts as a fiduciary for the class." *1988 Tr. for Allen Child. Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513, 525 (4th Cir. 2022). "In fulfilling this role, the district court must conclude that a

proposed settlement is 'fair, reasonable, and adequate.'" *Id.* (quoting Fed. R. Civ. P. 23(e)(2)). "In determining whether a settlement is fair, reasonable, and adequate," Rule 23(e)(2) requires the court to consider whether:

> (A)   the class representatives and class counsel have adequately represented the class;
>
> (B)   the proposal was negotiated at arm's length;
>
> (C)   the relief provided for the class is adequate, taking into account:
>
>> (i)   the costs, risks, and delay of trial and appeal;
>>
>> (ii)   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> (iii)   the terms of any proposed award of attorneys' fees, including timing of payments; and
>>
>> (iv)   any agreement required to be identified under Rule 23(e)(3);
>
> (D)   the proposal treats class members equitably relative to each other.

*Galloway*, 2020 WL 7482191 at *4 (quoting Fed. R. Civ. P. 23(e)(2)). In making this assessment, district courts are provided with "considerable deference" because "the court 'is exposed to the litigants, and their strategies, position[s], and proofs, and is on the firing line and can evaluate the action accordingly.'" *Lumber Liquidators*, 952 F.3d at 484 (citation omitted).[5]

---

[5] On December 1, 2018, "Rule 23(e)(2) was amended to specify factors for assessing the 'fairness, reasonableness, and adequacy' of a class-action settlement." *Lumber Liquidators*, 952 F.3d at 484, n.8. Prior to this, the Fourth Circuit developed and applied its "own multifactor standards" for fairness and adequacy. *See, e.g.*, *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 159 (4th Cir. 1991). Because the Fourth Circuit's prior considerations "almost completely overlap with the new Rule 23(e)(2) factors," *Lumber Liquidators*, 952 F.3d at 484, n.8, decisions prior to the amendment to Rule 23(e)(2) continue to be relevant.

**A.      Plaintiffs and Class Counsel have adequately represented the Class.**

Rule 23(e)(2)'s first factor examines whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). This assessment is "redundant of the requirements of Rule 23(a)(4) and Rule 23(g), respectively." *In re Flint Water Cases*, 571 F. Supp. 3d 746, 780 (E.D. Mich. 2021) (quoting Albert Conte & Herbert Newberg, *Newberg on Class Actions* § 13:48 (5th ed. June 2021 update)). Rule 23's adequacy requirements are met if: "(1) the named plaintiff[s] [have] interests common with, and not antagonistic to, the Class's interests; and (2) the plaintiff[s'] attorney is qualified, experienced and generally able to conduct the litigation." *Gibbs v. Stinson*, No. 3:18-cv-676, 2021 WL 4812451, at *16 (E.D. Va. Oct. 14, 2021) (Lauck, J.) (quoting *Milbourne v. JRK Residential Am., LLC*, No. 3:12-cv-861, 2014 WL 5529731, at *8 (E.D. Va. Oct. 31, 2014)).

This first factor is easily satisfied here. As to the named Plaintiffs, their interests and those of members of the proposed class are fully aligned, as they are all victims of the same alleged usurious lending scheme. *See, e.g.*, *Stinson*, 2021 WL 4812451, at *16 (finding that the plaintiffs were adequate in a comparable case because they had "no interests antagonistic to the class's interest" and shared "identical interest of establishing Defendants' liability based on the same questions of law and fact"); *Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 59 (E.D. Va. 2021) (finding that the plaintiffs were adequate in a comparable case because the "Plaintiffs' interests are in line with those of the broader classes"); *MacDonald v. Cashcall, Inc.*, 333 F.R.D. 331, 345 (D.N.J. 2019) ("There is nothing in the record to suggest that either proposed class representative has a claim or interest antagonistic to the remainder of the class: both MacDonald and Spearman took out loans from Western Sky allegedly at usurious interest rates."); *Brice v. Haynes Invs., LLC.*, 2021 WL 1916466, at *6 (N.D. Cal. Apr. 23, 2021) (same). Indeed, in its

14

Preliminary Approval Order, the Court already found that "Plaintiffs have fairly and adequately represented the interest of the Settlement Class." ECF No. 216 ¶ 4. Nothing has changed since that time to warrant a different finding.

Plaintiffs' counsel is also the same team that was approved by this Court in *Galloway III* and *Williams. See, e.g., Williams*, 339 F.R.D. at 59 ("Proposed Class Counsel have extensive experience with class actions, consumer financial protection law, and tribal lending operations. . . . The Court has already found them competent in a related case, *Galloway III*, 2020 WL 7482191, at *8 (E.D. Va. Dec. 18, 2020), and the Court reaffirms that finding here."). In addition to these related matters, the Court has found Plaintiffs' counsel from Virginia, Kelly Guzzo, PLC, and Consumer Litigation Associates P.C., adequate in seven other tribal lending cases. *Gibbs*, No. 3:19-cv-00789, ECF 95; *Gibbs*, No. 3:17-cv-495, ECF 141; *Gibbs*, Case No. 3:18-cv-676; *Turner*, Case No. 3:19-cv-00293, ECF 114; *Hengle*, No. 3:19-cv-250, ECF 230; *Blackburn*, No. 3:22-cv-146, ECF 228.[6] Indeed, when recently assessing this factor in a comparable case, Judge Lauck noted that the "experience of the counsel in the specific area of litigation I think also pretty much goes without saying on all sides. This is a group of lawyers who have developed a level of expertise that I think is unsurpassed in the country." *Gibbs v. Stinson*, No. 3:18-cv-676, Trans. of Final Approval Hr'g at 25:19-23 (E.D. Va. Aug. 16, 2022).

### B.    *Negotiations were arm's length and involved Judge Colombell.*

The second factor examines whether the settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B); *see also Flint Water Cases*, 571 F. Supp. 3d at 780 (explaining that the

---

[6] The Court has approved counsel in other consumer-protection and complex class actions, typically as lead or co-lead counsel. *See, e.g., Clark v. Trans Union, LLC*, No. 3:15-cv-391, 2017 WL 814252, at *13 (E.D. Va. Mar. 1, 2017); *Thomas v. FTS USA, LLC*, 312 F.R.D. 407, 420 (E.D. Va. 2016); *Dreher v. Experian Info. Sols., Inc.*, No. 3:11-cv-624, 2014 WL 2800766, at *2 (E.D. Va. June 19, 2014).

second factor requires courts to "consider whether the negotiations were conducted at arm's length with no evidence of collusion or fraud"). "Courts presume the absence of fraud or collusion unless there is evidence to the contrary." *Id.* (quoting *UAW v. Gen. Motors, Corp.*, 2006 WL 891151, at *21 (E.D. Mich. Mar. 31, 2006)). Here, there is no evidence suggesting the presence of collusion or fraud between the parties—as evidenced by the seven years of litigation and multiple failed mediation attempts during this time.

To help confirm that the negotiations were arm's length, courts have looked at several other factors, including the presence of a mediator. As the leading class action treatise explains: "There appears to be no better evidence of [a truly adversarial bargaining process] than the presence of a third-party mediator." Conte & Newberg, *supra*, § 13:48; *see also Flint Water Cases*, 571 F. Supp. 3d at 780 ("highly experienced mediators" provided "ample protections in their roles"). Here, Plaintiffs and Defendants had lengthy negotiations and worked with United States Magistrate Judge Mark Colombell to help finalize the terms of their agreement through multiple rounds of negotiations. *See* Ex. 2, Kelly Decl. ¶ 26. Judge Colombell has extensive experience in settling cases, and his involvement in this settlement further establishes that there was no collusion among the parties.

Additionally, "[c]onsidering the posture of the case at the time of settlement allows the Court to determine whether the case has progressed far enough to dispel any wariness of 'possible collusion among the settling parties.'" *Brown v. Transurban USA, Inc.*, 318 F.R.D. 560, 571 (E.D. Va. 2016). As reflected by the dockets, these cases have resulted in extensive litigation such that no one could seriously claim that there was collusion between the parties. Collectively, the three cases before this Court have generated almost **3,000** docket entries. In addition to the litigation before this Court, the proposed settlement also resolves the extensive litigation that has been

ongoing in the United States District Court for the District of Massachusetts, the United States District Court for the District of Oregon, and the United States Bankruptcy Court for the Northern District of Texas. *Duggan v. Martorello*, 596 F. Supp. 3d 158, 165 (D. Mass. 2022); *Smith v. Martorello*, No. 3:18-CV-1651-AC, 2021 WL 981491, at *1 (D. Or. Mar. 16, 2021); *In Re: Eventide Credit Acquisitions, LLC*, Case No. 23-90007-mxm11 (N.D. Tex. Bankr.). The efforts undertaken demonstrate there has been no collusion between the parties.

      **C.**      ***The Relief Provided to the Class is Adequate.***

Rule 23(e)(2)(C) requires the Court to consider whether the relief is adequate, considering:

> (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3).

Fed. R. Civ. P. 23(e)(2)(C). These subfactors overlap with the factors that the Fourth Circuit has held are required to evaluate a class settlement's fairness, reasonableness, and adequacy. *Lumber Liquidators*, 952 F.3d at 484 n.8 (citing *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 159 (4th Cir. 1991)). An analysis of each factor shows that this settlement is fair, reasonable, and adequate.

The first Rule 23(e)(2)(C) sub-factor requires the Court to evaluate the settlement against the costs, risks, and delay of trial and appeal. This factor strongly supports approval of the settlement. While Class Counsel strongly believes in the strength of this case, they also acknowledge that there are substantial risks associated with continued litigation. Defendants have disputed Plaintiffs' claims since the inception of this case and have raised several defenses, including factual disputes over the degree and nature of their alleged involvement in the lending enterprise and possible merits defenses, such as mistake of law. There is also lengthy and complicated questions of whether plaintiffs could collect against international and domestic trusts. *See, e.g., Williams*, ECF Nos. 1409 & 1491. As the history of this litigation demonstrates,

Defendants would no doubt continue to exhaust all possible defenses, including appeals of the judgment in the *Williams* matter, and attempted delays through the automatic stay provided by the Bankruptcy Code. The Settlement avoids this significant cost, risk, and time by providing significant settlement benefits to the Class Members now.

Rule 23(e)(2)(C)'s second sub-factor requires the Court to evaluate the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims. Here, just as with multiple other similar settlements approved by this Court,[7] Class Members will receive the cash benefits based on the unlawful amount repaid on their loans—without having to submit a claim form or any proof of their damages. Thus, cash payments will be automatically distributed. This is important because "[t]he use of objective criteria to determine settlement distribution is a hallmark of fairness." *Flint Water Cases*, 571 F. Supp. 3d at 781. Because an automatic cash payment is based on objective criteria and does not require any action by Class Members, this factor weighs strongly in favor of approving the settlement.

Rule 23(e)(2)(C)'s third sub-factor requires the Court to evaluate the request for attorneys' fees, including the timing of the request. The focus of this analysis is whether there are signs that "counsel sold out the class's claims at a low value in return for [a] high fee." Conte & Newberg, *supra*, § 13:54. There are no such indications here as reflected by the seven-year history of this litigation, and there is no sign that Class Counsel left any money on the negotiating table. Instead, they have obtained $65 million settlement fund for automatic payments to Class Members who

---

[7] This tiered formula—which takes into account the differences in remedies available to borrowers in each state—has been approved by this Court in other tribal lending cases. *Gibbs,* No. 3:19-cv-00789, ECF 95; *Gibbs*, No. 3:17-cv-495, ECF 141; *Gibbs*, Case No. 3:18-cv-676, ECF 141; *Turner*, Case No. 3:19-cv-00293, ECF 114; *Hengle*, No. 3:19-cv-250-DJN, ECF 230; *Blackburn*, Case No. 3:22-cv-146, ECF 228.

meet objective criteria, which is in addition to the $8.7 million in payments and the cancelled debt obtained in *Galloway III*. This is significant consideration for the Class Members' claims.

It is also important to note that the attorneys' fee component of the settlement was negotiated under the supervision of Judge Colombell, who would notice if Class Counsel were compromising the class members' claims for their own benefit. *Flint Water Cases*, 571 F. Supp. 3d at 782. As to the timing of the attorney fee award request, "courts are to consider this to prevent situations in which the request for attorney fees is unknown and could upset the compensation to claimants at the time of final approval." *Id.* There is no such concern here as the proposed Notice to the Settlement Class identified the requested attorneys' fees. *See* ECF 665-3 at § 13 (explaining that the lawyers may ask the "for an award of attorneys' fees not to exceed one third of the amount paid by Defendants, which is $21,666,666.66.").

Finally, there are no agreements that need to be identified under Rule 23(e)(3).

### D.    *The Settlement Treats Class Members Equitably Related to Each Other.*

The final factor under Rule 23(e)(2) requires a court to consider whether "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D) (emphasis added). This factor considers whether class members have been treated in a fair and impartial manner, but "[t]here is no requirement that all class members in a settlement be treated equally." *Swinton v. SquareTrade, Inc.*, 454 F. Supp. 3d 848, 876 (S.D. Iowa 2020) (emphasis in original) (citation omitted). And when considering this factor, a court "must balance the claims of those with potentially substantial damages with those with potentially minimal or insignificant damages." *Id.* (citation omitted).

The Settlement here achieves this balance. It limits payments to only those Members who made unlawful payments on their loans based on the legal protections of their respective states of residence. The Settlement further awards payments on a *pro rata* basis after considering the

amount of each qualifying Class Member's payments above the lawful amount in their respective states. For example, each of the named plaintiffs will receive approximately the following amounts from the settlement:

| Name | Estimated Amount |
|---|---|
| WILLIAMS, LULA | $87.95 |
| TURNAGE, GLORIA | $14.57 |
| HENGLE, GEORGE | $732.52 |
| COFFY, DOWIN | $145.83 |
| MARCELLA SINGH AS ADMINISTRATOR OF THE ESTATE OF FELIX GILLISON | $100.83 |
| GALLOWAY, RENEE | $38.30 |
| TURNER, DIANNE | $19.14 |
| DELABAY, DOMINQUE SHERYL | $212.67 |
| FITZGERALD, LORI | $41.49 |
| SCARBOROUGH, ANDREA | $106.66 |
| BROWNE, EARL | $32.23 |
| BUCHERT, ROSE MARIE | $144.63 |
| NOLTE, REGINA | $340.62 |
| MINOR, KEVIN | $304.88 |
| TITUS, TERESA | $168.87 |
| POUGH JR, BURRY | $92.22 |
| MARTINEZ, LISA | $79.97 |
| GRANDY, SONJI | $238.97 |
| SHERMAN, ANASTASIA | $218.18 |
| AVENT, JERRY | $33.86 |
| GRAY, LUCINDA | $96.35 |
| GREEN, ANTHONY | $31.90 |
| MADISON, LINDA | $0.00 |
| GETER, DENNIS | $409.71 |
| HAMM, KEISHA | $547.10 |
| THOMAS, FAITH | $351.37 |
| PAAVO, SHARON | $31.68 |
| TARLETON, LATANYA | $306.70 |
| SMITH, RICHARD | $121.42 |
| DUGGAN, DANA | $49.36 |

Ex. 1, Kelly Decl. at ¶ 27.

The structure of the settlement balances the claims of those with more substantial damages and treats members equitably based those who have suffered actual monetary harm (*i.e.*, the unlawful amounts paid), while also obtaining important injunctive relief for those who do not receive payments. Moreover, Class Members who do not receive any payments will not provide a broad release, but instead, only their potential right "to bring a class action, collective action, or mass action against Released Parties[.]" ECF 649-1 at § 2.18. Class Members, therefore, will be treated equitably relative to each other and their damages.

\* \* \*

Because all the Rule 23(e)(2) factors confirm that the Settlement is fair, reasonable, and adequate, Plaintiffs and Class Counsel respectfully request that the Court approve the Settlement.

## II.     The Service Awards are Reasonable.

Plaintiffs request——and none of the Defendants oppose—an award of $20,000 for the five named plaintiffs in *Williams* matter, as well as the two named plaintiffs in the *Duggan* and *Smith* matters. Plaintiffs further request an award of $15,000 to the remaining named 23 plaintiffs in this matter. If awarded, this would reduce the total settlement amount by $445,000, which equates to .68% of the total settlement amount. In other words, this award reduces each class member who is receiving a payment by a little more than one dollar.

To begin, Plaintiffs note that the requested service awards are consistent with the service awards in other tribal lending cases. *Gibbs*, No. 3:18-cv-676, ECF No. 346 ¶ 20 (awarding $20,000 service awards to each of the 13 class representatives); *Gibbs*, No. 3:19-cv-789, ECF No. 95

(approving a $7,500 service award);[8] *Blackburn*, Case No. 3:22-cv-146, ECF 228 (granting $15,000 to each named plaintiff, for a total of $120,000). And in other non-tribal lending cases where class representative involvement has been as rigorous as in this case, courts, including this one, have approved similar service awards than the $20,000 award sought here. For example, in another consumer class action, the Court awarded a $20,000 service award to a class representative who, like Plaintiffs here, remained engaged in a class-action case for several years, participated in discovery, and remained in regular communication with her counsel. *Souter v. Equifax Info. Servs., LLC*, No. 3:10-cv-107, ECF No. 247 ¶ 11 (E.D. Va. Apr. 5, 2016).[9] This Court routinely awards service awards in consumer class actions[10] and should do so here, as they were amply earned.

---

[8]As part of the same global settlement, the Court approved an additional $7,500 to each of the named plaintiffs for service awards related to another defendant. *Gibbs v. Rees*, No. 3:20-cv-717, ECF No. 68 ¶ 21 (E.D. Va. Mar. 26, 2021). When considered together, the service awards for the plaintiffs in that settlement were $15,000, which are equal the amount requested here.

[6] *See also Loudermilk Servs., Inc. v. Marathon Petroleum Co. LLC*, 623 F. Supp. 2d 713, 727 (S.D. W. Va. 2009) (awarding each of the five class representatives a $25,000 service award); *Temp. Servs., Inc. v. Am. Int'l Grp., Inc.*, No. 3:08-cv-271, 2012 WL 4061537, at *6 (D.S.C. Sept. 14, 2012) (approving $20,000 service awards to each of the two class representatives); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 400 (D.D.C. 2002) (approving a service award of $25,000 to each of the three class representatives in the case); *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299–300 (N.D. Cal. 1995) (awarding $50,000 to the named plaintiff); *In re Dunn & Bradstreet Credit Serv. Customer Litig.*, 130 F.R.D. 366, 374 (S.D. Ohio 1990) (awarding $55,000 each to two named plaintiffs); *In re Janney Montgomery Scott LLC Fin. Consultant Litig.*, No. 06-3202, 2009 WL 2137224, at *12 (E.D. Pa. July 16, 2009) (approving a service award of $20,000 to each of the three class representatives in the case); *Garett v. Morgan Stanley DW, Inc.*, Civ. A. No. 04–1858 (S.D. Cal. Sept. 12, 2006) (order granting final approval) (awarding named plaintiffs service awards of $20,000 each).

[10] *See, e.g.*, *Hayes v. Delbert Servs. Corp.*, 3:14-cv-258 (JAG) (E.D. Va.); *Manuel v. Wells Fargo Nat'l Ass'n*, No. 3:14cv238(DJN), 2016 WL 1070819, at *6 (E.D. Va. Mar. 15, 2016); *Beverly v. Wal-Mart Stores, Inc.*, No. 3:07-cv-469; *Williams v. Lexis Nexis Risk Mgmt.*, No. 3:06cv241; *Cappetta v. GC Servs. LP*, No. 3:08-cv-288- (E.D. Va.); *Makson v. Portfolio Recovery Assoc., Inc.*, No. 3:07cv982-HEH (E.D. Va. Feb. 9, 2009); *Daily v. NCO*, No. 3:09-cv-31; *Conley v. First Tenn.*, No. 1:10CV1247-TSE (E.D. Va.); *Lengrand v. Wellpoint*, No. 3:11-cv-333 (E.D. Va.);

The requested amounts are consistent with other cases and this, of course, was not the average case. Among other things, many of the named plaintiffs were the subject of sanctions motions and other litigation in the bankruptcy court in hopes to intimate them into withdrawing their claims. In that motion, one of Martorello's companies sought to hold the named plaintiffs "in contempt for failing to abide by the orders, injunctions, Bankruptcy Code or Rules," and to award it "damages as a result of Defendants' violation of the automatic stay." *See In Re Eventide Credit Acquisitions*, Case No. 23-90007-mxm11 (N.D. Tex. Bankr.), Motion to Enforce Automatic Stay, ECF 106 at pg. 16. Many of these same plaintiffs were also subject to sanctions threats in this case, including the filing of a Rule 11 motion against them, which was denied by the Court. *See* ECF 105. Such litigation tactics could lead a reasonable borrower to abandon ship, but the named plaintiffs stayed in the case for years despite such pressures from the defense.

The named plaintiffs not only stayed the course in the face of claims for damages against them, but they invested years of their time into this case. For example, the five named plaintiffs in the *Williams* matter were deposed, answered written discovery, participated in settlement discussions, but they also had to be extensively prepared for trial. Although they did not ultimately testify (because of the summary judgment rulings), their years of work and effort led to the entry of a judgment on the RICO claims in the amount of $43,401,817.47, plus interest. *Williams*, ECF 1407. Because the *Williams* plaintiffs filed the first action and saw it through the judgment, an award of $20,000 for the five named plaintiffs in *Williams* matter has been well earned. Similarly, Plaintiffs seek $20,000 for both Smith and Duggan—who were the sole plaintiffs in the Oregon

---

*Henderson v. Verifications, Inc.*, No. 3:11-cv-514 (E.D. Va.); *Pitt v. K-Mart Corp.*, No. 3:11-cv-697 (E.D. Va.); *James v. Experian Info. Sols.*, No. 3:12-cv-902 (E.D. Va.); *Manuel v. Wittstadt*, No. 3:12-cv-450 (E.D. Va.).

and Massachusetts actions. As the declaration of Michael Caddell explains, both "Duggan and Smith have been very active in this litigation, including each being deposed twice, reviewing pleadings and discovery, serving on the creditors' committee of both Eventide bankruptcies," and refused to accept individual settlement offers as high as $50,000 so that they could obtain relief for this class. Ex. 3, Caddell Decl. at ¶¶ 42-43. Likewise, the named Plaintiffs in *Galloway* and *Galloway II* have been fully committed to this case for years with all Plaintiffs responding to discovery in *Galloway* and with some of those Plaintiffs sitting for deposition.

In short, Plaintiffs believe that the service awards are reasonable in light of: (1) the contentious nature of the case, including essentially counterclaim attacks lodged by Defendants; (2) the long duration of the cases; (3) the significant involvement of the plaintiffs, especially those who prepared for trial; (4) the foregoing of individual settlement offers, which eclipsed the service awards requested; (5) the results obtained as this is the second largest tribal related settlement; and (6) awards in similar cases. When considering each of these factors, an award of $20,000 for the five named plaintiffs in *Williams* matter, as well as the two named plaintiffs in the *Duggan* and *Smith* matters, and $15,000 to the remaining named 23 plaintiffs in this matter is reasonable. It is also reasonable given that the service awards will not significantly reduce any class members' recoveries when considering the consideration and size of the class.

## III.    The Requested Attorneys' Fees and Costs are Appropriate and Should Be Awarded.

The multi-firm team of Class Counsel collectively seek an award of $21,666,666.66 for their attorneys' fees and costs in these cases. This request represents one third of the Settlement Fund. And of course the percentage allocated just to fees, net of costs, would be even lower.

### i. A percentage fee is appropriate and reasonable here.

Rule 23(h) gives the Court authority to "award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement" in class actions. Fed. R. Civ. P.

23(h). If the case results in a common fund for the class, the Court may award fees as a percentage of that common fund. The doctrine originates from the equitable principles of quantum meruit and unjust enrichment and aims to shift the expense of litigation from named plaintiffs, who obtained the fund's benefits, to the absent class members, who benefit from the fund but likely contributed little, or nothing, to the process. *Brundle ex rel. Constellis Employee Stock Ownership Plan v. Wilmington Tr., N.A.*, 919 F.3d 763, 785 (4th Cir. 2019), as amended (Mar. 22, 2019). As the Fourth Circuit has explained, awarding fees as a percentage of the common fund "hold[s] the beneficiaries of a judgment or settlement responsible for compensating the counsel who obtained the judgment or settlement for them." *Id.* at 786.[11]

The collective preference for the percentage method is common sense. It is easily administered and saves valuable court and party resources, which heeds the Supreme Court's mandate that a "request for attorney's fees . . . not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). The percentage method also aligns the interests of class counsel and the class members because it both motivates class counsel to generate the largest possible recovery for the class and rewards efficient litigation. This is because their fee increases with the class's take, removing any incentive to run up their hours in order obtain a higher fee. A percentage fee also encourages early settlements because class counsel will not receive additional fees for unnecessary motions or discovery. *Johnson v. Metro-Goldwyn-Mayer Studios, Inc.*, 2018 WL 5013764, at *11 (W.D. Wash. 2018) ("the percentage-of-recovery method plays an important role in aligning the interests of the class and class counsel" and "[i]n such situations, class counsel

---

[11] Most circuits either permit or require the percentage method. 5 Newberg on Class Actions § 15:66 (5th ed. Dec. 2020 Update). For example, the Eleventh and the District of Columbia Circuits require the use of the percentage method. *Id.* at n.6 (citing cases). The Third Circuit prefers the percentage method. *Id.* at n.7. And the First, Second, Fifth, Sixth, Eight, Ninth, and Tenth Circuits allow district courts to use either method. *Id.* at n.5 (citing cases).

is motivated to obtain the largest tangible benefit possible, to provide for the best possible notice to the class, and to assure that the claims process is not overly burdensome"); *In re Anthem, Inc. Data Breach Litigation*, 2018 WL 3960068, at *5 (N.D. Cal. 2018) ("By tying the award to the recovery of the Class, Class Counsel's interests are aligned with the Class, and Class Counsel is incentivized to achieve the best possible result."); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 991 F. Supp. 2d 437, 440 (E.D.N.Y. 2014) ("The percentage method better aligns the incentives of plaintiffs' counsel with those of the class members because it bases the attorneys' fees on the results they achieve for their clients, rather than on the number of motions they file, documents they review, or hours they work."); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1268–69 (D.C. Cir. 1993) ("using the lodestar approach in common fund cases encourages significant elements of inefficiency," while "if a percentage-of-the-fund calculation controls, inefficiently expended hours only serve to reduce the per hour compensation of the attorney expending them").

On the other hand, the lodestar method is time consuming and requires lawyers to submit voluminous records that courts must then review and scrutinize in detail. Furthermore, a lodestar fee motivates class counsel to increase the number of hours they spend on a case to maximize their fees, no matter if that time advances the case or class members' interests. *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 821 (3d Cir. 1995) ("[T]he lodestar method has been criticized as giving class counsel the incentive to delay settlement in order to run up fees while still failing to align the interests of the class"). Indeed, the lodestar method is used in only a fraction of class-action cases, usually those involving fee-shifting statutes or where the settlement provides injunctive relief that cannot be reliably calculated. *See, e.g.*, Theodore Eisenberg, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. Law Review

937, 945 (2017) (finding that the lodestar method used only 6.29% of the time from 2009–2013, down from 13.6% from 1993–2002 and 9.6% from 2003–2008); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811, 832 (2010) (finding that the lodestar method used in only 12% of settlements).

Although the Fourth Circuit has not explicitly required its use in class actions, the percentage method is overwhelmingly preferred by the district courts in this circuit. *See Galloway III* 2020 WL 7482191, at *5 (noting that "Nevertheless, over time, certain customs have developed, both in the Fourth Circuit and across the country; for example, the favored method for calculating attorneys' fees in common fund cases is the percentage of the fund method."); *Thomas v. FTS USA, LLC*, No. 3:13-cv-825, 2017 WL 1148283, at *3 (E.D. Va. Jan. 9, 2017) ("District Courts within this Circuit have also favored the percentage of the fund method." (citations omitted)), *report and recommendation adopted,* No. 3:13-cv-825, 2017 WL 1147460 (E.D. Va. Mar. 27, 2017); *see also Kelly v. Johns Hopkins Univ.*, No. 1:16-cv-2835, 2020 WL 434473, at *2 (D. Md. Jan. 28, 2020); *Seaman v. Duke Univ.*, No. 1:15-cv-462, 2019 WL 4674758, at *2 (M.D.N.C. Sept. 25, 2019); *Cox v. Branch Banking & Tr. Co.*, No. 5:16-cv-10501, 2019 WL 164814, at *5 (S.D. W. Va. Jan. 10, 2019) (collecting cases and stating, "In sum, there is a clear consensus among the federal and state courts, consistent with Supreme Court precedent, that the award of attorneys' fees in common fund cases should be based on a percentage of the recovery. This consensus derives from the recognition that the percentage of fund approach is the better-reasoned and more equitable method of determining attorneys' fees in such cases."); *Krakauer v. Dish Network, L.L.C.*, No. 14-333, 2018 WL 6305785, at *2 (M.D.N.C. Dec. 3, 2018); *Phillips v. Triad Guar. Inc.*, No. 1:09-cv-71, 2016 WL 2636289, at *2 (M.D.N.C. May 9, 2016); *Archbold v. Wells Fargo Bank, N.A.*, No. 13-24599, 2015 WL 4276295, at *5 (S.D. W. Va. July 14, 2015)

("[T]he Court concludes that there is a clear consensus . . . that the award of attorneys' fees in common fund cases should be based on a percentage of the recovery.").

The Fourth Circuit has not established a benchmark for fee awards in common-fund cases. Class Counsel is requesting one third of the settlement amount. This is well within the 25-to-40-percent range that courts within the Fourth Circuit have held appropriate.[12] It is also within the appropriate range found by the recent comprehensive study of attorneys' fees in class action cases. Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Studies 27, 31, 33 (2004) (noting "a remarkable uniformity in awards between roughly 30% to 33% of the settlement amount."). Indeed, several courts in this District approving tribal lending settlements have approved fees constituting one-third of the cash value of the settlement fund. *See Hengle*, ECF No. 230 ¶ 20 (approving $13 million in fees, representing one third of the settlement's $39 million cash value); *Gibbs*, No. 3:17-cv-495, ECF No. 141 ¶ 24 (awarding $5,248,227.93 in fees, representing one-third of fund value); *Gibbs*, No. 3:19-cv-789, ECF No. 95 ¶ 19 (awarding $11,677,165.50, representing one-third of fund value); *Gibbs*, No. 3:20-cv-717, ECF No. 68 at 9–11  (same); *Turner*, No. 3:19-cv-293, ECF No. 114 (same); *Gibbs*, No. 3:18-cv-676, ECF No. 346 ¶ 20  (same).

---

[12] Indeed, "empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in the class actions average around one-third of the recovery." 4 Newberg *on Class Actions* § 14:6 (4th ed.); *see also In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 735 (E.D. Pa. 2001) (review of 289 class action settlements shows "average attorney's fees percentage [of] 31.31%" with a median value that "turns out to be one-third."). In an analysis of such historic patterns, Silber and Goodrich explained that empirical evidence does not necessarily establish what a court should do in any given case, but it does provide guidance to the court in determining whether a fee is reasonable. Reagan W. Silber & Frank E. Goodrick, *Common Funds and Common Problems: Fee Objections and Class Counsel's Response*, 17 Rev. Litig. 525, 545–46 (1998).

In addition, this Court awarded a 33-percent fee award in the prior *Galloway III* matter, holding: "A percentage award of 33% of a common fund is a bit on the high side for this circuit and in general, but it is certainly not outside of the realm of reasonable percentage awards, particularly given that the award will be inclusive of costs." *Galloway*, 2020 WL 7482191 at *11 (citing *In re Celebrex (Celecoxib) Antitrust Litig.*, No. 2:14-cv-361, 2018 WL 2382091, at *5 (E.D. Va. Apr. 18, 2018)).

As with any class case that they agree to take on and because the representation is on a contingent basis, Class Counsel lives by the result that they obtain for the Class Members. *See, e.g.*, Ex. 2, Kelly Decl. at ¶ 24; Ex. 3, Caddell Decl. at ¶ 45.In this case, given the recovery and significant risk of non-payment over years of litigation, the requested fee is reasonable.

### ii. A cross-check against Class Counsel's lodestar confirms the requested fee is reasonable.

A cross-check is not required to determine the fairness of a fee when the percentage method is used. Courts, however, have at times used a lodestar estimate as a cross-check in assessing Class Counsel's fee request. *Manual for Complex Litigation (Fourth)* § 21.724. As this Court recently recognized, "where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *Galloway*, 2020 WL 7482191 at *11.

Here, the requested award includes both attorneys' fees and costs. For fees, the collective total lodestar is $17,305,742.60. *See* Ex. 2, Kelly Decl. at ¶ 22 (detailing Kelly Guzzo's hours, which resulted in a remaining unpaid lodestar of $4,800,075.00); *See* Ex. 3, Caddell Decl. at ¶ 51 (detailing: (1) Caddell & Chapman's hours, which resulted in a total lodestar of $5,307,407.10; and (2) the hours of its local and bankruptcy counsel, which amounts to an additional $568,377); Ex. 4, Bennett Decl. at ¶ 32 (detailing Consumer Litigation Associates' hours, which resulted in a total lodestar of $1,887,941.25); Ex. 5, Drake Decl. at ¶ 16 (detailing Berger Montague's hours,

which resulted in a total lodestar of $1,870,284.79); Ex. 6, Terrell Decl. at ¶ 21 (detailing Terrell Marshall's hours, which resulted in a total lodestar of $1,277,095); Ex. 7, Wessler Decl. at ¶ 13 (detailing Gupta Wessler's hours, which resulted in a total lodestar of $1,594,562.50). Class Counsel also has unreimbursed costs in the amount of $547,393.14. *See* Ex. 2, Kelly Decl. at ¶ 23 (explaining that Kelly Guzzo has advanced $127,772.86); Ex. 3, Caddell Decl. at ¶ 54 (explaining that Caddell & Chapman and its local counsel have advanced $119,613.52); Ex. 4, Bennett Decl. at ¶ 33 (unpaid costs of $144,967.27); Ex. 5, Drake Decl. at ¶ 16 (unpaid costs of $148,430.15); Ex. 6, Terrell Decl. at ¶ 23 (detailing unpaid expenses of $6,609.34).

Altogether, Class Counsel has incurred a total of $17,853,135.70 in fees and costs. If the full requested fee is awarded, it would amount to a modest multiplier of 1.21—without even considering the post-approval hours that will be required. The benefits of the settlement, coupled with the seven years invested by counsel, reflect that a modest multiplier of 1.21 is reasonable. *Berry v. Schulman,* 807 F.3d 600, 617 n.9 (4th Cir. 2015) (noting that using the lodestar method, "the district court multiplies the number of hours worked by a reasonable hourly rate. And it can then "adjust the lodestar figure using a 'multiplier' derived from a number of factors, such as the benefit achieved for the class and the complexity of the case") This multiplier is well-within the range approved in other settlements both in the Fourth Circuit and nationally.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court to grant this Motion for Final Approval of the Class Action Settlement, as well as their request for reasonable service awards and attorneys' fees.

Respectfully submitted,
**PLAINTIFFS**

Date: September 27, 2024          _____/s/_____

Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

Leonard A. Bennett, VSB #37523
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com

*Class Counsel*